SPN:RCH/HDM/CRH/MJM
F. #2018R01309

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -                          No. 21-CR-371 (BMC)

RASHID SULTAN RASHID AL MALIK
ALSHAHHI,
        also known as "Rashid Al Malik"
        and "Rashid Al-Malik,"
THOMAS JOSEPH BARRACK and
MATTHEW GRIMES

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X


### THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS


BREON PEACE
United States Attorney
Eastern District of New York


Ryan C. Harris
Samuel P. Nitze
Hiral D. Mehta
Craig R. Heeren
Assistant United States Attorneys

Matthew J. McKenzie
Trial Attorney
National Security Division
(Of Counsel)

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND AND PROCEDURAL POSTURE................................................ 3

LEGAL FRAMEWORK ...................................................................................................... 6

ARGUMENT........................................................................................................................ 8

I.      Count One and Count Two Allege All of the Necessary Elements of the Offenses ....... 8

    A.      The Indictment Sufficiently Alleges That the Defendants Acted as Agents of a
Foreign Government Without Prior Notice to the Attorney General and Conspired to Do the
Same ................................................................................................................................ 8

    B.      The Charges Are Consistent with Section 951's Purpose as a Broad Protection
Against Foreign Government Agent Activities ................................................................ 13

    C.      The Defendants Can Be Convicted of Violating Section 951 Through Aiding and
Abetting and *Pinkerton* Liability ................................................................................ 18

    D.      The Government Does Not Have to Allege a "Duty" to the UAE.............................. 21

    E.      Engaging in a "Legal Commercial Transaction" is an Affirmative Defense, and Does
Not Have to Be Alleged in the Indictment.................................................................... 26

    F.      Neither Section 951 Nor Due Process of Law Require the Indictment to Allege that
Grimes was Aware of Section 951's Notification Requirement........................................... 29

    G.      Grimes' Various Further Claims of Charging Defects in the Indictment are Meritless
........................................................................................................................................ 34

    H.      To the Extent the Defendants' Challenge the Sufficiency of the Government's
Evidence, Such Arguments Should be Rejected as Premature ............................................ 41

II.     The Indictment Adequately Alleges That Barrack Made Material False Statements and
Obstructed Justice .......................................................................................................... 43

    A.      Barrack's Claim that Counts Three through Seven Must be Dismissed for Failure to
Record His Voluntary Interview is Wrong ...................................................................... 43

    B.      Count Five Sufficiently Alleges that Barrack Knew that His Statement Was False.. 46

III.    Section 951 Does Not Violate the First Amendment ................................................... 48

    A.      Section 951 is Not Overbroad ............................................................................... 48

    B.      Section 951 Does Not Otherwise Violate the First Amendment .............................. 52

IV.     Section 951 Is Not Unconstitutionally Vague Pursuant to the Due Process Clause ..... 56

    A.      Section 951 Is Not Vague as Applied to this Case.................................................... 57

    B.      Grimes' Claims that the Department of Justice's FARA Advisory Opinions Should
Preclude his Prosecution are Unfounded ........................................................................ 64

    C.      Section 951 Is Not Vague on Its Face .................................................................... 73

V.      Section 951's Notification Requirement Does Not Violate Grimes's Right Against

Self-Incrimination under the Fifth Amendment ...................................................... 74

VI.    Section 951's Implementing Regulations are Not Invalid............................................ 77

VII.    The Defendant's Motion to Dismiss the Indictment Based on Alleged Improper Pre-Trial Delay Should Be Denied................................................................................ 79

    A.    The Defendant Has Failed to Demonstrate Actual and Substantial Prejudice ........... 80

    B.    The Defendant Has Failed to Establish That the Government Delayed the Indictment for An Improper Purpose ..................................................................................... 84

CONCLUSION.................................................................................................................. 87

**Cases**

Albertson v. Subversive Activities Control Board, 382 U.S. 70 (1965)...................................... 86

Alderman v. United States, 394 U.S. 165 (1969) ........................................................................ 26

Arizona v. Youngblood, 488 U.S. 51 (1988)................................................................................ 97

Attorney General v. Irish People, Inc., 684 F.2d 928 (D.C. Cir. 1982)...................................... 19

Blodgett v. Holden, 275 U.S. 142 (1927) .................................................................................... 66

Broadrick v. Oklahoma, 413 U.S. 601 (1973) ............................................................................ 56

Carter v. United States, 530 U.S. 255 (2000) ............................................................................. 35

Cheek v. United States, 498 U.S. 192 (1991) .............................................................................. 83

Citizens United v. Schneiderman, 882 F.3d 374 (2d Cir. 2018)................................................. 64

Connecticut Nat'l Bank v. Germain, 503 U.S. 249 (1992) ......................................................... 16

DeMichele v. Greenburgh Centr. Sch. Dist. No. 7, 167 F.3d 784 (2d Cir. 1999) ....................... 91

Dowling v. United States, 493 U.S. 342 (1990) .......................................................................... 97

Farrell v. Burke, 449 F.3d 470 (2d Cir. 2006) ........................................................................... 83

FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, (2000) .......................................... 88

Garner v. United States, 424 U.S. 648.......................................................................................... 85

Giboney v. Empire Storage & Ice Co., 336 U.S. 490 (1949) ...................................................... 60

Guzman v. United States, 02 CV 5672, 2003 WL 22023985, at *3 n. 4 (S.D.N.Y. Aug. 27, 2003)
.......................................................................................................................................... 41

Haig v. Agee, 453 U.S. 280 (1981)............................................................................................... 63

Hamling v. United States, 418 U.S. 87 (1974) ............................................................................. 7

Haynes v. United States, 390 U.S. 85 (1968) .............................................................................. 87

Hill v. Colorado, 530 U.S. 703 ............................................................................................... 67, 72

Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489 (1982) ................................ 66

Holder v. Humanitarian Law Project, 561 U.S. 1 (2010) ...................................................... 66, 84

Iannelli v. United States, 420 U.S. 770, 783 n. 15 (1975) .......................................................... 44

Insurance Company of North America v. Gee, 702 F.2d 411 (2d Cir. 1983).............................. 88

Lambert v. People of the State of California, 355 U.S. 225 (1957)............................................. 36

Leary v. United States, 395 U.S. 6 (1969).................................................................................... 87

Lederman v. New York City Dep't of Parks & Recreation, 731 F.3d 199 (2d Cir. 2013)........... 62

Lindauer, 2004 WL 2813168, at *4-5........................................................................................... 37

Marchetti v. United States, 390 U.S. 39 (1968) .......................................................................... 86

McKelvey v. United States, 260 U.S. 353, 357 (1922) ................................................................ 31

Meese v. Keene, 481 U.S. 465........................................................................................................ 19

New York v. Ferber, 458 U.S. 747 (1982).................................................................................... 59

New York Youth Club v. Town of Smithtown, 867 F. Supp. 2d 32 (E.D.N.Y. 2012)................. 61

Nichols v. Reno, 124 F.3d 1376 (10th Cir. 1997)......................................................................... 76

Novak v. United States, 07 CV 4361, 2009 WL 982429, at *4 (E.D.N.Y. Apr. 13, 2009).......... 40

Parker v. Levy, 417 U.S. 733 (1974) ........................................................................................... 66

Perez v. Hoblock, 368 F.3d 166 (2d Cir. 2004)............................................................................ 73

Pinkerton v. United States, 328 U.S. 640 (1946)................................................................... 22, 23

Rehaif v. United States, 139 S. Ct. 2191, 2194 (2019)................................................................ 38

Rubin v. United States, 449 U.S. 424, (1981) ............................................................................. 16

Scales v. United States, 367 U.S. 203 (1961) .............................................................................. 86

Sullivan v. United States, 348 U.S. 170 (1954) ................................................................... 75

Thibodeau v. Portuondo, 486 F.3d 61, (2d Cir. 2007) ........................................................ 72

Turner Broadcasting Sys., Inc. v. FCC, 520 U.S. 180 (1997) ............................................ 62

United States v. Abouammo 19-CR-621 (EMC) (N.D.Cal.) (ECF No. 53) ........................ 27

United States v. Alameh, 341 F.3d 167 (2d Cir. 2003) ....................................................... 97

United States v. Aleynikov, 676 F.3d 71 (2d Cir.2012) ........................................................ 8

United States v. Alfonso,
    143 F.3d 772 (2d Cir. 1998) .......................................................................................... 48

United States v. Amirnazmi, No. 08-CR-0429-01, 2009 WL 32481, at *3 (E.D. Pa. Jan. 5, 2009)
    .......................................................................................................................................... 13

United States v. Aref, 533 F.3d 72 (2d Cir. 2008) ............................................................... 63

United States v. Bailey, 444 U.S. 394 (1980) ...................................................................... 35

United States v. Bernstein, 533 F.2d 775 (2d Cir. 1976) ...................................................... 7

United States v. Birney, 686 F.2d 102 (2d Cir. 1982) ......................................................... 92

United States v. Bommarito, 524 F.2d 140 (2d Cir. 1975) .................................................. 44

United States v. Brandt, 546 F.3d 912   (7th Cir. 2008) ...................................................... 52

United States v. Bronson, 05 CR 714, 2007 WL 2455138, at *4 (E.D.N.Y. Aug. 23, 2007) ...... 47

United States v. Bryant, 976 F.3d 165, 172-73 (2d Cir. 2020) ........................................... 38

United States v. Burke, No. 09 Cr. 135 (SJ), 2011 WL 2609837,   at *7 (E.D.N.Y. July 1, 2011)
    ...................................................................................................................................... 100

United States v. Busher, 817 F.2d 1409 (9th Cir. 1987) ...................................................... 76

United States v. Bustos de la Pava, 268 F.3d 157 (2d Cir. 2001) ......................................... 6

United States v. Butenko, 384 F.2d 554, 565 (3d Cir. 1967) ............................................... 26

United States v. Caceres, 440 U.S. 741 (1979) .................................................................... 76

United States v. Campa 529 F.3d 980 (11th Cir. 2008) .................................................. 34, 35

United States v. Carbonaro, No. 02 Cr. 743 (RCC), 2004 WL 2222145 (S.D.N.Y. Sept. 30, 2004)
    ...................................................................................................................................... 100

United States v. Chiarizio, 388 F. Supp. 858, 862 (D. Conn.), aff'd, 525 F.2d 289 (2d Cir. 1975)
    ........................................................................................................................................ 45

United States v. Chung, 659 F.3d 815 (9th Cir. 2011) ........................................................ 24

United States v. Clifford, 426 F. Supp. 696 (E.D.N.Y. 1976) ............................................. 51

United States v. Cooper, No. 17-CR-296 (PKC), 2020 WL 2307646 (E.D.N.Y., 2020) ............. 48

United States v. Cornielle, 171 F.3d 748 (2d Cir. 1999) ..................................................... 92

United States v. Craveiro, 907 F.2d 260 (1st Cir.1990) ...................................................... 75

United States v. Delacruz, 970 F. Supp. 2d 199 (S.D.N.Y. 2013) ...................................... 98

United States v. Desposito, 704 F.3d 221 (2d Cir. 2013) .................................................... 73

United States v. DiScala, 14 CR 399, 2018 WL 1187394, at *25 (E.D.N.Y. Mar. 6, 2018) ........ 47

United States v. Dornau, 356 F. Supp. 1091 (S.D.N.Y. 1973) ............................................ 95

United States v. Dumeisi, 424 F.3d 566 (7th Cir. 2005) ................................................ 10, 27

United States v. Dumeisi, No. 03 CR 664-1, 2003 WL 22757747, at *2 (N.D. Ill. Nov. 20, 2003)
    .................................................................................................................................. 13, 66

United States v. Duran, 596 F.3d 1283 (11th. Cir. 2010) ............................................. passim

United States v. Duran, No. 07-20999-CR, 2008 WL 11333989, at *2 (S.D. Fla. Oct. 10, 2008),
    aff'd 596 F.3d 1283 (11th Cir. 2010) ............................................................................. 32

United States v. Elsbery, 602 F.2d 1054 (2d Cir. 1979) ...................................................... 92

iv

United States v. Ewell, 383 U.S. 116 (1966) .............................................................. 99

United States v. Farhane, 634 F.3d 127 (2d Cir. 2011) ............................................. 56

United States v. Frank, 520 F.2d 1287, (2d Cir. 1975) .............................................. 44

United States v. Fruchter, 104 F. Supp. 2d 289 (S.D.N.Y. 2000) ............................... 9

United States v. Full Play Grp., S.A., 15 CR 252, 2021 WL 5038765, at *9 (E.D.N.Y. Oct. 29, 2011) .................................................................................................................. 41

United States v. Gagliardi, 506 F.3d 140 (2d Cir. 2007) ........................................... 60

United States v. Gilbert, 266 F.3d 1180 (9th Cir. 2001) ............................................ 93

United States v. Greer, 956 F. Supp. 525 (D. Vt. 1997) ............................................. 95

United States v. Harrison, 764 F. Supp. 29 (S.D.N.Y. 1991) ...................................... 96

United States v. Heine, 151 F.2d 813 (2d Cir. 1945) .................................................. 24

United States v. Helmich, 704 F.2d 547 (11th Cir. 1983) ........................................... 46

United States v. Henderson, 337 F.3d 914 (7th Cir. 2003) .......................................... 92

United States v. Hill, 279 Fed. App'x 90 (2d Cir. 2008) ....................................... 22, 40

United States v. Hillegas, 578 F.2d 453 (2d Cir. 1978) .............................................. 99

United States v. Hoo, 825 F.2d 667 (2d Cir. 1987) .................................................... 98

United States v. Horvath, 492 F.3d 1075 (9th Cir. 2007) ........................................... 51

United States v. Hung 629 F.2d 908, 912 (4th Cir. 1980) ..................................... 27, 88

United States v. Iannelli, 461 F.2d 483 (2d Cir. 1972) ............................................... 93

United States v. Int'l Mins. & Chem. Corp., 402 U.S. 558 (1971) ............................. 35

United States v. Ji Chaoqun, No. 18 CR 611, 2020 WL 1689826, at *5 (N.D. Ill. Apr. 7, 2020) ................................................................................................... 12, 58, 65, 69

United States v. Hu Ji, et al., 21 CR 265 (E.D.N.Y. Feb. 28, 2022) ..................... 12, 47, 49

United States v. Kerik, 615 F. Supp. 2d 256 (S.D.N.Y. 2009) ..................................... 6

United States v. Khan, 18 CR 195, 2020 WL 7767890, at *2 (D. Conn. Dec. 30, 2020) ........... 52

United States v. King, 560 F.2d 122 (2d Cir. 1977) ................................................... 94

United States v. Lange, 10 CR 968, 2012 WL 511448, at *1 (E.D.N.Y. Feb. 15, 2012) .......... 47

United States v. LaSpina, 299 F.3d 165, 177 (2d Cir. 2002) ................................. 11, 41

United States v. Latchin, 554 F.3d 709 (7th Cir. 2009) .............................................. 37

United States v. Latchin, No. 04-CR-661 (RRP), 2005 WL 8160638, at *2 (N.D. Ill. July 26, 2005) ................................................................................................... 13, 65

United States v. Laurenti, 581 F.2d 37 (2d Cir. 1978) ............................................... 99

United States v. Lawson, 683 F.2d 688 (2d Cir. 1982) .............................................. 92

United States v. Lee, 274 F.3d 485 (8th Cir. 2001) ............................................... 75, 76

United States v. Lemay, No. 20 CR 235, 2022 WL 125743, at *2 (E.D.N.Y. Jan. 13, 2022) ...... 42

United States v. Lindauer, No. 03 CR. 807 (MBM), 2004 WL 2813168, at *1 (S.D.N.Y. Dec. 6, 2004) .................................................................................................................. 12

United States v. Long, 697 F. Supp. 651 (S.D.N.Y. 1988) .......................................... 95

United States v. Lovasco, 431 U.S. 783 (1977) .......................................................... 97

United States v. Marion, 404 U.S. 307 (1971) ........................................................... 91

United States v. Martinez, No. 94 Cr. 219 (RPP), 1995 WL 10849, at *4 (S.D.N.Y. Jan. 12, 1995) .................................................................................................................. 98

United States v. Mayo, 705 F. 2d 62, 74-75 (2d Cir. 1983) ....................................... 32

United States v. Merrett, 9 F.4th 713, 717-18 (8th Cir. 2021) .................................... 38

United States v. Metter, 860 F. Supp. 2d 205 (E.D.N.Y. 2012) .................................. 47

United States v. Miley, 513 F.2d 1191 (2d Cir.) (1975) ............................................................ 22

United States v. Mucciante, 21 F.3d 1228 (2d Cir. 1994) ........................................................ 21

United States v. Nunez, 03 CR 670, 2006 WL 1233940, at *5-6 (S.D.N.Y. May 6, 2006) ......... 44

United States v. Nunez, 03 CR 670, 2006 WL 1233940, at *8 (S.D.N.Y. May 6, 2006) ........... 45

United States v. Nyenekor, 784 Fed. App'x 810 (2d Cir. 2019) ............................................... 22

United States v. O'Brien, 391 U.S. 367 (1968) ....................................................................... 62

United States v. Parkes, 497 F.3d 220 (2d Cir. 2007) ............................................................. 22

United States v. Perez, 575 F.3d 164 (2d Cir. 2009) ................................................................ 9

United States v. Pimenta, No. 14-CR-649, 2015 WL 6502098, *3-4 (D.N.J. Oct. 27, 2015) ...... 14

United States v. Poindexter, 951 F.2d 369 (D.C. Cir. 1991) ................................................... 51

United States v. Poutre, 646 F.2d 685 (1st Cir. 1980) ............................................................ 51

United States v. Rafiekian, 991 F.3d 529 (4th Cir. 2021) ....................................................... 17

United States v. Rafiekian, No. 18-CR-457, 2019 WL 3021769, at *13-14 (E.D. Va. 2019) ...... 12

United States v. Rahman, No. S3 93 CR. 181 (MBM), 1994 WL 388927, at *1–2 (S.D.N.Y. July
     22, 1994) ....................................................................................................................... 58

United States v. Reale, No. S4 96 CR. 1069 (DAB), 1997 WL 580778 (S.D.N.Y. Sept.17, 1997)8

United States v. Ricard, 922 F.3d 639 (5th Cir. 2019) ............................................................ 53

United States v. Ricco, 549 F.2d 264 (2d Cir. 1977) ............................................................... 91

United States v. Rivera, et al., No. 13-CR-149 (KAM) (E.D.N.Y.) ............................................. 28

United States v. Rodriguez, 320 F. App'x 105 (2d Cir. 2009) .................................................. 23

United States v. Royal, 731 F.3d 333 (4th Cir. 2013) ............................................................. 31

United States v. Rubin, 609 F.2d 51 (2d Cir. 1979) ................................................................ 91

United States v. Rybicki, 354 F.3d 124 (2d Cir. 2003) ............................................................ 68

United States v. Salerno, 481 U.S. 739 (1987) ....................................................................... 67

United States v. Sampson, 898 F.3d 270 (2d Cir. 2018) ........................................................... 9

United States v. Scarpa, 913 F.3d 993 (2d Cir. 1990) ............................................................ 91

United States v. Schulte, 436 F. Supp. 3d 747 (S.D.N.Y. 2020) .............................................. 63

United States v. Scotti, 47 F.3d 1237, 1244 (2d Cir. 1995) ..................................................... 35

United States v. Snyder, 668 F.2d 686 (2d Cir. 1982) ............................................................ 93

United States v. Sorich, 523 F.3d 702 (7th Cir. 2008) ............................................................ 50

United States v. Spears, 159 F.3d 1081 (7th Cir. 1999) .......................................................... 93

United States v. Sperling, 560 F.2d 1050 (2d Cir. 1977) ......................................................... 44

United States v. Sprouts, 282 F.3d 1037 (8th Cir. 2002) ........................................................ 93

United States v. Stewart, 590 F.3d 93, 111 (2d Cir. 2009) ...................................................... 34

United States v. Subeh, 04 CR 6077, 2006 WL 219968, at *7 n.11 (W.D.N.Y. Jan. 24, 2006) .. 51

United States v. Swinton, 797 F. App'x 589, 598 (2d Cir. 2019) .............................................. 39

United States v. Szuhsiung Ho, No. 3:16-CR-46 (D. Tenn. Nov. 30, 2016) (ECF No. 79) ......... 13

United States v. Tanu, 589 F.2d 82 (2d Cir. 1978) ................................................................. 98

United States v. Trevino, 989 F.3d 402, 405 (5th Cir. 2021) ................................................... 38

United States v. Turner, 13 CR 572, 2014 WL 4699708, at *2 (N.D. Ill. Sept. 22, 2014) ......... 34

United States v. Ulbricht, 14 CR 68, 2014 WL 5410049, at *2 (S.D.N.Y. Oct. 24, 2014) .......... 39

United States v. Valona, 834 F.2d 1334 (7th Cir. 1987) ......................................................... 96

United States v. Velastegui, 199 F.3d 590 (2d Cir. 1999) ....................................................... 16

United States v. Walden, 411 F.2d 1109 (4th Cir.) ................................................................. 85

United States v. Walker, 796 F.2d 43, 47 (4th Cir. 1986) ........................................................ 44

<u>United States v. Watson</u>, 599 F.2d 1149 (2d Cir. 1979) ............................................. 98

<u>United States v. Williams</u>, 553 U.S. 285 (2008) ......................................................... 84

<u>United States v. Wright</u>, 343 F.3d 849 (6th Cir. 2003) ............................................... 92

<u>United States v. Wydermyer</u>, 51 F.3d 319 (2d Cir. 1995) ........................................... 7

<u>United States v. Yannotti</u>, 541 F.3d 112 (2d Cir. 2008) .......................................... 7, 9

<u>United States v. Ying Lin</u>, No. 15-CR-601 (DLI), 2018 WL 3416524, (E.D.N.Y. July 11, 2018)

.......................................................................................................................... passim

<u>United States v. Yuan Li</u>, 18 CR 302 (BMC), 2020 WL 639,3038, at \*6 (E.D.N.Y. Nov. 2, 2020)

................................................................................................................................. 41

<u>Virginia v. Hicks</u>, 539 U.S. 113 (2003) ...................................................................... 57

<u>Wong Tai v. United States</u>, 273 U.S. 77 (1927) ........................................................... 8

**Statutes**

18 U.C.C. § 921(a)(3) .................................................................................................. 33

18 U.S.C. § 1001(a)(2) .................................................................................................. 6

18 U.S.C. § 1512(c)(2) .................................................................................................. 6

18 U.S.C. § 2 ......................................................................................................... passim

18 U.S.C. § 2113(a) .................................................................................................... 35

18 U.S.C. § 371 ............................................................................................................. 6

18 U.S.C. § 922(g) ...................................................................................................... 38

18 U.S.C. § 951 .................................................................................................... passim

22 U.S.C. § 233 ..................................................................................................... 24, 25

22 U.S.C. §§ 611(c), 612(a) ....................................................................................... 20

28 C.F.R. § 73 ................................................................................................... 25, 89, 90

<u>PRELIMINARY STATEMENT</u>

The defendants Thomas J. Barrack and Matthew Grimes (together, the "Defendants") move to dismiss the Indictment on several grounds, none of which has merit. <u>See</u> ECF Nos. 67 (Barrack Mot.) and 69 (Grimes Mot.). Many of the Defendants' arguments, though framed as challenges to purported defects in the pleadings, move well beyond the language of the charging instrument to advance factual disputes not properly entertained in a motion to dismiss and to be resolved, ultimately, by a jury.

Barrack argues that: (1) the Indictment is insufficiently pled because it fails to allege that he owed a duty to a foreign sovereign; (2) the false statements charges must be dismissed because the government purportedly failed to make an adequate record of the statements at issue; and (3) the Indictment must be dismissed in its entirety based on an alleged improper delay in bringing the charges.

First, Section 951 does not require the government to plead a "duty" to a foreign sovereign, nor has Barrack identified any legal basis for this claim. Second, the government did make a fulsome record of Barrack's false statements, in lengthy contemporaneous notes and in a formal Federal Bureau of Investigation ("FBI") report—which courts have routinely upheld as sufficient in false statement cases. Third, there was no improper delay in bringing charges here, nor is there any legal basis for dismissing an Indictment given the lack of any actual prejudice.

Grimes argues that: (1) the Indictment fails adequately to allege facts sufficient to meet various elements of the charged offenses, including with respect to the <u>actus</u> <u>reus</u>, <u>mens</u> <u>rea</u>, and venue, and is duplicitous; (2) Section 951 is unconstitutional because it infringes on his rights of free expression under the First Amendment; (3) the notification requirement in Section 951

violates his right against self-incrimination under the Fifth Amendment; and (4) he cannot be prosecuted under Section 951 because the implementing regulations are invalid.

First, the Indictment sufficiently pleads that Grimes agreed to act as an agent of the United Arab Emirates (the "UAE"), did act as an agent, did so in the Eastern District of New York and had the requisite intent for Section 951 liability, both substantively and conspiratorially. Nor is the Indictment duplicitous or invalid based on alleged infirmities in its implementing regulations. Second, Section 951 does not regulate speech, only conduct, and thus, does not implicate the First Amendment. Even if Section 951 regulated speech—it does not—the statute is valid because it is unquestionably content-neutral and advances important government interests. Third, the notification requirement does not infringe on Grimes' Fifth Amendment rights as it is a neutral notification requirement and does not target a class of persons engaging in illegal conduct. Fourth, Section 951's plain language and implementing regulations are complementary and proscribe the same conduct, and thus, the regulations are not void.

Finally, the Defendants' constitutional arguments—that Section 951 is unconstitutionally vague or overbroad—fare no better. These challenges rest on a misframing of the allegations and a misreading of the applicable case law and constitutional doctrines, which make clear that Section 951 provides sufficient notice that the Defendants' conduct is proscribed and that the pending prosecution of their conduct does not infringe on their rights of free expression or against self-incrimination.

Accordingly, and as set forth in detail below, the Court should deny the Defendants' motions in their entirety.

<u>FACTUAL BACKGROUND AND PROCEDURAL POSTURE</u>

As alleged in the Indictment, Barrack was the Executive Chairman of a global investment management firm ("Company A") and an informal advisor to the presidential campaign of Donald J. Trump (the "Trump Campaign") and, subsequently, the Trump Administration.   <u>See</u> Indictment ¶ 2.   Grimes reported directly to Barrack at Company A, first as an Analyst and then later as a Vice President.   <u>See</u> Indictment ¶ 3.

During the pendency of the Trump Campaign, Barrack and Grimes, working through Al Malik, made contact with senior UAE national security officials and, at their direction, agreed to influence public opinion and the foreign policy positions of the Trump Campaign, relay non-public information about the foreign policy positions and decisions of the Trump Campaign, develop a backchannel line of communication with the Trump Campaign on behalf of the UAE government, and design plans to increase the UAE's political influence and promote its foreign policy preferences.   <u>See id.</u> ¶ 13.   As part of these efforts: (a) Barrack flew to Abu Dhabi and met directly with senior UAE national security officials in May 2016, <u>see id.</u> ¶ 16; (b) Barrack provided UAE officials with a non-public draft of a speech to be delivered by then-candidate Trump on U.S. energy policy, <u>see id.</u> ¶ 18; (c) Barrack and Grimes inserted UAE-favored language into the draft speech, <u>see id.</u> ¶ 18-19; (d) Barrack promoted the UAE and its foreign policy interests during media appearances after soliciting direction from UAE officials through Al Malik, <u>see id.</u> ¶¶ 24(a)-(g); (e) at the direction of UAE officials, Barrack and Grimes drafted a strategy for the UAE to promote its foreign policy interests and increase its political influence in the United States, <u>see id.</u> ¶¶ 25-34; (f) Barrack and Grimes flew to Morocco and met with senior UAE national security officials and a senior official from the Kingdom of Saudi Arabia ("KSA"), a close ally of the UAE, <u>see id.</u> ¶ 31; (g) Barrack and Grimes downloaded a secure messaging application on a

dedicated cellular telephone at the direction of a UAE national security official to allow Barrack to communicate directly with senior UAE officials, see id. ¶¶ 35-42; (h) Grimes provided UAE officials with an advanced draft of an Op-Ed authored by Barrack that praised UAE officials and received feedback, talking points, and language changes for incorporation into the Op-Ed, see id. ¶¶ 43-50; (i) Barrack agreed to provide non-public information about potential appointments by President-Elect Trump to Cabinet-level positions to a senior UAE official, see id. ¶ 54; and (j) Barrack and Grimes flew to Abu Dhabi in December 2016 and met with senior UAE officials where they discussed a plan to influence U.S. foreign policy in the first 100 days, the first six months, year and the entire four years of the incoming Trump Administration, see id. ¶ 61.

The Defendants' work for the UAE continued after the inauguration of President Trump in January 2017. As part of these continued efforts: (a) Grimes agreed to seek to list the Muslim Brotherhood as a foreign terrorist organization at Al Malik's direction, see Indictment ¶ 65; (b) Barrack and Grimes arranged for President Trump to speak on the telephone with a senior UAE official, see id. ¶ 66; (c) Barrack "forced" the White House to treat a senior KSA official, who was a close ally to the UAE, at higher level of protocol, "programmed" White House officials regarding the importance of the senior KSA official and arranged for another White House official to speak on a telephone call with a senior UAE official, all during a White House visit by the senior KSA official, see id. ¶ 67; (d) Barrack and Grimes agreed to advocate for a UAE-favored individual to be appointed to a senior position in the Trump Administration, see id. ¶¶ 71-73; (e) Barrack divulged non-public information to Al Malik about his potential appointment to a senior position in the Trump Administration and discussed how such an appointment would give the UAE more power and allow Barrack to deliver more for the UAE, see id. ¶ 74; (f) Barrack agreed to arrange for certain White House officials to meet with senior UAE officials during a

White House visit in May 2017 and then to provide non-public information about the White House visit to Al Malik, see id. ¶ 76-78; (g) Barrack advocated for a former White House official to meet with a senior UAE official, see id. ¶ 82; and (h) Barrack provided non-public information to Al Malik and UAE officials about internal discussions in the Trump Administration concerning the blockade of Qatar by the UAE and other Middle Eastern governments, see id. ¶¶ 83, 87. Barrack, Grimes and Al Malik never notified the Attorney General that they were acting as agents of the UAE government. See id. ¶ 88.

After Barrack subsequently became aware that he was being investigated by the FBI for his actions at the behest of the UAE, Barrack, through counsel, contacted the government and affirmatively requested an interview. After the government consented to the request, the interview was scheduled for June 20, 2019, at the law firm offices of Barrack's counsel in Washington, D.C. FBI special agents traveled from New York to Washington, D.C. to attend the interview. During the interview, Barrack was represented by multiple attorneys and was advised that the interview was entirely voluntary and that he was free to end the interview at any time. During the interview, an FBI special agent took detailed, contemporaneous notes, totaling more than 50 pages. Barrack's counsel also took contemporaneous notes during the interview, but did not electronically record or transcribe the interview, nor did Barrack ever request that the interview be so recorded or transcribed, despite being the party that requested the interview and set its date, time, and location.

During the interview, Barrack repeatedly and materially lied about the events and activities that underlie Count One and Count Two of the Indictment, including, but not limited to, making misstatements about whether Al Malik proffered policies or requests to Barrack on behalf of the UAE, whether he was ever asked to download a messaging application or acquire a dedicated

telephone to communicate with UAE officials, whether he facilitated communications between President-Elect Donald Trump and UAE officials after the 2016 Presidential Election, and whether he provided any guidance or input in arranging a former U.S. official's meeting with a senior UAE official. Indictment ¶¶ 91-92, 98-107.

On July 16, 2021, a grand jury sitting in the Eastern District of New York returned an indictment charging Barrack, Grimes and Al Malik with one count of acting as agents of the UAE without prior notice to the Attorney General, in violation of 18 U.S.C. §§ 951(a) and 2, and one count of conspiring to do the same, in violation of 18 U.S.C. § 371. Barrack was also charged with one count of obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2), and four counts of making material false statements, in violation of 18 U.S.C. § 1001(a)(2).

LEGAL FRAMEWORK

The Federal Rules of Criminal Procedure require only that an indictment contain a "plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). Motions to dismiss indictments are disfavored and must satisfy a high standard. See United States v. Bustos de la Pava, 268 F.3d 157, 165 (2d Cir. 2001) ("[D]ismissal of an indictment is an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights."); United States v. Kerik, 615 F. Supp. 2d 256, 262 (S.D.N.Y. 2009) ("A defendant seeking to dismiss counts under Rule 12 must satisfy a high standard.").

It is well-established that "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." United States v. Alfonso, 143 F.3d 772, 776 (2d. Cir. 1998) (quoting

Hamling v. United States, 418 U.S. 87, 117 (1974)).  The Second Circuit has held that an indictment that tracks the language of the statute is sufficient to meet these notice requirements. See United States v. Yannotti, 541 F.3d 112, 127 (2d Cir. 2008) (to withstand a motion to dismiss, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."); United States v. Bernstein, 533 F.2d 775, 786 (2d Cir. 1976) (observing that the Second Circuit has "consistently sustained indictments" that tracked the applicable statutory language and described the time and place in "approximate terms.").  In the context of a conspiracy charge, "[i]t is well settled that in an indictment for conspiring to commit an offense—in which conspiracy is the gist of the crime—it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy."  United States v. Wydermyer, 51 F.3d 319, 325 (2d Cir. 1995) (quoting Wong Tai v. United States, 273 U.S. 77, 81 (1927)). "The rationale is that the crime of conspiracy is complete whether or not the substantive offense which was its object was committed. The indictment need only put the defendants on notice that they are being charged with a conspiracy to commit the underlying offense."  Wydermyer, 51 F.3d at 326 (internal citation omitted).

Federal Rule of Criminal Procedure 12(b) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).  On a pre-trial motion to dismiss, the court must accept all factual allegations in the indictment as true, and "the sufficiency of the evidence is not appropriately addressed."  Alfonso, 143 F.3d at 776-77.  In other words, Rule 12 authorizes defendants to challenge the lawfulness of a prosecution on purely legal, as opposed to factual, grounds.  See United States v. Aleynikov, 676 F.3d 71, 75–76 (2d Cir. 2012) ("[A] federal

indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute.").

Thus, a defendant's factual arguments challenging facially valid pleadings do not justify pre-trial dismissal of the indictment. The government is entitled to marshal and present its evidence at trial and, if warranted, have its sufficiency tested by a motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. A motion to dismiss a properly pled indictment "confuse[s] standards of pleading with standards of proof." United States v. Reale, No. S4 96 CR. 1069 (DAB), 1997 WL 580778, at *7 (S.D.N.Y. Sept. 17, 1997); United States v. Perez, 575 F.3d 164, 166 (2d Cir. 2009) (defendants had no basis to challenge "sufficiency of the indictment before trial because it met the basic pleading requirements"); United States v. Sampson, 898 F.3d 270, 279-80 (2d Cir. 2018) (explaining that there is no "analogue for summary judgment" in federal criminal procedure, and therefore "although a judge may dismiss a civil complaint pretrial for insufficient evidence, a judge generally cannot do the same for a federal criminal indictment.")

<u>ARGUMENT</u>

I.  <u>Count One and Count Two Allege All of the Necessary Elements of the Offenses</u>

A.  <u>The Indictment Sufficiently Alleges That the Defendants Acted as Agents of a Foreign Government Without Prior Notice to the Attorney General and Conspired to Do the Same</u>

The Defendants both move to dismiss Counts One and Two, charging substantive and conspiratorial violations of Section 951, respectively, for failure to state an offense. Their arguments are without merit. An indictment need not include all the government's factual evidence. So long as it tracks the language of the statute and states the approximate time and

place of the alleged crime, an indictment is sufficient to survive a motion to dismiss for failure to state an offense.   See Yannotti, 541 F.3d at 127.

Section 951 states that it is a crime for: "Whoever, other than a diplomatic or consular officer or attaché, acts in the United States as an agent of a foreign government without prior notification to the Attorney General."   18 U.S.C. § 951(a).   The elements of an offense under Section 951 are (1) the defendant acted in the United States as an agent of a foreign government; (2) the defendant failed to notify the Attorney General of the United States that he would be acting in the United States as an agent of the foreign government prior to so acting; and (3) the defendant acted knowingly.   See id.; United States v. Dumeisi, 424 F.3d 566, 581 (7th Cir. 2005) ("Dumeisi II"); United States v. Ying Lin, No. 15-CR-601 (DLI), 2018 WL 3416524, at *3 (E.D.N.Y. July 11, 2018).

The Indictment alleges the elements of a Section 951 offense:

> In or about and between April 2016 and April 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants RASHID SULTAN RASHID AL MALIK ALSHAHHI, also known as "Rashid Al Malik" and "Rashid Al-Malik," THOMAS JOSEPH BARRACK and MATTHEW GRIMES, together with others, did knowingly and intentionally act in the United States as agents of a foreign government, to wit: the United Arab Emirates, without prior notification to the Attorney General of the United States, as required by law.

Indictment ¶ 94.   Count Two similarly alleges all the necessary elements of a conspiracy to commit a Section 951 offense:

> In or about and between April 2016 and April 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants RASHID SULTAN RASHID AL MALIK ALSHAHHI, also known as "Rashid Al Malik" and "Rashid Al-Malik," THOMAS JOSEPH BARRACK and MATTHEW GRIMES, together with others, did knowingly and

9

> intentionally conspire to act in the United States as agents of a
> foreign government, to wit: the United Arab Emirates, without prior
> notification to the Attorney General of the United States as required
> by law, contrary to Title 18, United States Code, Section 951(a).

Indictment ¶ 96.   Count Two also alleges dozens of overt acts committed in furtherance of the conspiracy.   See id. at ¶ 97(a) – (i).

Count One tracks the language of Section 951 and includes the approximate time and place of the charged crime.   It alleges that the Defendants acted as agents of a foreign government, that they acted in the United States, that they acted knowingly, and that they failed to notify the Attorney General prior to acting.   Moreover, Count One identifies the foreign government at issue (the UAE), the dates in which the Defendants acted on behalf of the UAE (April 2016 through April 2018), and the location of their acts (within the Eastern District of New York and elsewhere).   This is all that is required under the law.

Count Two alleges that the Defendants conspired to commit this underlying offense and identifies overt acts in furtherance of the offense.   To state a conspiracy, an indictment that alleges an agreement to violate another law is sufficient.   See United States v. LaSpina, 299 F.3d 165, 177 (2d Cir. 2002) (citation omitted) ("[I]n an indictment for conspiring to commit an offense—in which the conspiracy is the gist of the crime—it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy.").   That allegation was made here, and therefore this charge is valid as well.

Consistent with this well-settled law on pleading, every court to consider a motion to dismiss a Section 951 offense based on alleged defects in the indictment or purported vagueness in the charging language has denied such a motion.   See Memorandum and Order, United States v. Hu Ji, et al., 21 CR 265 (E.D.N.Y. Feb. 28, 2022), Dkt. No. 123; Ying Lin, 2018 WL 3416524,

at *4-5 (denying motion to dismiss Section 951 offense); United States v. Lindauer, No. 03 CR. 807 (MBM), 2004 WL 2813168, at *1 (S.D.N.Y. Dec. 6, 2004) (denying motion to dismiss Section 951 substantive and conspiracy offenses where indictment was charged "in bare-bones fashion"); United States v. Ji Chaoqun, No. 18 CR 611, 2020 WL 1689826, at *5 (N.D. Ill. Apr. 7, 2020) (denying motion to dismiss Section 951 substantive count because "the indictment as a whole sets forth the elements of the offense, fairly informs Defendant of the nature of the charges against him, and enables him to plead an acquittal or conviction as a bar against future prosecutions for the same offense"); United States v. Rafiekian, No. 18-CR-457, 2019 WL 3021769, at *13-14 (E.D. Va. 2019) (denying motion to dismiss Section 951 substantive and conspiracy charges); United States v. Amirnazmi, No. 08-CR-0429-01, 2009 WL 32481, at *3 (E.D. Pa. Jan. 5, 2009) (denying motion to dismiss Section 951 substantive and conspiracy charges where "the allegations are sufficient for [the defendant] not only to invoke double jeopardy but also to prepare his defense");[1] United States v. Latchin, No. 04-CR-661 (RRP), 2005 WL 8160638, at *2 (N.D. Ill. July 26, 2005) (denying motion to dismiss Section 951 charge because "the indictment fairly notifies [the defendant] of the nature of the charge against him and . . . there is no basis for dismissing Count Three on vagueness grounds") (citing Fed. R. Crim. P. 7(c)); United States v. Dumeisi, No. 03 CR 664-1, 2003 WL 22757747, at *2 (N.D. Ill. Nov. 20, 2003) ("Dumeisi I") (denying motion to dismiss Section 951 charge because the indictment "tracks the language of the statute and specifically identifies nine different ways in which [the defendant] allegedly violated the statute");

---

[1] The court in Amirnazmi incorrectly referred to these counts as violations of the Foreign Agent Registration Act ("FARA"), but the indictment makes clear that these counts charged violations of Section 951, and a conspiracy to violate Section 951 pursuant to 18 U.S.C. § 371.

United States v. Szuhsiung Ho, No. 3:16-CR-46 (D. Tenn. Nov. 30, 2016) (ECF No. 79) (Report & Recommendation) (denying motion to dismiss Section 951 conspiracy charge).

The 46-page Indictment goes far beyond the limited legal requirements of tracking the statutory language and identifying the time and place of the offense. But that is of no moment for these purposes. Count One meets the Second Circuit requirement to "track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime," and therefore adequately states an offense. Alfonso, 143 F.3d at 776. Indeed, the charging language in the Ying Lin indictment found to be sufficient by Judge Irizarry is materially identical to the language in the Indictment in this case. See Superseding Indictment, Ying Lin, No. 15-CR-601, ¶ 38 (ECF No. 87).

In support of his argument that the Indictment fails to state an offense, Barrack cites United States v. Pimenta and United States v. Webb, but those cases are inapposite.

Pimenta, a bank bribery case, involved a dispute over the meaning of an "agent" of a financial institution in that statute, which notably (and unlike Section 951) contained no definition for the term. See No. 14-CR-649, 2015 WL 6502098, *3-4 (D.N.J. Oct. 27, 2015). The court concluded that, based on the government's allegations, the person identified could not legally be an agent of a financial institution under that statute. See id. at *5 ("[T]he Government fails to offer any authority suggesting that controlling an account into which a bank sends loan funds–and closing mortgage loans for the relevant properties–makes the individual who controls the account an agent of the bank under [the relevant statute]."). The issue, therefore, was not the failure of the Indictment to allege sufficient facts to demonstrate agency, but that, as a matter of law, the defendant in that case could not constitute an agent of a financial institution under that statute. By contrast, Section 951(d) expressly defines the term "agent of a foreign government,"

the facts alleged here are sufficient to meet that statutory definition of "agent," as has been true in several other cases, and Barrack cites no authority for the claim that Barrack, like the defendant in Pimenta, cannot be an agent of the UAE as a matter of law.

In Webb, the government failed to allege several essential elements of both wire fraud and Travel Act offenses. See 24 F. Supp. 3d 432, 438-41 (M.D. Pa. 2014) (finding that the government failed to allege the use of interstate wires for the wire fraud count, and, among other things, "a subsequent overt act in furtherance of the unlawful activity" as required under the Travel Act). No such defects exist here, as the Indictment alleges all the essential elements.[2]

B.      The Charges Are Consistent with Section 951's Purpose as a Broad Protection Against Foreign Government Agent Activities

The Defendants each advance arguments relating to the history, purpose, and scope of Section 951 to bolster their claims. Setting aside that the Court need not wade into the history or purpose of a statute to find the Indictment valid, the Defendants' interpretation of Section 951 is wrong.

As an initial matter, statutory construction begins with the plain text and, if that text is unambiguous, it usually ends there as well. See United States v. Velastegui, 199 F.3d 590, 594 (2d Cir. 1999) (citations omitted), cert. denied, 531 U.S. 823 (2000); Connecticut Nat'l Bank v.

---

[2]      Notably, both cases that Barrack relies upon have been rarely cited by other courts and instead have been criticized for being contrary to other legal authorities. See, e.g., United States v. Sittenfeld, 522 F. Supp. 3d 353, 366-67 (S.D. Ohio 2021) (denying motion to dismiss and noting that both Pimenta and Webb are "inconsistent with the overwhelming weight of Sixth Circuit authority" on the sufficiency of an indictment, and "contrary to" a Third Circuit decision on the sufficiency of an indictment that both cases "purported to apply"). The Sixth Circuit authority that Sittenfeld relied upon in rejecting the application of these cases is substantially the same as the legal standard in the Second Circuit. See Sittenfeld, 522 F. Supp. 3d at 363-64 (citing Supreme Court and Sixth Circuit decisions for the applicable legal standard and explaining that "the only additional information the specific offense requirement mandates is some indication of the relevant time period—when the alleged criminal conduct occurred").

_Germain_, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" (quoting _Rubin v. United States_, 449 U.S. 424, 430 (1981))).  Here, the plain language of Section 951 prohibits any affirmative conduct within the United States taken as an agent of a foreign government or official without notifying the Attorney General.

        The purpose and legislative history of Section 951 also supports this reading of the statute.  Section 951 arose out of concerns after World War I about foreign governments' attempts to surreptitiously gather information from the United States, as well as those governments' attempts to use U.S.-based individuals to influence the U.S. government, the U.S. media, and the U.S. polity.  See _United States v. Duran_, 596 F.3d 1283, 1294 (11th. Cir. 2010) ("Congress' original intent in 1917 was national security, defense and targeting espionage and subversive acts"); see also David Aaron, _18 U.S.C. Section 951 and the Non-Traditional Intelligence Actor Threat from the First World War to the Present Date_, 45 Seton Hall Leg. J. 1, 6-17 (2021) (describing activity of German government that gave rise to Section 951 and explaining that the foreign government "had several objectives," including "propaganda and perception management").  Much of this conduct, while contrary to the national security interests of the U.S. government, was nonetheless outside the scope of more traditional espionage and statutes that prohibit such conduct.  Accordingly, the statute that would become Section 951 was deliberately designed to be a "catch-all statute that would cover all conduct taken on behalf of a foreign government."  _Duran_, 596 F.3d at 1295 (emphasis added); _United States v. Rafiekian_, 991 F.3d 529, 544 (4th Cir. 2021) (same).  Thus, Section 951 does not, and has never been intended, to "require that the charged conduct involve 'espionage or traditional notions of spying and

14

subversive activity,'" as the Defendants claim.[3]  <u>Ying Lin</u>, 2018 WL 3416524, at *3 (quoting <u>Duran</u>, 596 F.3d at 1293).

The broad scope of Section 951 is also consistent with the national security interests of the U.S. government.  "Section 951 sweeps broadly because the Government has an interest in knowing the identity of those acting on behalf of a foreign government within the United States, whether the action is legal or not."  <u>Duran</u>, 596 F.3d at 1295.  Failing to disclose such information deprives the government of the ability to make fully-informed decisions about the nation's security.  These concerns are born out in this case, where the defendants are alleged to have used their access to the most powerful members of the government—Congressmen, senior executive branch officials, and even the President of the United States—to provide information to, and otherwise assist, a foreign government.  The Defendants' alleged conduct at the direction or control of the UAE government sits squarely within the types of cases that have previously been prosecuted under Section 951.[4]

---

[3]     Although Grimes focuses on the reference to "espionage-like behavior" in Congressional testimony by one Department of Justice official, he is forced to concede that the official also explained that it covered much more than that: "espionage-like behavior, <u>information gathering</u>, and procurement of technology on behalf of foreign governments." <u>See</u> Testimony of Adam S. Hickey, Deputy Assistant Attorney General (emphasis added) (available at https://www.judiciary.senate.gov/imo/media/doc/07-26-17%20Hickey%20Testimony.pdf) ("Hickey Testimony") (last visited Feb. 18, 2022).  Setting aside that "espionage-like" is itself a broad term, information gathering is even broader and still consistent with the purpose of Section 951.  As reflected in the Indictment, "information gathering" is one of the core aspects of the Defendants' conduct taken on behalf of the UAE, including by providing non-public information about developments within the Trump Campaign and the Trump Administration.  <u>See</u>, <u>e.g.</u>, Indictment ¶¶ 18, 19, 33, 54, 77, 78, 83, 87.

[4]     For example, the government has used Section 951 to charge and convict agents working on behalf of the German government during World War II (<u>United States v. Heine</u>, 151 F.2d 813 (2d Cir. 1945)), the Soviet Union during the Cold War (<u>United States v. Butenko</u>, 384 F.2d 554 (3d Cir. 1967)), the Vietnamese government in the 1970s (<u>United States v. Hung</u>, 629

Even if Section 951 only captured "espionage-like" activity, the Defendants' alleged conduct still falls within that narrower conception of Section 951. The Defendants used their positions to provide direct access to information, insight and lines of communication with highly-placed government officials and their advisors. For example, the Defendants are alleged to have relayed non-public information to Al Malik and UAE officials about internal deliberations within the Trump Administration by senior U.S. officials about sensitive foreign policy issues, including the blockade of Qatar by the UAE and other Middle Eastern governments. See Indictment ¶¶ 83, 87. The Defendants also went beyond passing sensitive information and agreed to assist the UAE in trying to shape the foreign policy positions of the Trump Campaign and the Trump Administration in a way that would be favorable to that foreign government. See id. ¶¶ 19, 22, 56-57, 60, 65, 67, 69, 71-74, 76-77, 81-82, 84-86.

Moreover, the Defendants' reliance on and comparison to FARA is misplaced. Although FARA and Section 951 both concern the activity of foreign agents operating in the United States, they are significantly different statutes. FARA was enacted at a different time than Section 951 (decades after the original version of the Section 951 statute was passed), and for a different purpose (to combat the Nazi propaganda apparatus during World War II). See generally Attorney General v. Irish People, Inc., 684 F.2d 928, 938 (D.C. Cir. 1982) (discussing FARA's legislative history). FARA is primarily a regulatory scheme, whose goal is to promote transparency with respect to foreign influence within the United States by ensuring that the United

F.2d 908 (4th Cir. 1980)), the Chinese' government in the 1980s through the present (United States v. Chung, 659 F.3d 815 (9th Cir. 2011); Ying Lin, 2018 WL 3416524), the Venezuelan government in the 1990s (Duran, 596 F.3d 1283), the Iraqi government in the 1990s (Dumeisi II, 424 F.3d 566, Latchin, 554 F.3d 709 (7th Cir. 2009)), and more recently the Kingdom of Saudi Arabia (United States v. Abouammo, et al., 19 CR 621 (N.D. Cal.).

States government and the public know the source of certain information from foreign agents, thereby facilitating informed evaluation of that information. See <u>Meese v. Keene</u>, 481 U.S. 465, 469 (1987). Section 951 is fundamentally a criminal statute designed to deter a broad array of conduct that a foreign government seeks to conduct surreptitiously and might not engage in if required to notify the U.S. government.

The language of the statutes reflects these differences. Section 951 is simultaneously broader and narrower than FARA's regulatory scheme. Section 951 is narrower in that it only targets for prosecution agents of a foreign government or official (as opposed to any foreign principal), and is broader because it prohibits <u>any</u> conduct, other than a few enumerated exceptions, conducted at the direction or control of a foreign government without prior notice to the Attorney General (as opposed to the limited set of primarily political conduct that is the focus of FARA). <u>Compare</u> <u>Duran</u>, 596 F.3d at 1295 ("The broad sweep of § 951 creates a plethora of possibilities under which those engaged in purportedly legal conduct on behalf of a foreign government could be convicted if an agent of a foreign government fails to notify the Attorney General of such conduct."); <u>with</u> 22 U.S.C. §§ 611(c), 612(a) (requiring registration of agent of "foreign principal", and limiting scope to political activities, public relations, and other specific categories of conduct).[5] It therefore makes sense that, under FARA, where there is expected to be a body of lawful (albeit regulated) conduct involving any foreign principal, the statute provides a substantial amount of detail about how and when conduct is regulated by that statute. By

---

[5] Section 951's <u>notification</u> requirement is often conflated with FARA's <u>registration</u> requirement. Section 951 requires notice to the Attorney General prior to acting as an agent of a foreign government in the United States, whereas FARA requires entities and individuals engaged in certain enumerated activities on behalf of foreign principals to register with DOJ's FARA Unit and provide specific information in their registration statements.

contrast, because Section 951 provides a straightforward criminal prohibition that affects a smaller subset of people—do not take any acts at the direction or control of a foreign government unless you provide notice to the Attorney General or are specifically excepted—a detailed regulatory schema is unnecessary.

C.      The Defendants Can Be Convicted of Violating Section 951 Through Aiding and Abetting and *Pinkerton* Liability

Both Defendants argue that Count One must be dismissed because they themselves did not directly act as agents of the UAE.   See, e.g., Barrack Mot. at 14-15 (arguing that the government must prove that Barrack himself entered an agreement with the UAE); Grimes Mot. at 4-6 (claiming that Grimes had no direct relationship with the UAE, and that Section 951 does not reach "employees of agents").   Aside from the numerous allegations that demonstrate the Defendants are directly liable under Section 951, both Defendants also can be convicted of the charged offenses because they aided and abetted their co-defendants, and because they participated in a conspiracy that brought about the substantive offense.

Under 18 U.S.C. § 2, a defendant is "punishable as a principle" where he "aids, abets, counsels, commands, induces or procures [a crime's] commission."   Aiding and abetting is not a separate offense and is generally assumed to be an alternative theory of liability in every indictment that charges a substantive offense.   See, e.g., United States v. Mucciante, 21 F.3d 1228, 1234 (2d Cir. 1994) (explaining that "an aiding and abetting charge is arguably implicit in every indictment" and that an aiding and abetting instruction may be given "even if the indictment does not expressly charge a violation of 18 U.S.C. § 2").   Neither the statute nor the phrase aiding and abetting need be included in the indictment.   Id.; see also United States v. Nyenekor, 784 F. App'x 810, 816 (2d Cir. 2019) ("The well established rule in this and other circuits is that a defendant may be indicted for the commission of a substantive crime and convicted of aiding and abetting

its commission although not named in the indictment as an aider and abettor.").   Nonetheless, the Indictment does provide defendants with notice that they may be found guilty based on aiding and abetting others, citing Section 2 and stating that the substantive Section 951 offense was committed "together with others."   See United States v. Hill, 279 F. App'x 90, 95 (2d Cir. 2008) (holding that the phrase "together with others" and citation to 18 U.S.C. § 2 "were sufficient to put [the defendant] on notice that he faced such liability.").

Count One is also adequate because the Defendants participated in a criminal conspiracy, and the commission of a Section 951 offense was a reasonably foreseeable result of that conspiracy.   Pursuant to Pinkerton v. United States, 328 U.S. 640, 646 (1946), "a defendant who does not directly commit a substantive offense may nevertheless be liable if the commission of the offense by a co-conspirator in furtherance of the conspiracy was reasonably foreseeable to the defendant as a consequence of their criminal agreement."   United States v. Parkes, 497 F.3d 220, 232 (2d Cir. 2007), cert. denied, 552 U.S. 1220 (2008) (internal quotation marks and citations omitted).   Pinkerton "permits a jury to find a defendant guilty on a substantive count without specific evidence that he committed the act charged."   United States v. Miley, 513 F.2d 1191, 1208 (2d Cir. 1975) (Friendly, J.), cert. denied, 423 U.S. 842 (1975).   A defendant does not need to commit the substantive violation himself to be found guilty of the substantive offense, provided he participated in the conspiracy that brought about that offense, and it was reasonably foreseeable. See United States v. Rodriguez, 320 F. App'x 105, 107 (2d Cir. 2009) (affirming conviction for murder through use of a firearm where defendant participated in narcotics conspiracy involving armed robberies that led to firearm-related murder by others).

The Indictment's reference to 18 U.S.C. § 2 and a related conspiracy in Count Two both sufficiently notify the Defendants that that they may be found criminally liable on Count One

as either aiders and abettors or under <u>Pinkerton</u>.  But the Indictment goes further; it provides detailed information relevant to the offense that supports both charging theories.   The Indictment alleges that the Defendants took a number of steps to assist their co-defendant Al Malik, who made it clear throughout their relationship that he was acting at the direction or control of the UAE and was asking them to do the same.   Accordingly, even if the Indictment were deficiently pled with respect to the Defendants' direct liability (which it is not), the fact that both are alleged to have aided and abetted and conspired with others is enough to satisfy the pleading requirements for Count One.

Moreover, prior Section 951 decisions demonstrate that a person can be convicted of an agent even where they act "indirectly" or for a third party like a business entity.   Multiple defendants have been convicted even while they worked for businesses like Boeing and China Air.  <u>See</u> <u>Ying Lin</u>, <u>United States v. Chung</u>, 659 F.3d 815 (9th Cir. 2011).   The defendant in <u>United States v. Heine</u>, a case discussed further below, indirectly received requests from the German government through a German automotive company.   151 F.2d 813 (2d Cir. 1945) (Hand, J.) (interpreting 22 U.S.C. § 233, the materially identical predecessor statute to Section 951).   In fact, the defendant in <u>Heine</u> was an agent even though he was two layers removed from the foreign government—he was not in direct contact with the German government and he specifically declined employment from the German company.   <u>Id.</u> at 814. Thus, because Congress designed Section 951 to act as a "catch-all" that covers a "plethora" of potential conduct, <u>Duran</u>, 596 F.3d at 1295, an indictment need not allege a formal relationship, only that the agent agreed to act at a foreign government's direction or control.

D.        The Government Does Not Have to Allege a "Duty" to the UAE

The Defendants argue that, to plead a Section 951 offense, the government must allege that they were "subject to a duty to comply with the foreign principal's directions," or operating subject to some contractual or employment relationship with the UAE. See Barrack Mot. at 7-8; Grimes Mot. at 4. The Defendants do not cite to any authority to support this erroneous claim.

The plain language of Section 951 does not support this claim. Barrack speaks of a "duty to comply" and "an obligation to do" what the foreign government requests, but the statue says no such thing. Barrack Mot. at 8. Rather, it clearly defines an "agent of a foreign government" as "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official." 18 U.S.C. § 951(d). It speaks of an agreement, not a duty. And it clearly defines the scope of that agreement: engaging in conduct, in the United States, "subject to the direction or control" of a foreign government. The government agrees that, to satisfy Count One, it must prove that the Defendants acted subject to the direction or control of the UAE,[6] as it has alleged in the Indictment, but the claim that it must allege some additional obligation or greater duty to the UAE is found nowhere in the statute. Nor do the implementing regulations for Section 951 support Barrack's claim. Like the statute itself, the regulations do not reference "duty" or "obligation," and instead define an agent as anyone "acting as representatives of, or on behalf of, a foreign government or official, who are subject to [their] direction or control." 28 C.F.R. § 73.1(a).

---

[6]        As discussed supra, the Defendants can also be convicted on Count One as aiders and abettors or pursuant to Pinkerton.

The government is unaware of any Section 951 case requiring the government to allege a "duty" to a foreign government, nor have the Defendants cited any such authority. To the contrary, decisions in this circuit and elsewhere reveal that no such formal relationship or legal obligation is required. For example, in <u>Heine</u>, 151 F.2d 813, the Second Circuit interpreted the materially identical predecessor statute to Section 951. <u>See</u> 22 U.S.C. § 233 ("Whoever . . . shall act in the United States as an agent of a foreign government without prior notification to the Secretary of State shall be [punished].").[7] The Second Circuit affirmed the conviction of a defendant who provided information to the German government through a German automotive company. <u>Heine</u>, 151 F.2d at 817. The company "asked [the defendant] to find out what he could about the automobile and aviation industries in [the United States]," and the defendant, in turn collected information about these industries from "lawfully accessible" source such as "ordinary magazines, . . . technical catalogues, [and] . . . correspondence with airplane manufacturers" among others. <u>Id.</u> at 815. There was no evidence of any direct communication between the German government and the defendant, let alone any evidence of some sort of enforceable "duty" to that foreign government. <u>See id.</u> at 817. And these conclusions were reached after trial on the merits, not on a motion to dismiss.

Similarly, in <u>United States v. Butenko</u>, the defendant was alleged to have participated in a scheme to pass information to Russian nationals working for the Soviet Union. The Third Circuit expressly rejected a claim that the defendant could not be an agent because

---

[7]     The statute was transferred to Section 601 of Title 22 before being recodified as Section 951 of Title 18 in 1948. <u>See</u> "United States Code: Preservation of Friendly Foreign Relations Generally, 22 U.S.C. §§ 231-250f (1940)" and "United States Code: Foreign Agents and Propaganda, 22 U.S.C. §§ 601-616 (1940)", U.S. Code Collection, Library of Congress (available at https://www.loc.gov/collections/united-states-code/) (last visited Feb. 16, 2022).

"there was shown no contractual relationship between himself and the Soviet Union." 384 F.2d 554, 565 (3d Cir. 1967), vacated on other grounds Alderman v. United States, 394 U.S. 165 (1969). The Third Circuit held that the defendant's conduct—transferring classified documents to a representative of the Soviet Mission—was sufficient proof of the relationship, and "a contractual relationship is unnecessary, since the act itself does not define the word 'agent.'" Id. at 566. Although the term "agent of a foreign government" was defined in Section 951 after Butenko was decided, that definition does not include the requirement of a contract or proof of some particular "duty." Similarly, the defendants in United States v. Hung, as agents of the Socialist Republic of Vietnam, passed diplomatic cables and other information. 629 F.2d 908, 912 (4th Cir. 1980). Both were independent actors and one described doing so because he wanted to "improve relations between the North Vietnamese government and the United States so that he could be reunited with a woman whom he loved who was a prisoner of the North Vietnamese government." Id. There was no allegation of any contract or duty owed to the North Vietnamese government and yet no infirmity was found on this basis.

More recent decisions under Section 951 likewise do not reflect the need to prove a duty, a contract, or some sort of employer-employee relationship to support the charge. The defendant in Ying Lin worked for a commercial airline and had no contract or employment with the PRC government. See 2018 WL 3416524 at *2-3. In Dumeisi II, the defendant was a publisher of an Arabic-language newspaper in the United States, who collected information and published materials at the direction of the Iraqi government. See 424 F.3d at 570-74. The defendant in Chung worked for Boeing while he was passing sensitive and valuable information to the PRC government. See 659 F.3d at 818-23. In Ji Chaoqun, a motion to dismiss was denied where the defendant was charged for gathering background reports and joining the U.S. military

at the PRC government's request, without any allegation of a particular duty or legal relationship

with the PRC.   See 2020 WL 1689826 at *4-5; Indictment, No. 18-CR-611 (N.D. Ill.) (ECF No.

32).   Lastly, in United States v. Abouammo, the defendants have been charged with acting as

agents of the Kingdom of Saudi Arabia without prior notice to the Attorney General for passing

nonpublic information about Twitter users while they worked for Twitter.   See Superseding

Indictment, No. 19-CR-621 (EMC) (N.D. Cal.) (ECF No. 53).

Indeed, it is unsurprising that Section 951 has no "duty" element or a requirement

to prove some formal relationship.   As the cases above reflect, most persons that engage in

conduct at the direction or control of a foreign government without notifying the Attorney General

try to obscure their relationship with the foreign government, and typically avoid memorializing

that relationship in an agreement like a contract, because neither the agent nor the foreign

government want their agreement to come to light.   This is not a new concept.   Courts regularly

instruct juries about proof of what constitutes an agreement to commit a criminal conspiracy:

> The government is not required to prove that the conspirators sat
> around a table and entered into a solemn contract, orally or in
> writing, stating that they have formed a conspiracy to violate the
> law, setting forth details of the plans, the means by which the
> unlawful project is to be carried out or the part to be played by each
> conspirator.   Indeed, common sense would suggest that when
> people do, in fact, undertake to enter into a conspiracy, much is left
> to an unexpressed understanding.   What the government must
> prove is that there was a mutual understanding, either spoken or
> unspoken, between two or more people to cooperate with each other
> to accomplish an unlawful act by means of a joint plan or common
> design.

Jury Instructions, United States v. Rivera, et al., No. 13-CR-149 (KAM) (E.D.N.Y.); see also L.

Sand, et al., Modern Federal Jury Instructions, Instructions 19-3, 19-4, 19-6.   The defendants want

to flip the standard principal that "actions often speak louder than words" on its head, because their own actions are compelling proof of an agreement to act at the direction or control of the UAE.

Barrack's reliance on Rafiekian to support this "duty" claim is misplaced. See Barrack Mot. at 8-11, 19. Rafiekian does not even use the word "duty." Rather, the Fourth Circuit held that the "definition of 'agent' envisions a mutual agreement to operate subject to foreign direction or control." Rafiekian, 991 F.3d at 538. While the court agreed that the term "agent" generally "resonated with the common-law in important respects," it concluded that "some aspects of common-law agency . . . don't jibe with § 951's language and purpose, and we must not force term-of-art definitions into contexts where they plainly do not fit." Id. at 539. The court squarely rejected the claim that Section 951 requires "something akin to an employer-employee relationship." Id. at 540. Other relationships, such as an "independent contractor" who "agrees to operate subject to a more hands-off form of 'direction'" would also be enough to find a violation of the statute. Id.

Barrack's reference to indictments in several other cases that proceeded past a motion to dismiss are also unavailing. See Barrack Mot. at 19-20. The fact that these indictments allege certain facts that may constitute evidence of an agreement—such as a contract, compensation for services, or other benefits conferred to the agent—does not somehow create an additional requirement to allege a "duty to comply."[8] Fundamentally, Barrack conflates a motive

---

[8] Indeed, the concept of a legal duty to comply is illogical in this context. No person acting as an agent without notice to the Attorney General in violation of Section 951 is bound by any legal duty to the foreign government, because the conduct is illegal and thus no duty can arise from such an agreement. See, e.g., Schlessinger v. Valspar Corp., 686 F.3d 81, 85 (2d Cir. 2012) ("It is the settled law of this State (and probably of every other State) that a party to an illegal contract cannot ask a court of law to help him carry out his illegal object, nor can such a person plead or prove in any court a case in which he, as a basis for his claim, must show forth his illegal purpose.") (quoting Stone v. Freeman, 82 N.E.2d 571, 572 (N.Y. 1948)).

to enter an agreement with a foreign government, or a benefit derived from that agreement, with a legal duty to be bound to act on behalf of a foreign agent. Section 951 requires no such thing.

To be sure, facts establishing a motive or benefit are useful evidence of the unlawful relationship. Similar factual allegations are included in the Indictment in this case. For example, the Indictment alleges that the UAE government wanted a "long term relationship" with Barrack, and that they promised that Barrack would be their "only channel" to the future President of the United States. See Indictment ¶¶ 15-17. Barrack referred to the UAE as the "home team" for whom he "nailed" an interview. Id. ¶ 24(d). The co-defendants repeatedly discussed how Barrack and Grimes' conduct would make them "heroes" in the UAE. See id. ¶¶ 20, 78. The government further anticipates that it will introduce additional evidence at trial as to the motive of the Defendants in agreeing to act at the direction or control of the UAE government and affirmatively represents that it has not made a "full proffer of the evidence it intends to present at trial" on this issue. See Alfonso, 143 F.3d at 776-77 ("Unless the government has made what can fairly be described as a fully proffer of the evidence it intends to present at trial . . . the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment."). At trial, the jury will have the opportunity to assess this evidence and determine whether that evidence establishes beyond a reasonable doubt that the Defendants acted as agents of the UAE. But motive is not an element of the crimes charged and these are issues for trial. The law remains that, at this stage, the government is only required to allege the elements of the offense and it has done so.

     E.     <u>Engaging in a "Legal Commercial Transaction" is an Affirmative Defense, and Does Not Have to Be Alleged in the Indictment</u>

Grimes argues that the Indictment should be dismissed because his conduct constitutes a "legal commercial transaction" and thus falls outside the reach of the statute. See

Grimes Mot. at 8-10. Putting aside the fact that the Indictment specifically alleges that Grimes' conduct was not a legal commercial transaction, see Indictment ¶ 90, both courts to have considered the issue have held that Section 951's carve-out for legal commercial transactions in Section 951(d)(4) is an affirmative defense rather than an element. This Court should reach the same result here.

In <u>Rafiekian</u>, the Fourth Circuit concluded that "the 'legal commercial transaction' exception provides for an affirmative defense—which must be raised first, if at all, by a defendant—rather than an essential element of the offense." 991 F.3d at 544. Relying on long-standing Supreme Court precedent, the court explained that, where a statute is "founded on a general provision defining the elements of an offense," there is no need for the government to "negative the matter of an exception made by a proviso or other distinct clause." <u>Id.</u> at 541 (quoting <u>McKelvey v. United States</u>, 260 U.S. 353, 357 (1922)). Because Section 951 is set up in precisely this manner, it should be treated as an affirmative defense instead of an element. <u>See id.</u> at 542. The Fourth Circuit compared Section 951 to an unlawful firearm possession statute, where it had similarly concluded in an earlier case that an exception for "antique firearms" was also an affirmative defense and not an element of the offense. <u>See id.</u> at 542 (discussing <u>United States v. Royal</u>, 731 F.3d 333 (4th Cir. 2013)). The court pointed out that construing the "legal commercial transaction" exception as an element of the crime would be "at odds with § 951's broad, overarching purpose—serving as a 'catch-all statute that would cover all conduct taken on behalf of a foreign government.'" <u>Id.</u> at 544 (quoting <u>Duran</u>, 593 F. 3d at 1295-95). Lastly, the court noted that such a holding would create perverse results, including creating an incentive for "would-be agents to sidestep disclosure by commoditizing their otherwise non-commercial endeavors" and forcing the government to "prove the commission of crimes it chose not to

charge—beyond a reasonable doubt—in order to establish that the exception did not apply." 991 F.3d at 544.

Duran likewise concluded that the "legal commercial transaction" exception was an affirmative defense and not an element. United States v. Duran, No. 07-20999-CR, 2008 WL 11333989, at *2 (S.D. Fla. Oct. 10, 2008), aff'd 596 F.3d 1283 (11th Cir. 2010). The district court in Duran noted that the elements of the offense were set forth in one part of Section 951 while the exceptions were located in a separate part of the statute. See id. at *2. The court also explained that this latter section used "the terms 'except' and 'does not include,'" which "is an unambiguous indication that Section 951(d) describes exceptions to, rather than additional elements of, the offense described in Section 951(a)." Id. The court similarly noted the incongruity of treating these exceptions as elements, explaining that the defendant was "in the better position to prove that the acts he engaged in within the United States as charged by the Government were merely 'legal commercial transactions.'" Id.

This court should reach the same conclusion as the Fourth Circuit in Rafiekian and the district court in Duran. The Second Circuit's test for an affirmative defense is essentially the same as the Fourth Circuit. See United States v. Mayo, 705 F. 2d 62, 74-75 (2d Cir. 1983) (likewise relying upon the Supreme Court's decision in McKelvey for affirmative defense analysis). Moreover, in Mayo, the Second Circuit held that the "antique firearm" language in 18 U.C.C. § 921(a)(3) constitutes an affirmative defense because of its placement in a separate section rather than the general provision of the statute, which is the same comparison relied upon by Rafiekian for its determination. See Mayo, 705 F. 2d at 74-75. The logic of both Rafiekian and Duran are sound as well. The text of the statute identifies a general offense provision, which encompasses all the elements, while the legal commercial transaction is explicitly identified as an

exception to this general language.  The history of the statute likewise supports this interpretation since these exceptions were only added decades after the statute was enacted.

Even if the Court were to rule contrary to this persuasive precedent, there is no legal defect in the Indictment because it alleges that the Defendants were not engaged in a legal commercial transaction.  <u>See</u> Indictment ¶ 90.  And contrary to Grimes' claim that this amounts to a "naked assertion," the Indictment alleges several facts to demonstrate that the Defendants were engaged in "non-commercial endeavors" that are not a legal commercial transaction.

F.  <u>Neither Section 951 Nor Due Process of Law Require the Indictment to Allege that Grimes was Aware of Section 951's Notification Requirement</u>

Grimes argues that Count One of the Indictment must be dismissed on the alternative grounds that either (a) it has failed to allege that he "knew that he was required to register" as an agent of a foreign government with the Attorney General or (b) if Section 951 does not require specific knowledge of the notification requirement, it violates due process of law. Grimes Mot. at 10-13.  Both arguments have already been rejected by other courts and should be here as well.

a.  <u>Section 951 is a General Intent Crime</u>

Numerous courts have concluded that Section 951 does not require the government to show that a defendant knew about the notification requirement.  <u>See</u>, <u>e.g.</u>, <u>Dumeisi</u>, 424 F.3d at 581 ("Knowledge of the requirement to [notify] is not an element of § 951."); <u>United States v. Turner</u>, 13 CR 572, 2014 WL 4699708, at *2 (N.D. Ill. Sept. 22, 2014) (same).  For example, in <u>United States v. Campa</u>, the Eleventh Circuit held that, like here, "[w]here no specific intent element is apparent on the face of the statute, the crime is one of general intent."  529 F.3d 980 (11th Cir. 2008) (internal quotation marks omitted).

Although Grimes correctly notes that courts generally "interpret criminal statutes to require that a defendant possess a mens rea, or guilty mind, as to every element of an offense," Grimes Mot. at 12, Grimes' argument here that the government must "prove that the defendants knew that they were required to [notify the Attorney General] is not an argument for a mens rea requirement but an argument for a heightened mens rea requirement" that is "contrary to the ordinary rule, deeply rooted in the American legal system, that ignorance of the law is no defense to a criminal prosecution," Campa, 529 F.3d at 998-99 (internal quotation marks omitted); see also United States v. Stewart, 590 F.3d 93, 111 (2d Cir. 2009) ("The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system."). Section 951 "establishes a general intent crime, so the government was required to prove the intent only to do the acts that the law proscribes." Campa, 529 F.3d at 1002. Following Campa, the Eleventh Circuit affirmed this holding in Duran:

> Section 951's plain language makes it clear that it is a general intent crime, as there is no mens rea element on the face of the statute. . . . The silence of § 951 as to a specific intent element is dispositive of the fact that Congress intended it to be one of general intent. . . . Although we found that § 951 does not require a showing of a heightened mens rea requirement, the Government must still prove the mens rea of general intent.

596 F.3d at 1292.

Indeed, the Supreme Court "has cautioned courts against too readily imposing heightened mens rea requirements in construing federal criminal statutes." United States v. Scotti, 47 F.3d 1237, 1244 (2d Cir. 1995) (citing United States v. Bailey, 444 U.S. 394 (1980)). In Carter v. United States, 530 U.S. 255 (2000), the defendant argued that the Court should read certain additional specific intent requirements into the federal bank robbery statute, 18 U.S.C. § 2113(a), although did not argue, as Grimes does here, that these additional specific intent

requirements should include even the knowledge of the applicable legal prohibitions.   Id. at 267.

The Supreme Court rejected this argument, concluding that "the presumption in favor of scienter

demands only that we read [Section 2113(a)] as requiring proof of general intent—that is, that the

defendant possessed knowledge with respect to the actus reus of the crime."   Id. at 268; United

States v. Int'l Mins. & Chem. Corp., 402 U.S. 558, 563 (1971) ("[W]e decline to attribute to

Congress the inaccurate view that [the statute] requires proof of knowledge of the law, as well as

the facts.").   Because Section 951 is a general intent crime, the statute does not require that the

government demonstrate that Grimes was aware of the legal requirement that agents of a foreign

government provide notice to the Attorney General.

> b.   Due Process of Law Does Not Require Notice of the Notification
> Requirement

Grimes next argues that, if Section 951 does not require that he was aware of the

notification requirement, then it violates due process of law.   Grimes cites two cases for this

proposition—Lambert and Rehaif—both of which are clearly inapposite.

Lambert addressed the constitutionality of a municipal code provision in Los

Angeles requiring convicted felons who remain in Los Angeles for more than five days to register

with the police department.   See Lambert v. People of the State of California, 355 U.S. 225, 242

(1957).   The Supreme Court, weighing whether "a registration act of this character violates due

process where it is applied to a person who has no actual knowledge of his duty to register, and

where no showing is made of the probability of such knowledge," held that the municipal code

provision violated the Due Process requirement of the Fourteenth Amendment.   Id. at 227.   In so

finding, the Supreme Court emphasized that, key to its analysis, was that the municipal code

provision regulated "conduct that is wholly passive—mere failure to register" and was "unlike the

commission of acts, or the failure to act under circumstances that should alert the doer to the

consequences of his deed." Id. at 228 (emphasis added). "Violation of [the municipal code's] provisions is unaccompanied by any activity whatever, mere presence in the city being the test." Id. at 229 (emphasis added). The Supreme Court concluded that due process of law requires notice of a registration requirement "where a person, wholly passive and unaware of any wrongdoing, is brought to the bar of justice for condemnation in a criminal case." Id. at 228.

The same argument made here, seeking to extend Lambert to Section 951, has been rejected by the Eleventh Circuit. In Duran, the court concluded that Lambert did not apply, because Section 951 requires more than wholly passive behavior. See 596 F.3d at 1292-93 (internal citations omitted) (finding that despite the purported similarity to Lambert, "whether a defendant must [notify the Attorney General] under § 951 depends on the defendant's action and conduct as an agent of a foreign government" and that "under § 951, it is not sufficient for the defendant to hold the status of an agent of a foreign government—he must also act") (emphasis in original). Unlike in Lambert, under Section 951, "[s]tatus is not the issue in any sense, rather specific actions are at issue." Id. at 1293 n.2. See also Lindauer, 2004 WL 2813168, at *4-5 (noting that Section 951 "is not a statute that imposes a requirement of notification or registration, but rather a statute that criminalizes certain conduct – acting as an agent of a foreign government – in the absence of notification"); United States v. Latchin, 554 F.3d 709, 715 (7th Cir. 2009) (Section 951 "requires more than mere status as a foreign agent; it requires acts as an agent on behalf of a foreign country").[9]

---

[9] Indeed, although Grimes argues that "Section 951's registration requirement is based on an individual's status," his description of that status essentially concedes that a person's status as an "agent of a foreign government" is derived from their conduct. Grimes Mot. at 11-12. This differs substantially from the municipal ordinance at issue in Lambert, where a convicted felon would have been required to register with the Los Angeles Police Department regardless of

Nor does <u>Rehaif</u> offer any support.   <u>Rehaif</u> held that to convict a defendant of violating 18 U.S.C. § 922(g), which prohibits the possession of firearms by felons or aliens who are "illegally or unlawfully in the United States," the government must show that the defendant "knew" his status as a felon or unlawful alien when he possessed the firearm.   <u>Rehaif v. United States</u>, 139 S. Ct. 2191, 2194 (2019).   <u>Rehaif</u> does not stand for the proposition offered by Grimes in his motion: that the government must show that he knew his conduct was illegal.   In fact, the Second Circuit and numerous other courts have flatly rejected efforts by defendants to extend <u>Rehaif</u> in this manner.   <u>See</u> <u>United States v. Bryant</u>, 976 F.3d 165, 172-73 (2d Cir. 2020) (noting that "a felon need not specifically know that it is illegal for him to possess a firearm under federal law"); <u>United States v. Merrett</u>, 9 F.4th 713, 717-18 (8th Cir. 2021) ("<u>Rehaif</u> did not alter the well-known maxim that ignorance of the law (or mistake of law) is no excuse." (internal quotations omitted)); <u>United States v. Trevino</u>, 989 F.3d 402, 405 (5th Cir. 2021) ("Our cases applying <u>Rehaif</u> have not required the Government to prove knowledge of the statutory prohibition contained in § 922(g).") (collecting cases).   This Court should likewise decline to adopt this rejected theory.

Because neither the plain language of Section 951 nor due process of law require that the government prove beyond a reasonable doubt that Grimes "knew that he was required to register as an agent of a foreign government," Grimes Mot. at 13, and because such a requirement would "run[] headlong into the venerable maxim that ignorance of the law is no excuse," <u>Bowens</u>, 938 F.3d at 797, this Court should deny Grimes' motion to dismiss Count One of the Indictment.

---

their actions.   Under Section 951, however, a person is not required to notify the Attorney General unless they act as an agent of a foreign government.

G.     Grimes' Various Further Claims of Charging Defects in the Indictment are Meritless

1.     Count One of the Indictment is Not Duplicitous

Grimes claims that Count One of the Indictment must be dismissed as duplicitous because it alleges Grimes violated both 18 U.S.C. § 951(a) and 18 U.S.C. § 2.   See Grimes Mot. at 37-38.   This argument is frivolous.   "An indictment is impermissibly duplicitous where: 1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be a separate count for each offense, and 2) the defendant is prejudiced thereby."   United States v. Swinton, 797 F. App'x 589, 598 (2d Cir. 2019) (internal quotation marks omitted).   The Second Circuit has directly rejected Grimes' argument.   See Swinton, 797 F. App'x at 598 ("Joining aiding and abetting to a substantive crime is therefore not duplicitous."). Lower courts in this circuit have reached the same conclusion.   See, e.g., United States v. Ulbricht, 14 CR 68, 2014 WL 5410049, at *2 (S.D.N.Y. Oct. 24, 2014) ("[A]n indictment charging aiding and abetting in the same count as a substantive offense is not duplicitous." (citing cases)); Novak v. United States, 07 CV 4361, 2009 WL 982429, at *4 (E.D.N.Y. Apr. 13, 2009) ("[A]iding and abetting is not a separate offense and may be charged in the same count as a substantive crime."). The Court should similarly reject Grimes' argument.

2.     The Indictment Sufficiently Alleges in Count One that Grimes Aided and Abetted and in Count Two that Grimes Knowingly and Intentionally Conspired

Next, Grimes argues that Count One of the Indictment has failed to allege that he "had the required specific intent to aid and abet" a violation of Section 951 and that Count Two of the Indictment has failed to allege that he "had the required specific intent to . . . conspire" to violate Section 951 because those charges have failed to allege that Grimes "knew that either Mr. Barrack or Mr. Alshahhi were foreign agents of the UAE and that they had failed to register as

required by the law."[10]   Grimes Mot. at 38-40.   Grimes is wrong.

First, as discussed above, the Indictment sufficiently alleges both aiding and abetting liability as it relates to Count One, and conspiracy liability as to Count Two.   Count One of the Indictment alleges that Grimes and his co-defendants acted, "together with others," and cites 18 U.S.C. § 2, which is all that is required for aiding and abetting liability.   Hill, 279 F. App'x at 94-95; see also United States v. Yuan Li, 18 CR 302 (BMC), 2020 WL 639,3038, at *6 (E.D.N.Y. Nov. 2, 2020) ("The well established rule in this and other Circuits is that a defendant may be indicted for the commission of a substantive crime and convicted of aiding and abetting its commission although not named in the indictment as an aider and abettor.") (internal quotation marks omitted).

Similarly, Count Two alleges an agreement to violate Section 951, which is all that is required to plead a sufficient conspiracy offense.   See LaSpina, 299 F.3d at 177 (2d Cir. 2002) ("[I]n an indictment for conspiring to commit an offense—in which the conspiracy is the gist of the crime—it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy.").   Moreover, Count Two specifically alleges that Grimes "knowingly and intentionally conspire[d]" to violate Section 951 and thus fully meets the pleading requirements of Federal Rule of Criminal Procedure 7(c)(1), Indictment ¶ 96 (emphasis added).   Courts have made clear that use of the phrase "knowingly and intentionally" satisfies any requirement to plead specific intent.   See, e.g., Guzman v. United States, 02 CV 5672, 2003 WL 22023985, at *3 n. 4 (S.D.N.Y. Aug. 27, 2003) ("Guzman's

_____

[10]   To the extent Grimes is again claiming that the Indictment must allege that he knew of the legal requirement for agents of foreign governments to notify the Attorney General, this argument should be rejected by the Court for all of the reasons set forth by the government supra.

indictment, through the phrase 'intentionally and knowingly,' sufficiently alleged the specific intent required for a conspiracy charge."); cf. United States v. Full Play Grp., S.A., 15 CR 252, 2021 WL 5038765, at *9 (E.D.N.Y. Oct. 29, 2011) (concluding that allegations in the indictment were "more than sufficient" to satisfy "specific intent" where indictment alleged that defendants acted "knowingly and intentionally").[11]

Setting aside that the charges are adequately pled, Grimes' argument appears to be that the government has not sufficiently alleged facts to demonstrate that he knew of his co-defendants' failure to notify the Attorney General. See Grimes Mot. at 39-40. But this is, like much of the rest of his motion, a challenge to the sufficiency of the government's evidence, rather than the sufficiency of the language in the Indictment. It is not appropriately addressed on a pretrial motion to dismiss. See United States v. Lemay, No. 20 CR 235, 2022 WL 125743, at *2 (E.D.N.Y. Jan. 13, 2022) ("[T]he sufficiency of the [government's] evidence is not appropriately addressed on a pretrial motion to dismiss an indictment."). In any event, this type of claim was considered and rejected by the Eleventh Circuit, who affirmed a district court's decision to exclude "evidence of [defendant] and his co-conspirators' lack of knowledge of the [notification] requirement under § 951." Duran, 596 F.3d at 1296 (explaining that "[a]lthough conspiracy is a specific intent crime, and aiding and abetting of a substantive violation must be willfully undertaken, those theories of vicarious liability do not import into either the conspiracy

---

[11]     In fact, the Seventh Circuit held that an indictment sufficiently alleged specific intent for a conspiracy charge, even absent allegations of knowing and intentional conduct, where the indictment alleged that the defendant conspired, which necessarily encompassed the necessary mens rea. United States v. Jones, 754 F. App'x 452, 455-56 (7th Cir. 2018) ("True, the indictment did not explicitly accuse [the defendant] of 'knowingly and intentionally' conspiring. The verb 'conspire,' however, necessarily entails an intent to act. To 'conspire,' like to 'induce' or 'entice,' involves intent.").

charge or the substantive offense under § 951 that Duran be on actual notice of the [notification] requirement.").

The defendant's reliance on <u>Butenko</u> does not alter this analysis. <u>See</u> Grimes Mot. at 39-40. That case, which involved an appeal after trial and not a pretrial challenge to the Indictment, stands for the proposition that the government must prove that the conspirators agreed that one or more of them would act as agents of a foreign government without providing notice to the Secretary of State, as Section 951 previously required. <u>See</u> 384 F.2d at 565 (noting that such evidence may be proven "directly or indirectly by a compelling inference," "by circumstantial evidence or by deduction from facts from which a natural inference arises," or from "common design, intent and purpose"). In that case, the indictment alleged that one defendant, Igor A. Ivanov, and others conspired to aid and abet another defendant, John W. Butenko, to act as an agent of a foreign government without providing notice to the Secretary of State. <u>See</u> <u>id.</u> at 557 (explaining that defendant was charged with conspiracy to violate Section 951 based on theory that he and others conspired to "aid and abet and induce" another person to act as an agent without notifying the Secretary of State). Here, Count Two does not merely allege that Grimes conspired to aid and abet Al Malik or Barrack in acting as agents of the UAE, but that all three defendants conspired "to act in the United States as agents" of the UAE. <u>See</u> Indictment ¶ 96.

3.     <u>Count Two of the Indictment Does Not Violate Wharton's Rule</u>

Grimes contends that Count Two must be dismissed because it violates Wharton's Rule, <u>see</u> Grimes Mot. at 40-41, a prudential rule that "[a]n agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission." <u>United States v. Bommarito</u>, 524 F.2d 140, 143 (2d Cir. 1975).

However, Wharton's Rule is "inapplicable when the conspiracy involves the cooperation of a greater number of persons than is required for commission of the substantive offense." United States v. Walker, 796 F.2d 43, 47 (4th Cir. 1986) (citing Iannelli v. United States, 420 U.S. 770, 783 n. 15 (1975); see also Bommarito, 524 F.2d at 144 (holding that "Wharton's Rule would not bar the conviction," "[s]ince the conspiracy would encompass a greater number than the two persons required to complete the substantive offense" (citing cases)). Thus, "[t]he 'third party' exception to Wharton's Rule allows dual punishment for the conspiracy and the object crime where more persons take part in the conspiracy than are necessary to accomplish the substantive offense." United States v. Sperling, 560 F.2d 1050, 1055-56 (2d Cir. 1977). Here, Grimes has been charged in Count Two with conspiring with both of his co-defendants as well as with multiple UAE government officials to violate 18 U.S.C. § 951, making the "third party exception" to Wharton's Rule clearly applicable. See United States v. Frank, 520 F.2d 1287, 1290-91 (2d Cir. 1975); United States v. Nunez, 03 CR 670, 2006 WL 1233940, at *5-6 (S.D.N.Y. May 6, 2006) ("Because the conspiracy had at least three members including [the defendant], none of whom was a federal agent, Wharton's Rule is not implicated in this case."); United States v. Chiarizio, 388 F. Supp. 858, 862 (D. Conn.), aff'd, 525 F.2d 289 (2d Cir. 1975) ("[A]s long as the conspiratorial concert of action and the substantive offense underlying it are not coterminous and fewer participants are required for the commission of the substantive offense than are named as joining in a conspiracy to commit it, there is no infirmity in the conspiracy indictment.").

Wharton's Rule is also inapplicable to a conspiracy to violate Section 951. "Wharton's Rule arose in, and has been primarily applied in, cases involving alleged conspiracies to commit offenses such as adultery, incest, bigamy, and dueling where 'the immediate

consequences of the crime rest on the parties themselves rather than on society at large,' and where 'the agreement that attends the substantive offense does not appear likely to pose the distinct kinds of threats to society that the law of conspiracy seeks to avert.'" Bommarito, 524 F.2d at 144 n. 3 (quoting Iannelli, 420 U.S. at 782-83). Courts have repeatedly declined to apply Wharton's Rule to conspiracies to commit substantive offenses that pose significant consequences on society at large and which pose distinct threats to society. See id. at 144 n.3 (declining to apply Wharton's Rule to narcotics distribution conspiracy); United States v. Nunez, 03 CR 670, 2006 WL 1233940, at *8 (S.D.N.Y. May 6, 2006) (declining to apply Wharton's Rule to money laundering conspiracy). Further, courts have declined to apply Wharton's Rule to offenses that implicate national security concerns, such as at issue here. See, e.g., United States v. Helmich, 704 F.2d 547, 550 (11th Cir. 1983) ("[W]e doubt that Wharton's Rule . . . could apply to a crime of such public importance as espionage. . . . All Americans, in terms of lessened national security, are affected when secret defense information is surreptitiously passed on to a foreign power."); Walker, 796 F.2d at 46-47 (declining to apply Wharton's Rule to espionage conspiracy). Because the immediate consequences of Section 951 offenses rest on society at large, rather than the parties themselves, and conspiracies to commit such an offense pose the distinct kinds of national security threats to society that the law of conspiracy seeks to avert, this Court should reject Grimes' argument.[12]

---

[12] Grimes' claim that "double jeopardy principles would preclude a conviction on both such a conspiracy and a Section 951 charge" is also without merit. Grimes Mot. at 41 n.17. The Supreme Court has made clear that "Wharton's Rule does not rest on principles of double jeopardy" but "only as a judicial presumption," Iannelli, 420 U.S. at 782, and "long applied the rule that the 'substantive crime and a conspiracy to commit that crime are not the "same offense" for double jeopardy purposes,' as "'each requires an element that the other does not."'" United States v. Ortega, 00 CR 432, 2000 WL 1577193, at *2 (S.D.N.Y. Oct. 23, 2000) (quoting United

4.     The Indictment Sufficiently Alleges Venue as to Counts One and Two

Grimes argues that Count One and Count Two must be dismissed because the Indictment "pleads no facts plausibly suggesting that venue for either charge is in this district," other than "stock language" alleging that the charges were committed "within the Eastern District of New York and elsewhere."   Grimes Mot. at 42-43.   "The law of this Circuit is clear that the Government's burden is satisfied with regard to pleading venue by alleging that criminal conduct occurred within that venue, even if phrased broadly and without a specific address or other information."   United States v. Bronson, 05 CR 714, 2007 WL 2455138, at *4 (E.D.N.Y. Aug. 23, 2007).   On numerous occasions, this Court has reaffirmed this principle, and has described such arguments as "frivolous."   See, e.g., United States v. DiScala, 14 CR 399, 2018 WL 1187394, at *25 (E.D.N.Y. Mar. 6, 2018) (holding that the burden of alleging venue "is satisfied when allegations are made that criminal conduct occurred within the venue, even if phrased broadly"); United States v. Metter, 860 F. Supp. 2d 205, 207 (E.D.N.Y. 2012) (denying motion to dismiss for lack of venue and describing challenge as "frivolous"); United States v. Lange, 10 CR 968, 2012 WL 511448, at *1 (E.D.N.Y. Feb. 15, 2012) (denying motion to dismiss for lack of venue where each count of the indictment alleged that "the criminal activity occurred within the Eastern District of New York and elsewhere").   Here, the Indictment alleges that the offenses in Count One and Count Two occurred "within the Eastern District of New York and elsewhere," Indictment ¶¶ 94, 96, and therefore sufficiently alleges venue.   See Hu Ji, Dkt. No. 123 at 17-19.

---

States v. Felix, 503 U.S. 378, 389 (1992) and United States v. Sessa, 125 F.3d 68, 71 (2d Cir. 1997)).

H.      To the Extent the Defendants' Challenge the Sufficiency of the Government's
        Evidence, Such Arguments Should be Rejected as Premature

Much of the Defendants' motions are devoted not to arguing that the Indictment fails to allege the elements, but rather that the Indictment does not allege sufficient supporting facts.   But "[u]nless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial . . .   the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment."   Alfonso, 143 F.3d at 776-77; United States v. Cooper, No. 17-CR-296 (PKC), 2020 WL 2307646, at *3 (E.D.N.Y., 2020) (denying motion to dismiss where "the arguments in support of [the defendants'] claim reveal that the true nature of [d]efendants' objections are not the sufficiency of the allegations, but rather the sufficiency of the factual and evidentiary support that the government will likely use" to prove the offense).   The Defendants' motions to dismiss largely consist of impermissible challenges to the sufficiency of the government's evidence, and claims on this basis should be rejected as the Indictment does not set forth a full proffer of the evidence the government expects to introduce at trial.   See Sampson, 898 F.3d at 279-80.

The district court's opinion on a motion to dismiss a Section 951 charge in Amirnazmi is instructive.   In that case, the defendant moved to dismiss two counts of an indictment that charged him with a conspiracy to violate Section 951 and a substantive violation of Section 951.[13]   2009 WL 32481, at *3.   Like the defendants here, the defendants in Amirnazmi argued for dismissal because the "factual allegations of the Superseding Indictment do not demonstrate that Defendant acted subject to the direction or control of a foreign government or official."   Id.   The court rejected the defendant's argument, holding, among other things, that

---

[13]      As noted above, the court in Amirnazmi misidentified the statute as FARA, but in fact the defendants were charged with Section 951 and Section 951 conspiracy offenses.

whether the defendant's actions were at the direction and control of foreign officials was a trial defense. <u>Id.</u> Likewise, here, the Defendants may present many of these arguments at trial, but a jury will be entitled to hear the evidence of the Defendants' conduct and the nature of their relationship with the UAE government and determine for itself whether that evidence proves beyond a reasonable doubt that the Defendants violated Section 951. <u>See also</u> <u>Hu Ji</u>, Dkt. No. 123 at 7-8, 11-12.

Apart from not being a proper basis for a motion to dismiss, the Defendants' claims about the Indictment are simply untrue. Grimes contends that "the indictment does not allege . . . that Mr. Grimes ever took direction from . . .the UAE" or that he ever agreed to act as an agent of the UAE. Grimes Mot. at 3-4. To the contrary, the Indictment alleges that Al Malik, after conferring with a UAE official, told Grimes about the UAE's desire to have the Muslim Brotherhood listed as a foreign terrorist organization, to which Grimes replied, "Yes. <u>At your direction</u>." Indictment ¶ 65 (emphasis added). Grimes also claims that there are no allegations that he "acted" on behalf of the UAE, yet the Indictment alleges, among other things that Grimes provided a draft Op-Ed to Al Malik for edits by UAE officials, received those edits, and agreed to make those changes. Indictment ¶ 49. These are just a few examples of allegations that establish both Defendants were acting as agents of the UAE and conspiring to do the same.

In any event, the government has not made a full proffer of the evidence that it intends to prove at trial in support of the charges. Without the government having the opportunity to present its evidence to the jury, the Defendants' motion is premature. Once the government presents its case at trial, the Court can revisit–if appropriate–Grimes' argument in a motion pursuant to Rule 29 of the Federal Rules of Criminal Procedure.

II.    The Indictment Adequately Alleges That Barrack Made Material False Statements and Obstructed Justice

   A.    Barrack's Claim that Counts Three through Seven Must be Dismissed for Failure to Record His Voluntary Interview is Wrong

      Barrack argues that the Court should dismiss Count Three (obstruction of justice) and Counts Four through Seven (material false statements) because his June 20, 2019 interview was memorialized by a FBI special agent in more than 50 detailed pages of contemporaneously recorded notes and in a subsequent FBI FD-302 report,[14] rather than by a stenographer or electronic recording device.[15]   This argument lacks merit.

      Essentially, Barrack argues that the government cannot sustain a conviction against him for making materially false statements to FBI special agents and thereby obstructing a grand jury investigation absent a verbatim transcription.   Numerous courts have rejected this exact argument.   See United States v. Sorich, 523 F.3d 702, 717 (7th Cir. 2008) ("[T]here is no requirement that a conversation be transcribed or recorded in order to support a conviction under

   _____

   [14]      Although not relevant to a motion to dismiss, Barrack alleges that the FBI special agent violated policies set forth in the FBI Manual of Administrative Operations and Procedures, which require that the preparation of an FD-302 be effected within five days following an interview, because the "Date of Entry" listed on the FD-302 is July 19, 2019, which is nearly one month after the interview on June 20, 2019.   However, the "Date Drafted" on an FD-302 reflects the date that preparation of the FD-302 is effected.   Here, the "Date Drafted" on the FD-302 is June 24, 2019, four days after the interview of Barrack.

   [15]      Barrack notes that under the U.S. Department of Justice's Justice Manual, there is a presumption that FBI special agents will electronically record custodial interviews.   However, Barrack fails to note that, under the same provision of the Justice Manual, "[i]nterviews in non-custodial settings are excluded from th[is] presumption."   The circumstances of the interview in this case were the exact opposite of a custodial interview.   The interview was scheduled only after Barrack, through counsel, affirmatively requested it; the interview occurred at the law firm offices of Barrack's counsel; during the interview, Barrack was represented by multiple attorneys who themselves appeared to be taking contemporaneous notes, but who also chose not to record the interview; and Barrack was advised that the interview was entirely voluntary and that he was free to end the interview at any time.   For Barrack to cite language from the Justice Manual applying to custodial interviews in support of his argument is specious.

§ 1001.”); <u>United States v. Horvath</u>, 492 F.3d 1075, 1079 (9th Cir. 2007) (noting that "a verbatim transcript of Defendant's statement" is not required to sustain a § 1001 conviction); <u>United States v. Poindexter</u>, 951 F.2d 369, 387-88 (D.C. Cir. 1991) (holding that "§ 1001 may be applied to statements [that were] . . . not stenographically transcribed," and that arguments as to the evidence of "exactly what the defendant said" "are issues of the sufficiency of the evidence in a particular case, not reasons for carving a categorical exception from the statute"); <u>United States v. Poutre</u>, 646 F.2d 685, 688 (1st Cir. 1980) (declining to "hold that a verbatim transcript or written statement is required per se in prosecutions under 18 U.S.C. § 1001"); <u>United States v. Clifford</u>, 426 F. Supp. 696, 702 (E.D.N.Y. 1976) ("This court declines to adopt a rule that would mandate dismissal of a § 1001 count as a matter of law in the absence of a verbatim transcript or a written statement"). "To hold that dismissal of Section 1001 charges is required in the absence of a verbatim transcript would substantially narrow the reach of the statute by immunizing any knowing material false statements that were not recorded even if they otherwise met the jurisdictional requirements of the statute." <u>United States v. Subeh</u>, 04 CR 6077, 2006 WL 219968, at *7 n.11 (W.D.N.Y. Jan. 24, 2006), <u>report and recommendation adopted</u>, 04 CR 6077, 2006 WL 1875407 (W.D.N.Y. July 5, 2006). Barrack essentially is claiming that he is free to invite FBI special agents to his attorney's office when he is aware he is under investigation and then lie to those FBI special agents about the substance of that investigation without any legal consequence, as long as the interview is not recorded verbatim. Such an argument has been squarely rejected elsewhere and should be here as well.

Barrack "faults the lack of a transcript of his interview," but "the case law makes clear that a false statement charge does not depend on the existence of a transcript or other formal recording of the statement that is alleged to be false, and it is for a jury to decide whether the lack

of such corroboration undermines a finding that any false statement was made." United States v. Khan, 18 CR 195, 2020 WL 7767890, at *2 (D. Conn. Dec. 30, 2020) (citing cases). Because Barrack's argument challenges the sufficiency of the government's evidence establishing his statements during the interview, it is a matter for the jury and not appropriate for resolution on a motion to dismiss. See Lemay, 2022 WL 125743, at *2 ("[T]he sufficiency of the [government's] evidence is not appropriately addressed on a pretrial motion to dismiss an indictment."); see also United States v. Brandt, 546 F.3d 912, 916-17 (7th Cir. 2008) (noting that defendant's argument that the agent's recollection of the defendant's statements should be disregarded because "agents failed to record the interview or make any verbatim transcript of it" was rejected by the jury and that "[i]t is not our role on appeal to second-guess the jury's credibility determinations"); Sorich, 523 F.3d at 717 (holding that determination of trustworthiness of agent's testimony regarding defendant's statements, where there was no transcript or recording of the interview, "was a matter for the jury, not a reviewing court"). As the Fifth Circuit noted in United States v. Ricard, 922 F.3d 639 (5th Cir. 2019), Barrack may "argue[] to the jury that they should not believe [the FBI special agent's] testimony without audio or video proof," and "[t]he jury [is then] entitled to determine the credibility of [the FBI special agent's] testimony." Id. at 652.

Barrack further contends that the government's failure to electronically record or stenographically transcribe his interview on June 20, 2019 has irreparably impaired his ability to advance certain defenses, including defenses related to purported ambiguousness in the questions posed to Barrack and the literal truthfulness of his answers. Yet, Barrack will have every opportunity to explore the ambiguity of the questions, or lack thereof, and the literal truthfulness of his answers, or lack thereof, to those questions at trial, as well as to argue to the jury that the government has failed to present sufficient evidence establishing the precise nature of Barrack's

statements during the interview.   See, e.g., Subeh, 2006 WL 3407891, at *4 (noting that defenses alleging that questions were "ambiguous, or capable of being understood in more than one way, [or] that the alleged false statement was, in fact, literally true" are defenses that "necessarily involve[] factual issues" and are not "capable of determination without a trial of the general issue").[16]

B.   Count Five Sufficiently Alleges that Barrack Knew that His Statement Was False

Barrack also argues that Count Five of the Indictment must be dismissed because the Indictment fails to allege that Barrack had knowledge of the falsity of his statement, namely that he "was never asked to download any messaging application by anyone associated with the Middle East, never had a dedicated telephone to communicate with anyone associated with the Middle East, and was never asked to acquire a dedicated telephone to communicate with anyone associated with the Middle East."   Indictment ¶ 103.   Barrack argues that none of the communications identified in the Indictment reflect that he, as opposed to others, were aware of the kinds of requests or actions at issue in Count Five.

As an initial matter, the Indictment alleges in Count Five that Barrack made these false statements "when in fact, as he then and there well knew and believed" that they were false, thereby clearly alleging the element Barrack claims is absent from Count Five.   Indictment ¶ 103.

---

[16]      In his brief, Barrack attempts to make some of the alleged false statements appear more ambiguous than they are in the Indictment.   For example, he identifies the false statement set forth in Count Four of the Indictment as Barrack stating that Al Malik did not ask Barrack to do anything for the UAE but omits the remaining clause, which provides greater specificity: "and never proffered any policies or requests to Barrack on behalf of the United Arab Emirates." Similarly, Barrack argues that, with respect to Count Six of the Indictment, the phrase "facilitating communications" is ambiguous and that the government should be faulted for failing to ask follow up questions of Barrack on this topic, but fails to acknowledge that the FD-302 and the FBI special agent's handwritten notes reflect that this topic was, in fact, explored further with Barrack, including discussions of whether he arranged for telephone calls between UAE government officials and President-Elect Trump.

Although Barrack dismisses this language as "pro forma" language, such language is all that is required.   See Fed. R. Crim. P. 7(c)(1).   On this basis alone, Barrack's argument is fatally flawed and should be rejected.

Barrack then argues that, because the Indictment specifies certain additional detail regarding Barrack's alleged conduct, this Court should then assess whether those alleged facts, if true, are sufficient to establish Barrack's commission of the offense set forth in Count Five. However, at this pre-trial stage, courts "do not evaluate the adequacy of the facts to satisfy the elements of the charged offense."   United States v Dawkins, 999 F.3d 767, 780 (2d Cir. 2021). Here, although the Indictment sets forth additional details about the conduct that Barrack and his co-defendants are alleged to have committed, it does not constitute a "full proffer of the evidence [that the government] intends to present at trial."   Id.   Indeed, the government expects to introduce significant additional evidence at trial regarding each of the counts set forth in the Indictment.   Accordingly, judicial evaluation of the sufficiency of the government's evidence regarding Count Five is inappropriate at this time.

Even if the Court were to conclude that the detailed allegations set forth in the Indictment constituted a "full proffer" of the government's evidence (which it does not), the Court should deny the motion to dismiss Count Five because the communications identified in the Indictment plainly implicate Barrack's awareness of the falsity of the statements at issue.   For example, the Indictment alleges, among other things: (i) in paragraph 37 that Emirati Official 4 stated he had sent Barrack "a link for a secure application" used by Emirati Official 1; and (ii) in paragraph 42 that Emirati Official 4 indicated Barrack had told Emirati Official 4 that he had acquired the dedicated telephone with the secure application.   See Indictment ¶¶ 37, 42.   These communications plainly allege that Barrack had personal knowledge of the request to download a

messaging application and the acquisition of a dedicated telephone. Accordingly, under any standard, the Court should deny Barrack's motion to dismiss Count Five of the Indictment.[17]

III. Section 951 Does Not Violate the First Amendment

The Defendants claim that the Indictment should be dismissed because Section 951 is unconstitutionally overbroad and violates the First Amendment in several other respects as applied to them. None of these claims has merit.

A. Section 951 is Not Overbroad

Barrack argues that the Court must read a duty element into Section 951 or else strike down the statute as unconstitutionally overbroad. See Barrack Mot. at 12. Barrack is incorrect.

A law is overbroad "if it punishes a substantial amount of protected free speech, judged in relation to [its] plainly legitimate sweep." United States v. Farhane, 634 F.3d 127, 136 (2d Cir. 2011) (internal quotation marks and citations omitted). All overbreadth claims are facial challenges because the challenge is based on the idea that the rights of hypothetical third parties would be violated if applied to them. See Burke, 449 F.3d at 498 ("A party alleging overbreadth claims that although a statute did not violate his or her First Amendment rights, it would violate the First Amendment rights of hypothetical third parties if applied to them."). To be invalid, "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the

_____

[17] Although Barrack does not move to dismiss Count Six of the Indictment on this basis, Barrack argues that the allegations set forth in the Indictment fail to establish that his statement that he had no role in facilitating communications between President-Elect Trump and UAE officials was false. The Indictment plainly alleges in Count Six that, in fact, Barrack "facilitated communications between the President-Elect Trump and Emirati Official 1 and Emirati Official 2 after the 2016 Presidential Election, including by arranging one or more telephone calls between the President-Elect and Emirati Official 1 and Emirati Official 2 and by providing contact information for Emirati Official 1 and Emirati Official 2 to the President-Elect's assistant." ECF No. 5 at 43. This plainly satisfies the requirements of Federal Rule of Criminal Procedure 7(c)(1).

statute's plainly legitimate sweep." Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973). An overbreadth finding "invalidates all enforcement of a challenged law" in most circumstances, and therefore "[m]indful that such relief is 'strong medicine,' the law rigorously enforces the burden on the challenging party to demonstrate 'substantial' infringement of speech." Farhane, 634 F.3d at 136–37 (emphasis in original).

Even where a statute may hypothetically sweep in some protected conduct, "there comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting all enforcement of that law—particularly a law that reflects 'legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct.'" Virginia v. Hicks, 539 U.S. 113, 119 (2003) (quoting Broadrick, 413 U.S. at 615). Therefore, the Supreme Court has "insisted that a law's application to protected speech be substantial, not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications." Hicks, 539 U.S. at 119-20 (internal quotation marks and citation omitted). Moreover, "[r]arely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." Id. at 124.

The Defendants cannot demonstrate that Section 951 is substantially overbroad. Contrary to the Defendants' claims, the First Amendment is not implicated by the type of conduct the statute is designed to prohibit. Section 951 regulates conduct—acting at the direction or control of a foreign government—not speech. See Duran, 596 F3d. at 1292 ("[W]hether a defendant must [provide notice] under § 951 depend on the defendant's action and conduct as an agent of a foreign government") (emphasis in original); Latchin, 554 F.3d at 715 (Section 951 "requires acts as an agent on behalf of a foreign country"). A person's speech may be entirely

irrelevant to a Section 951 conviction, as has been the case in several past instances involving non-speech acts, such as the passage of technologically sensitive information to foreign governments or operating as a "sleeper agent" in the United States with no specific tasking. See Chung, 659 F.3d at 818-23; Latchin, 554 F.3d at 710-11. Even where a person's speech might constitute some evidence of the crime, the content of the speech is entirely irrelevant to the charge, because it is the act that matters not the content of that act. See Dumeisi II, 424 F.3d at 581 (affirming trial conviction where defendant argued evidence "established nothing more than that he gathered publicly accessible information, published news articles, and communicated with foreign consular officials" because the evidence demonstrated that he "acted knowingly at the behest of the [Iraqi government].").

The fact that the Defendants are also charged with a conspiracy and their words constitute a portion of the criminal conduct does not alter the analysis. "Speech is not protected by the First Amendment when it is the very vehicle of the crime itself. . . . The gist of the crime of conspiracy is agreement to violate the law. . . . Thus, it is both possible and permissible to charge that criminal statutes were violated entirely by means of speech." United States v. Rahman, No. S3 93 CR. 181 (MBM), 1994 WL 388927, at *1–2 (S.D.N.Y. July 22, 1994), aff'd in pertinent part, 189 F.3d 88, 114-15 (2d Cir. 1999) (holding that First Amendment challenge to seditious conspiracy statute was "without merit").

Overbreadth claims directed at Section 951 have twice been explicitly rejected by federal courts. In United States v. Ji Chaoqun, the district court conducted a thorough overbreadth analysis, noting the "heavy burden" of such a claim. 2020 WL 1689826, at *3. The court rejected the claim, explaining that several provisions of the statute, including the requirement that the agent "agrees to operate . . . subject to the direction or control of a foreign government or

official," the exceptions identified in the definition of agent, and the notification requirement all sufficiently guard against unconstitutional overreach. See id. ("Because Defendant has not demonstrated that § 951 is unconstitutional in a substantial portion of the cases to which it applies, the Court denies this basis for relief."). Similarly, in Hung, the Fourth Circuit, in upholding the conviction of individuals that had passed information to the North Vietnamese government, dismissed both vagueness and overbreadth claims directed at the statute. See Hung, 629 F.2d at 920 (finding the term agent to be "readily understandable").

With no relevant caselaw to support their claim, the defendants are left to conjure up theoretical circumstances to stoke fears of some hypothetical risk of First Amendment overreach. But the majority of potential applications of Section 951 fit comfortably within constitutional bounds. That is all that the law requires. See Farhane, 634 F.3d at 136 (defendant must prove "substantial infringement"). Indeed, individuals have been tried and convicted, and those convictions affirmed, on multiple occasions, in the Second Circuit and elsewhere, of violations of Section 951 based on facts that raise no constitutional concerns. The significant number of prosecutions under Section 951 over the past hundred years, which have not caused or lead to undue restriction on speech, belies the Defendants' baseless claims of overreach. Because the statute appropriately applies to a large number of instances of unprotected conduct related to actions taken on behalf a foreign government, the statute's "legitimate reach dwarfs its arguably impermissible applications." New York v. Ferber, 458 U.S. 747, 773 (1982). The number of hypothetically inappropriate applications amounts to, at most, no more than "a tiny fraction of the [instances] within the statute's reach." Id.

B.     Section 951 Does Not Otherwise Violate the First Amendment

Grimes also claims that Section 951 (1) unduly burdens political speech; (2) constitutes "speaker-based discrimination"; and (3) is an unconstitutional prior restraint. See Grimes Mot. at 26-31.   The Court should reject each of these arguments.[18]

First, as discussed supra, Section 951 does not regulate speech, it regulates conduct. See Duran, 596 F3d. at 1292; Latchin, 554 F.3d at 715.   As Grimes concedes, the Indictment charges him not for any particular speech but because he was "tasked by UAE officials" to conduct the "alleged activities."   See Grimes Mot. at 26-27.   That some of the Defendants' taskings may have involved speech does not mean that the First Amendment is suddenly implicated.   See Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 498 (1949) ("It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute. We reject the contention now."); see also United States v. Gagliardi, 506 F.3d 140, 148 (2d Cir. 2007) (describing as "unremarkable" its holding that "[s]peech is not protected by the First Amendment when it is the very vehicle of the crime itself.")

The Seventh Circuit has already rejected the same type of claim regarding Section 951 in Dumeisi II.   In that case, the defendant operated a newspaper, and at times published materials at the direction of the Iraqi government.   Dumeisi II, 424 F.3d at 579.   The Seventh Circuit affirmed the district court's decision rejecting defendant's proposed jury instruction that

---

[18]     Notably, Grimes limits his argument to an "as applied" challenge, and therefore the Court's analysis should be limited to whether the First Amendment was violated regarding Grimes' particular speech in this case, not the speech of any other hypothetical person.   See Grimes Mot. at 28.   Even if the Court were to consider the hypothetical scenarios raised in Grimes' motion, a broader, facial challenge based on a theoretical third-party is an overbreadth challenge that should be rejected for the reasons described in the prior section.

"It is not a violation of 18 U.S.C. § 951 to publish a news article," instead instructing the jury that defendant's speech, publications, opinions and political views could be considered "insofar as they may pertain to issues of motive and intent." Id. ("Given that an element of § 951 is acting 'subject to the direction or control of a foreign government or official,' . . . and there was evidence suggesting that [the defendant] published certain articles at the behest of the [Iraqi government], we find this publication relevant and agree with the district court that [defendant's] proposed instruction would have been 'misleading as to the law.'"). Accordingly, because Section 951 does not regulate speech, Grimes' claims should be rejected.

Second, even assuming arguendo that Section 951 regulated speech, it does not constitute "speaker-based discrimination." Statutes involve speaker-based discrimination "when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)." Turner Broadcasting, 512 U.S. at 658. But Section 951 does not favor or disfavor the substance of any speech by an agent of a foreign government, nor does it discriminate against agents of a foreign government vis-à-vis non-agents regarding the substance of their speech. Rather, Section 951 proscribes conduct absent notice (whether that takes the form of speech or not), not the underlying substance of that conduct. See New York Youth Club v. Town of Smithtown, 867 F. Supp. 2d 32, 34-35 (E.D.N.Y. 2012) (rejecting claim that non-content based regulation of speaker merited strict scrutiny, and explaining that "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others").

To the extent Section 951 proscribes speech at all, it is content-neutral, requiring only that the statute "advances important government interests" and does not "burden substantially more speech than necessary to further those interests." Turner Broadcasting Sys., Inc. v. FCC,

520 U.S. 180, 189 (1997) (citing United States v. O'Brien, 391 U.S. 367, 377 (1968)). And any such restrictions the statute places on speech (if at all) most resemble time, place and manner restrictions—identifying the place (when in the United States) and manner (only after notification) of any speech, which require only intermediate scrutiny. See Lederman v. New York City Dep't of Parks & Recreation, 731 F.3d 199, 202 (2d Cir. 2013) (discussing time, place and manner restrictions). Here, it is undisputed that Section 951 advances important national security interests in knowing which individuals are acting as foreign agents in the United States and does not burden "substantially more speech that necessary" in furthering those interests.

Even if Section 951 proscribed content-specific speech—which it unequivocally does not—Grimes' claim still fails because Section 951 satisfies the strict scrutiny standard of being "narrowly tailored to a compelling government interest." The statute protects important national security interests, which are regularly found by courts to be compelling. See, e.g., United States v. Schulte, 436 F. Supp. 3d 747, 751 (S.D.N.Y. 2020) ("There is no doubt the Government's interest in national security is compelling."); Haig v. Agee, 453 U.S. 280, 305 (1981) ("[T]he objective of safeguarding our national security is 'obvious and unarguable.'" (internal citation omitted)). Indeed, "no governmental interest is more compelling than the security of the Nation." United States v. Aref, 533 F.3d 72, 83 (2d Cir. 2008) (quoting Agee, 453 U.S. at 307). The statute is also narrowly tailored to support those compelling interests. The only burden Section 951 imposes is notification to the Attorney General, and the statute limits that notification requirement to a relatively discrete group: (1) individuals acting in the United States (2) subject to the direction or control (3) of a foreign government. The statute is even further

narrowed by the statutory exceptions to the term "agent." <u>See</u> 18 U.S.C. § 951(d).[19]

Third and finally, Section 951 is not an "unconstitutional prior restraint." Grimes Mot. at 29. A prior restraint is "a law, regulation or judicial order that suppresses speech—or provides for its suppression at the discretion of government officials—on the basis of the speech's content and in advance of its actual expression." <u>Citizens United v. Schneiderman</u>, 882 F.3d 374, 386 (2d Cir. 2018) (advising that courts "must guard against the doctrine's thinning by overextension"). Because the content of speech is entirely irrelevant to Section 951, it cannot be construed as a prior restraint. <u>See id.</u> at 387 (state disclosure regulations are not prior restraint). Even if the regulation were construed to be directed at speech content rather than conduct, the regulation is not "an outright ban" as is commonly required. <u>Id.</u> In any event, even if Section 951 were construed to be a prior restraint on speech, and thus subject to strict scrutiny, the statute would satisfy that standard for the reasons described above. <u>See</u> <u>Matter of Search of Information Associated with E-Mail Accounts</u>, 468 F. Supp. 3d 556, 560 (E.D.N.Y. 2020) (non-disclosure

---

[19]     The Supreme Court's decision in <u>Holder v. Humanitarian Law Project</u>, 561 U.S. 1 (2010) ("<u>HLP</u>") is instructive. In <u>HLP</u>, the Supreme Court considered the First Amendment implications of 18 U.S.C. § 2339B, the statute prohibiting material support to foreign terrorist organizations ("FTO") as applied to a human rights organization and individuals who wanted to provide support for "humanitarian and political activities" of the FTO. 561 U.S. at 10. The Court held that Section 2339B does not violate the First Amendment, even where the material support alleged is "support…in the form of speech." <u>Id.</u> at 28. The Court found that Section 2339B was a content-based restriction (unlike Section 951) because whether a person was prohibited from speaking "depends on what they say." <u>Id.</u> at 27. Despite subjecting the statute to strict scrutiny on this basis, the Court concluded that "national security and foreign policy concerns" constituted valid and compelling government interests, and the statute was narrowly tailored to promote those interests. <u>See id.</u> at 34-39. If a statute can entirely and explicitly prohibit as criminal forms of speech to promote a national security interest, then a statute that merely requires notification to promote national security interests likewise must survive judicial scrutiny.

order acted as prior restraint but satisfied strict scrutiny because of compelling interests in ongoing criminal investigation involving national security) (<u>vacated as moot</u>).

IV.  <u>Section 951 Is Not Unconstitutionally Vague Pursuant to the Due Process Clause</u>

The Defendants contend that Section 951 is impermissibly vague as it applies to their conduct.   Grimes also claims that Section 951 is facially invalid.   Their claims are without merit.[20]

Indeed, every court to have considered constitutional vagueness challenges to Section 951 have rejected them.  See, <u>e.g.</u>, <u>Duran</u>, 596 F.3d at 1291 (holding that Section 951 "plainly and concretely identifies the conduct which constitutes its violation, and the statute's language is clear and unambiguous" and that "the plain language of § 951 and its corresponding regulations give notice of what is prohibited and are readily understandable to a person of ordinary intelligence"); <u>Hung</u>, 629 F.2d at 920 (holding that Section 951 is not impermissibly vague and overbroad because "agent" is "a readily understandable term which provides adequate notice of the conduct proscribed by the statute"); <u>Ying Lin</u>, 2018 WL 3416524 at *4-5 (denying motion to dismiss Section 951 claims where defendant had raised vagueness challenge); <u>Lindauer</u>, 2004 WL 2813168, at *4 (rejecting vagueness challenge to Section 951 because the term "agent" is "readily understandable" and "provides adequate notice of the conduct proscribed by the statute.") (internal citation omitted); <u>Ji Chaoqun</u>, 2020 WL 1689826 at *2-3 (same); <u>Latchin</u>, 2005 WL 8160638, at *2 (same); <u>Dumeisi I</u>, 2003 WL 22757747, at *1-2 (same).

A statute is vague under the Fifth Amendment when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes

---

[20]    "[V]agueness and overbreadth are distinct concerns, the first implicating the Due Process Clause and the latter the First Amendment."   <u>Farhane</u>, 634 F.3d at 136 (citation omitted)).

or encourages seriously discriminatory enforcement."   <u>HLP</u>, 561 U.S. at 18 (2010).   Courts should first engage in an as-applied analysis when a vagueness challenge is raised, because "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."   <u>Hoffman Estates v. Flipside, Hoffman Estates, Inc.</u>, 455 U.S. 489, 495 (1982).   This preference for as-applied review is "'[e]mbedded in the traditional rules governing constitutional adjudication,'" notably, in "'the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.'"   <u>Parker v. Levy</u>, 417 U.S. 733, 759 (1974) (quoting <u>Broadrick</u>, 413 U.S. at 610).   That principle serves the jurisprudential maxim that "as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid," a court's "plain duty is to adopt that which will save the Act" enacted by Congress.   <u>Blodgett v. Holden</u>, 275 U.S. 142, 148 (1927); <u>see also</u> <u>United States v. Salerno</u>, 481 U.S. 739, 745 (1987) (observing that defendant mounting facial challenge bears heavy burden because he "must establish that no set of circumstances exists under which the Act would be valid").

     A.     <u>Section 951 Is Not Vague as Applied to this Case</u>

     There are two grounds for as-applied vagueness challenges.   First, a law violates due process "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits."   <u>Hill v. Colorado</u>, 530 U.S. 703, 732 (2000).   Second, a law is unconstitutionally vague "if it authorizes or even encourages arbitrary and discriminatory enforcement."   <u>Id.</u>

1. <u>Section 951 Provides Reasonable Notice of the Conduct it Proscribes</u>

"In analyzing a vagueness claim, the first step in determining whether a statute provides fair warning is to begin with the language of the statute itself."   <u>Duran</u>, 596 F.3d at 1291. Section 951 provides that "whoever, other than a diplomatic or consular officer or attaché, acts in the United States as an agent of a foreign government without prior notification to the Attorney General" shall be punished.   18 U.S.C. § 951(a).   The statute then defines the term "agent of a foreign government" as "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official," and proceeds to provide a series of exceptions.[21]   <u>See</u> 18 U.S.C. § 951(d).   Thus, Section 951 "gives the person of ordinary intelligence a reasonable opportunity to know" that the defendants' alleged conduct—agreeing to act and operate as agents of foreign national security officials to influence a presidential campaign and the highest levels of the United States government to favor a foreign government's policies— is proscribed by the statute.   <u>See</u> <u>United States v. Rybicki</u>, 354 F.3d 124, 132 (2d Cir. 2003). Among other things, the Defendants are alleged to have:

- Met with high-level UAE national security officials to establish themselves as a key channel between the UAE and the Trump Campaign, <u>see</u> Indictment ¶¶ 14-17;

- Inserted UAE-favored language into a national energy policy speech delivered by then-candidate Trump, at the direction of the UAE, <u>see</u> <u>id.</u> ¶¶ 18-23;

- Promoted the UAE government in several national media appearances while coordinating those appearances with UAE national security officials, <u>see</u> <u>id.</u> ¶ 24;

---

[21]     As the Fourth Circuit acknowledged in <u>Rafiekian,</u> in 1983, Congress "revised § 951's definition of 'agent' to address concerns about vagueness and overbreadth."   <u>See</u> <u>United States v. Rafiekian</u>, 991 F.3d 528, 543 (4th Cir. 2021) (citing S. Rep. No. 98-225, at 415 (1983) (explaining that § 951 was not "intended to cover ... routine commercial matters," and that "[b]y excluding from the notification requirement several classes of individuals" who were previously covered, the exceptions in subsection (d) "limit[ ] the coverage of the statute by focusing only on those in whom the United States government has a necessary interest")).

- Acquired a dedicated cellular telephone and installing a secure messaging application for Barrack to communicate with senior UAE officials, see id. ¶¶ 35-42,

- Agreed to provide a senior UAE official with information regarding the President-Elect's potential appointments to Cabinet and national security positions, see id. ¶ 54;

- Traveled from the United States to the UAE to meet and strategize with UAE officials about a pro-UAE U.S. foreign policy wish list for the incoming Trump administration, see id. ¶¶ 60-62;

- Arranged a telephone call between President Trump and a senior UAE official in January 2017 at the request of UAE officials, see id. ¶ 66;

- Agreed to arrange for two senior United States officials to attend a meeting with a senior UAE official at the White House in May 2017, see id. ¶¶ 76-77;

These allegations, and the numerous others in the Indictment, demonstrate why an as-applied vagueness challenge cannot survive. See Ji Chaoqun, 2020 WL 1689826, at *4 (denying motion to dismiss Section 951 claim on vagueness grounds because defendant "does not articulate any basis on which the statute is vague or standardless as to him"); see id. ("The question is whether the statute is sufficiently clear that it covers the defendant's conduct, not whether it gives fair notice in the abstract.").[22] Defendants' complaints are insufficient to sustain a challenge when a statute is as clear as Section 951. See Farhane, 634 F.3d at 139 (explaining that the notice test does not require "meticulous specificity in the identification of proscribed conduct" but instead "requires only that the statutory language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices."); Duran, 596 F.3d at 1291 ("Statutes are not automatically invalidated as vague simply because difficulty is found in

---

[22] Indeed, in their motions to dismiss, the Defendants provide a litany of hypothetical examples involving Park Slope supers, Staten Island priests and foreign officials who need help with their car batteries that have nothing to do with the Defendants' conduct, which is clearly proscribed by Section 951. See Grimes Mot. at 15-16; Barrack Mot. at 23.

determining whether certain marginal offenses fall within their language, and there is a strong presumption supporting the constitutionality of legislation.") (internal citation omitted).

The Defendants insist that no ordinary person in their positions would know that Section 951 proscribed their conduct. But in making this claim, the Defendants mischaracterize the allegations in the Indictment. Barrack states that he merely "expressed his views and connected officials in the UAE to people in the United States," and that an "ordinary person in Mr. Barrack's position would fail to comprehend that his public expression about Middle East policy and related political conduct"[23] would be proscribed under Section 951. Barrack Mot. at 23-24.[24] But that is not what the Indictment alleges. To the contrary, the Indictment alleges that Barrack (1) influenced the Trump Campaign and the U.S. government in favor of pro-UAE policies; (2) provided sensitive intelligence to UAE officials about high-level U.S. government meetings, decisions and potential political appointments; (3) advocated privately on behalf of the UAE at the highest levels of the U.S government; and (4) provided UAE officials with access to senior U.S.

---

[23]   Although not dispositive to Barrack's vagueness challenge, if Barrack actually believed that he had done nothing wrong, it is unclear why he allegedly lied to FBI special agents during his voluntary June 20, 2019 interview as set forth in Counts Three through Seven of the Indictment.

[24]   Barrack also claims erroneously that the Indictment alleges that Barrack acted "contrary to his supposed principals' interests" and cites paragraphs 83 and 85 of the Indictment in support. Barrack is mistaken. In paragraph 83, Barrack is alleged to have provided sensitive, non-public intelligence about the U.S. government's consideration of a Camp David summit to Al Malik, who was working as an intermediary to UAE officials. And in paragraph 85, Grimes is alleged to have sent Al Malik a news article that noted that Barrack advised President Trump not to get involved in the dispute between Qatar and the UAE—which is exactly what the UAE wanted. See Indictment ¶ 83. Paragraph 84 of the Indictment further alleges that Barrack intended to indicate, through the new article, that other senior U.S. government officials should not interfere with Barrack's efforts to advise President Trump not to get involved in the dispute, including by refraining from convening a Camp David summit.

government officials, including the President of the United States.   See supra.   This is exactly the type of conduct that Section 951 proscribes.

Similarly, Grimes claims that he was simply "a junior employee"[25] reporting to "an American supervisor."   Grimes Mot. at 17.   As an initial matter, the Indictment does not allege that Grimes was a junior employee.   The Indictment alleges that Grimes was employed by Company A and reported directly to Barrack.   See Indictment ¶ 3.   The Indictment also alleges that Grimes had significant responsibilities in the charged scheme, including, inter alia, (1) drafting a strategy proposal for the UAE to promotes its foreign policy interests and increase its political influence in the United States; (2) editing and revising a national energy speech with UAE-favored language for then-Candidate Trump; and (3) editing and revising a nationally published Op-Ed for Barrack that had UAE-favored language.

Grimes also argues that because the Indictment does not allege that he communicated directly with UAE officials, and simply reported to an "American supervisor," he could not have agreed to operate at the direction of UAE officials.   But nothing in Section 951 requires such direct contact for an agency relationship.[26]   The Fourth Circuit's recent decision in Rafiekian is instructive.   See 991 F.3d at 540.   In that case, the Fourth Circuit held that what

---

[25]    Grimes characterizes himself as someone with mere clerical responsibilities, such as "relaying messages," "making calls," "tagging along on trips," and "fetching [Barrack's] coffee," but that underplays his actual role and responsibilities.   Grimes Mot. at 21.   Although not alleged in the Indictment, records obtained by the government during its investigation indicate that Grimes graduated a year early and magna cum laude from the University of Pennsylvania's Wharton School and that, in 2016, Grimes served as an analyst in the Office of the Chairman at Company A with total compensation of $225,000, which rose to $433,600 in 2017, and then, when he was promoted to Vice President in 2018, rose to $600,000.

[26]    Moreover, the government anticipates that, at trial, it will introduce evidence of direct contacts and communications between Grimes and UAE officials.

matters for an agent-principal relationship under Section 951 is not whether it "is established by direct contact or via intermediary," but that a foreign government or official is "on one end of the line." Id. (citation omitted). Here, the Indictment alleges that Grimes understood that Al Malik was communicating with him and Barrack on behalf of senior UAE officials. See, e.g., Indictment ¶¶ 20, 24(e), 24(g), 29, 32, 38, 44-50, 53, 55, 57-63. Indeed, Al Malik makes clear in numerous communications with Grimes that he is acting as an intermediary between senior UAE officials and Barrack and Grimes. See id. And the Indictment alleges numerous communications and in-person meetings between Grimes and Al Malik that do not directly involve Barrack, with Grimes acting at the direction of UAE officials, aiding and abetting Al Malik and Barrack, and conspiring with both, as charged. See, e.g., Indictment ¶ 65.

2.     Section 951 Does Not Authorize or Encourage Arbitrary Enforcement

In examining challenges on the grounds that a statue will lead to arbitrary enforcement, courts should consider whether (1) the "statute as a general matter provides sufficiently clear standards to minimize the risk of arbitrary enforcement" or (2) "that, even without such standards, the conduct at issue falls within the core of the statute's prohibition." Thibodeau v. Portuondo, 486 F.3d 61, 67–68 (2d Cir. 2007) (citation omitted).

First, as discussed above, the statute provides sufficiently clear standards here. It requires that a person "agree" to operate within the United States "at the direction or control" of a foreign government or official. These are not vague terms that do not clearly define conduct. A statute's language is read in the context of the whole statute, using common sense and the canons of statutory construction. See Farhane 634 F.3d at 142 (collecting cases). As the Supreme Court explained in Hill v. Colorado:

> Petitioners proffer hypertechnical theories as to what the statute covers, such as whether an outstretched arm constitutes

'approaching.' And while '[t]here is little doubt that imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question,' <u>American Communications Assn. v. Douds</u>, 339 U.S. 382, 412 (1950), because we are '[c]ondemned to the use of words, we can never expect mathematical certainty from our language,' <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 110 (1972).

530 U.S. 730, 733 (2000). Accordingly, the Second Circuit has made clear that "a statute…is not required to specify every prohibited act" and has recognized "limitations inherent in English language" to drafting a statute. <u>Perez v. Hoblock</u>, 368 F.3d 166, 175 (2d Cir. 2004). In such circumstances, the context and ordinary meaning of a term is applied. <u>United States v. Desposito</u>, 704 F.3d 221, 226-27 (2d Cir. 2013) (applying "ordinary meaning" to the term "use" in statute).

Here, as numerous courts have held, "Section 951 plainly and concretely identifies the conduct which constitutes its violation, and the statute's language is clear and unambiguous." <u>Duran</u>, 596 F.3d at 1291; <u>see also</u> <u>Hung</u>, 629 F.2d at 920 (holding that Section 951 is not impermissibly vague because "agent" is "a readily understandable term which provides adequate notice of the conduct proscribed by the statute"); <u>Lindauer</u>, 2004 WL 2813168, at *4 (rejecting claim that Section 951 is unconstitutionally vague and noting that it "does not require extensive discussion" because 'agent' is readily understandable and provides adequate notice").

Second, even if Section 951 did not provide clear standards—which it does—the Defendants' alleged conduct falls squarely within the statute's core prohibitions. <u>Farhane</u>, 634 F.3d at 139 ("even in the absence of such standards, a statute will survive an as-applied vagueness challenge if the conduct at issue falls within the core of the statute's prohibition") (internal quotations and citations omitted). The Defendants claim Section 951 only applies to "espionage-related activities on behalf of foreign intelligence agents or assets," Barrack Mot. at

22-23, or "in cases involving espionage or other inherently criminal acts such as bribery," Grimes

Mot. at 14 n.12.   But, as discussed herein, the plain text of Section 951, its legislative history and

the types of cases actually brought all reflect a substantially broader purpose.   See supra at 13-18

(discussing how Section 951 proscribe any affirmative conduct undertaken as an agent of a foreign

government, without limit to espionage-like actions).

Even if the Court found that Section 951 was limited to clandestine, espionage-like,

information gathering, the Defendants' alleged conduct would still be proscribed.   The Indictment

alleges that Barrack worked to gather sensitive intelligence on behalf of UAE national security

officials: (1) about President Trump's potential Cabinet appointments: (2) about White House

meetings in May 2017 with UAE officials; (3) about the U.S. government's internal discussions

about a potential Camp David summit regarding a foreign policy issue of significance to the UAE,

the Qatari blockade; and (4) about the views of senior U.S. government officials regarding the

Qatari blockade.   The Indictment also alleges that Barrack lobbied the Trump Administration on

behalf of UAE interests, had meetings with senior UAE officials to discuss a pro-UAE U.S. foreign

policy wish list for the first 100 days, six months, year and four years of the Trump Administration,

and arranged a telephone call between a senior UAE official and President Trump.   Grimes makes

the identical argument under lack of reasonable notice, and it applies with equal force here.

Grimes' alleged conduct is also "clandestine, espionage-like" and involves "information

gathering."   See infra pp. 67-68.

B.    Grimes' Claims that the Department of Justice's FARA Advisory Opinions
      Should Preclude his Prosecution are Unfounded

Grimes also contends that he was not given fair notice because Section 951 does

not apply to his alleged conduct and has never been "applied to a person in Grimes' situation."

Grimes Mot. at 18 (citation omitted).   Grimes does not explain this conclusory assertion but

instead points to a series of Department of Justice Advisory Opinions ("DOJ AOs") on FARA and statements by a DOJ National Security Division ("NSD") official and argues that these opinions and statements somehow preclude his prosecution.

As an initial matter, Grimes incorrectly conflates Section 951 and FARA. Guidance related to FARA is just that: non-binding advice about a different statute designed for a different purpose. The government is aware of no case that stands for the principle that more detailed notice under one statute somehow renders a different statute vague, and Grimes cites no law in support of this claim.

Even if the FARA guidance had any relevance here, it is well-settled law that DOJ's internal regulations and policies confer no substantive or procedural rights onto defendants. See, e.g., Sullivan v. United States, 348 U.S. 170, 173 (1954) (rejecting defendant's reliance on a policy embodied in DOJ Circular Letter because it "was never promulgated as a regulation of the Department and published in the Federal Register."); United States v. Lee, 274 F.3d 485, 492-93 (8th Cir. 2001) (holding that DOJ's internal policies on the death penalty confer no enforceable rights on the defendant); United States v. Craveiro, 907 F.2d 260, 264 (1st Cir. 1990) (DOJ Handbook on the Comprehensive Crime Control Act of 1984 does "not confer substantive rights on any party"). That is because "[p]rosecutorial discretion has been treated differently than other types of agency discretion." Lee, 274 F.3d at 492. Indeed, DOJ AOs on FARA contain the following explicit disclaimer: "Nothing in these letters is intended to create any substantive or procedural rights, privileges, or benefits enforceable in any administrative, civil, or criminal matter" and cite to United States v. Caceres, 440 U.S. 741 (1979), which held that a defendant could not preclude evidence gathered in violation of an internal IRS policy. This language is identical to the disclaimer in the Justice Manual (formerly, the U.S. Attorney Manual), which

courts have routinely upheld. See Lee, 274 F.3d at 493 ("Federal courts have held this disclaimer to be effective."); Nichols v. Reno, 124 F.3d 1376 (10th Cir. 1997) (affirming district court's decision holding that "prosecutorial discretion is presumptively unreviewable by the courts" and rejecting defendant's "premise the [U.S. Attorney] Manual provides him a protectable interest."); United States v. Busher, 817 F.2d 1409, 1411-12 (9th Cir. 1987) (holding that, in light of the disclaimer, the defendant is "not entitled to rely on" the U.S. Attorney Manual).

Regardless, Grimes' contention that DOJ AOs on FARA and statements made by a DOJ NSD official fail to give Grimes notice that Section 951 proscribes his alleged conduct fails. Specifically, Grimes claims that his conduct did not violate Section 951 because: (1) a DOJ NSD official stated that Section 951 is "used to prosecute clandestine, espionage-like behavior, information gathering and procurement of technology on behalf of foreign governments or officials"; (2) DOJ AO 12/6/17 and DOJ AO 4/6/18 advised that an individual who had a contractual relationship with an American company and whose interactions with foreign government officials were limited to "scheduling, coordinating and facilitating communications" was not required to register under FARA; (3) DOJ AO 11/8/12 advised that a U.S. entity was not required to register under FARA after receiving a financial grant from a foreign entity; (4) DOJ AO 10/22/20 and DOJ AO 7/13/18 advised that companies receiving comments on either a single interview of a foreign official or a single article authored by a foreign official were not, on that conduct alone, required to register under FARA, where there was no obligation to follow those comments and no compensation was exchanged; (5) DOJ AO 9/16/20 advised that a company that proposed to offer a service to the Washington, DC community, including foreign embassies, that would allow subscribers to request analysis and information about policymakers would be required to FARA, despite the company retaining editorial control about whether or when to publish such

analysis; and (6) the DOJ NSD does not discuss Section 951's notification requirement on their website or in the Justice Manual. None of these claims has merit.

First, Grimes misconstrues the DOJ NSD official's statements about the comparative scope of Section 951 and FARA in several ways. The quoted language contrasts conduct done for a "foreign principal" (a broad term relevant to FARA regulations) to conduct done for a "foreign government." See Hickey Testimony at 2. FARA and Section 951 target conduct done on behalf of different foreign entities, with FARA broader in this respect, and so it is not unusual (nor relevant to a vagueness claim) that the statement makes this point. In addition, the quoted language provides a broad list of examples of conduct that would require FARA registration, not a limiting principle: "clandestine, espionage-like behavior, information gathering and procurement of technology on behalf of foreign governments or officials." Id. And even assuming arguendo this list was exclusive, no court has ever limited the statute in the manner the Defendants claim. As discussed above, courts have consistently described Section 951, unlike FARA, as a broad, catch-all designed to prohibit any conduct if it otherwise violates the elements of the statute. See, e.g., Duran, 596 F.3d at 1293 ("the activities that fall within § 951's purview have never been expressly or by judicial interpretation limited to those bearing upon national security or even those which by their nature are criminal or inherently wrongful").

Nevertheless, there is no question that Grimes' alleged conduct is "clandestine, espionage-like" and involves "information gathering." The Indictment alleges that Grimes (1) procured a dedicated cellular telephone and downloaded an encrypted messaging application for Defendants to communicate with UAE national security officials; (2) arranged meetings between Barrack and those same officials; (3) worked with Barrack to gather sensitive information about White House meetings and decisions by senior members of the U.S. government; and (4)

drafted a strategy proposal to increase UAE influence in the United States—a proposal that was aimed at the highest levels of UAE leadership.

Second, Grimes' reliance on guidance related to FARA—a different statute, with different elements, designed for a different purpose—is not an appropriate basis to move for dismissal on any basis, let alone for a claim that Section 951 is vague. To start, Grimes' reliance on DOJ AO 12/6/17[27] and DOJ AO 4/6/18[28] is misplaced. In DOJ AO 12/6/17, the company's responsibilities for the two U.S. firms engaged with a foreign government were "limited to scheduling, coordinating, and facilitating communications." Its contract with those firms "specifically prohibit[ed] [the company] from undertaking any substantive work on behalf of the [foreign government]," or "engaging in any of the activities either outlined or enumerated in [FARA] that would cause it to be considered an 'agent of a foreign principal' and subject to a registration obligation." No such limitations were placed on Grimes, either by contract or in practice. The fact that DOJ AO 12/6/17 advised a company that it was not required to register under FARA where the company had specific contractual terms prohibiting it from engaging in the activities enumerated under FARA is hardly remarkable.

DOJ AO 4/6/18 provides little guidance either, as Grimes' employment at an American company, Company A (which, unlike in DOJ AO 4/6/18, was itself not registered under FARA), has no bearing on whether he acted as an agent of the UAE during the charged period. Indeed, it is not the government's position that Grimes' employment at Company A required him to notify the Attorney General that he was acting as an agent of a foreign government, nor is it the

---

[27]     <u>Available at</u> https://www.justice.gov/nsd-fara/page/file/1068206/download.

[28]     <u>Available at</u> https://www.justice.gov/nsd-fara/page/file/1123651/download.

government's position that any other Company A employee became an agent of a foreign government by virtue of their employment.   In fact, most, if not all, of Grimes' alleged actions were entirely outside the scope of his employment at Company A—e.g., editing then-Candidate Trump's energy speech or helping to gather non-public information about White House meetings. In addition, Grimes' conduct largely involved constant coordination and communication with Al Malik, who was not a Company A employee and who made clear to Grimes that he was acting on behalf of senior UAE officials and conveyed numerous communications from those officials to Grimes.   And Grimes' alleged conduct was in no way limited to secretarial duties, as he wrongly suggests.

Grimes also grossly mischaracterizes DOJ AO 11/8/12, which involved a not-for-profit research company that does "not engage in any political activities."[29]   Thus, under FARA, which requires registration only for certain enumerated activities, it is unsurprising that DOJ might conclude the entity was not subject to registration.   Further, and omitted by Grimes, the entity seeking the advisory opinion specifically stated that they would be working with a foreign corporation (not a foreign government), that the foreign corporation "has no affiliation with the [foreign government]" and that the foreign corporation would not "exercise direction and control over" the U.S. entity.   Thus, even if this were related to Section 951 (which it is not), the opinion starts from the presumption that there was no direction or control by a foreign government.

---

[29]     Available at https://www.justice.gov/nsd-fara/page/file/file/1070106/download.

As another example, DOJ AO 10/22/20[30] and DOJ AO 7/13/18[31] both concluded that the individual/entity at issue, a president of a consulting firm and a print media company respectively, seeking guidance were not at all "linked to a foreign principal" because the only conduct that the individual/entity engaged in related to any foreign principal was, with respect to the consulting firm, the publication of a single interview of a foreign government official and, with respect to the print media company, the publication of a single article authored by a foreign official, for which the entities received no compensation and maintained editorial control, although they allowed the foreign government officials to suggest clarifications or revisions. There is nothing in the opinions to suggest that the entities were acting at the direction or control of any foreign government. By contrast, the conduct alleged here occurred over many months and involved numerous actions directed by the UAE government and ongoing coordination with the UAE government regarding that activity, entirely unlike the single publications at issue in those advisory opinions.

Grimes' mischaracterization of DOJ AO 9/16/20 is perhaps most egregious.[32] There, the company, a "leading provider of news, intelligence, and tools to government affairs professionals and policymakers," requested an advisory opinion concerning two new services that it proposed to offer. The first service would offer subscribers "detailed information about and analysis of policymakers and influencers at the state and federal level." The second service would allow subscribers to "request that a specific topic be covered or that previously published content

---

[30]     Available at https://www.justice.gov/nsd-fara/page/file/1366651/download.

[31]     Available at https://www.justice.gov/nsd-fara/page/file/1092521/download.

[32]     Available at https://www.justice.gov/nsd-fara/page-file/1366646/download.

be refreshed or revised." The company advised that, with respect to the second service, the company would "give weight to requests from subscribers," but would retain "editorial control regarding whether and when to produce content requested in this fashion." The company intended to offer this second service "broadly within the Washington, DC community, including foreign embassies." The advisory opinion concluded "the subscriber's ability to request coverage of a specific topic, coupled with the [company] agreeing to act upon such a request, would establish an agency relationship between the [company] and any requesting foreign subscriber" for purposes of FARA and, thus, the company "would be obligated to register as an agent of a foreign principal should it agree to produce the [second service] at the request of" the foreign embassy or any other foreign principal. Grimes cannot plausibly argue that DOJ AO 9/16/20 supports his argument, as the services proposed by the company in DOJ AO 9/16/20 provide a closer analogy to the conduct that Barack and Grimes are alleged to have engaged in than any of the other DOJ AOs cited by Grimes.

Even if the Advisory Guidance were somehow relevant, it remains clearly distinguishable from the conduct alleged here. Advisory guidance indicating that a single alleged act may not trigger a FARA requirement (such as one article publication of the sort described in AO 10/22/20 or AO 7/13/18 or the receipt of a single grant as in AO 11/8/12) cannot be a basis to preclude a prosecution under a different statute that alleges substantially greater conduct done at the direction or control of a foreign government.

Grimes also claims that taking action that would benefit Company A or himself financially by "fostering a better relationship with the UAE did not make him an agent of the UAE," and cites to DOJ Agency Guidance that the mere fact that a person advocates for a particular policy change that would benefit him financially does not make him an agent. See Grimes Mot.

at 19. That guidance was making the uncontroversial point that whether a person's conduct was in their own interest, or in the interest of a foreign principal, was evidence of whether that person was acting at the direction or control of a foreign principal. The example the DOJ Agency Guidance provides is a businessman who lobbies against tariffs to China that would make it more expensive for him to import goods from China, which might demonstrate that they were not actually acting at the direction or control of a foreign principal. By contrast, Grimes is alleged to have inserted UAE-favored language in a national presidential campaign speech and a nationally-published Op-Ed, sought to gather information of high-level U.S. government meetings to provide to the UAE, agreed to make efforts to list the Muslim Brotherhood as a foreign terrorist organization, and so forth, and did so at the direction or control of UAE officials. Grimes is welcome to argue that he engaged in this conduct purely out of personal self-interest at trial, and that the UAE government's directions were happenstance, but that is not a basis for dismissal.

Finally, Grimes complains that the DOJ NSD does not address Section 951's notification requirement on its website or in the Justice Manual. This argument lacks merit. "The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system." Cheek v. United States, 498 U.S. 192, 199 (1991). And Section 951 was enacted and enforced well before the advent of the Internet or the DOJ NSD's website. Grimes does not need a website or the Justice Manual to know that his alleged conduct was wrong.

C.     Section 951 Is Not Vague on Its Face

Grimes separately argues that Section 951 is facially vague.   See Grimes Mot. at
14-16.[33]   Grimes is incorrect.

It is well-settled law that a facial challenge for vagueness is highly disfavored, and
often an as-applied analysis is the only appropriate consideration.   See Farhane, 634 F.3d at 138
("In the absence of First Amendment concerns, courts generally view vagueness challenges to a
statute as applied to the defendant's case."); Farrell v. Burke, 449 F.3d 470, 495 (2d Cir. 2006)
(stating that "[c]ourts have looked with disfavor on facial vagueness challenges to statutes that do
not implicate fundamental rights").   To the extent a facial challenge may even be maintained, the
test is a variation of the as-applied analysis, "requiring the defendant to show 'that the law is
impermissibly vague in all of its applications.'" Farhane, 634 F.3d at 138-39 (quoting Hoffman
Estates, 455 U.S. at 497) (emphasis added).   Here, since the Defendants cannot succeed in
showing that the statute is vague as applied to the facts of this case, they cannot prove that it is
vague in "all of its applications."

Grimes seeks to avoid this result by arguing that Section 951 implicates his First
Amendment rights, permitting him to maintain a facial vagueness challenge.   But, as discussed
above, the statute does not implicate, let alone infringe upon, free speech or expression under the
Constitution.   See Duran, 596 F3d. at 1292 ("[W]hether a defendant must [provide notice] under
§ 951 depend on the defendant's action and conduct as an agent of a foreign government")
(emphasis in original).   Even if the First Amendment were implicated in this case (and it is not),
courts do not conduct an additional assessment beyond the "all applications" test described by

---

[33]     Barrack does not argue facial vagueness but to the extent that he does so by relying
on hypothetical applications of Section 951, see Barrack Mot. at 22, his argument fails for the same
reasons as Grimes' facial challenge.

Hoffman Estates. The Supreme Court has clearly held that the vagueness doctrine "makes no exception for conduct in the form of speech…Thus, even to the extent a heightened vagueness standard applies, a plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice." HLP, 561 U.S. at 20 (Further explaining that "[s]uch a plaintiff may have a valid overbreadth claim under the First Amendment, but our precedents make clear that a Fifth Amendment vagueness challenge does not turn on whether a law applies to a substantial amount of protected expression."); see also United States v. Williams, 553 U.S. 285, 304 (2008) ("Although ordinarily "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others," we have relaxed that requirement in the First Amendment context, permitting plaintiffs to argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech."). Because Grimes cannot show the statute is vague in all of its possible applications, let alone as applied to the facts of this case, the Court should reject his facial vagueness claim.

V. Section 951's Notification Requirement Does Not Violate Grimes's Right Against Self-Incrimination under the Fifth Amendment

Grimes argues that Section 951 violates his privilege against self-incrimination because the Attorney General notification requirement would necessarily incriminate him. See Grimes Mot. at 32, 35-36. This argument is also meritless.

Indeed, the Fourth Circuit expressly rejected this exact argument. See Hung, 629 F. 2d at 919-20. In Hung, the defendants, like Grimes here, argued that Section 951 "violated their privilege against self-incrimination because they would have been forced to confess participation in illegal espionage if they had registered." Id. In rejecting the defendants' claim, the Fourth Circuit held that a notification "provision violates the Fifth Amendment, however, only

if it is directed at a class of persons who are inherently suspect of illegal activities," and that a "neutral [notification] requirement, such as this one directed at representatives of foreign nations, does not offend the Fifth Amendment." Id. at 919 (citing United States v. Walden, 411 F.2d 1109, 1111 (4th Cir.), cert. denied, 396 U.S. 931 (1969)); see also Garner v. United States, 424 U.S. 648, 662 n. 16 (1976) (holding that if a statute requires only "certain basic disclosures fundamental to a neutral reporting scheme," there is no violation of the Fifth Amendment privilege).

Section 951 has a neutral notification requirement and thus, does not violate the Fifth Amendment. Indeed, the statute's purpose is to facilitate regulation of the activities of foreign agents in the United States by requiring prior notification. And, as discussed above, notification is not a requirement to report on activities "almost certain to be illegal," because the statute explicitly covers any affirmative conduct as a foreign agent, and cases have held that this conduct can include entirely legal activity. See Duran, 596 F.3d at 1295 (explaining that statute permits conviction of "those engaged in purportedly legal conduct on behalf of a foreign government" if the other elements are met).

To support his argument, Grimes cites several cases, which unlike Section 951, involved statutes compelling notification or registration of inherently illegal underlying conduct. See, e.g., Albertson v. Subversive Activities Control Board, 382 U.S. 70 (1965) (registration of Communist party members when Communist Party membership was itself illegal); Scales v. United States, 367 U.S. 203, 205 (1961) (involving statute making it a felony to acquire or hold membership "in any organization which advocates the overthrow of the Government of the United States by force or violence"); Marchetti v. United States, 390 U.S. 39, 42 (1968) (tax registration requirement to indicate whether the person is "in the business of accepting wagers" which at the time was "very widely prohibited under both federal and state law"); Haynes v. United States, 390

U.S. 85, 97 (1968) (requiring registration of people who obtained a firearm without complying with other requirements of statute, and therefore "immediately threaten[ing] criminal prosecutions"); <u>Leary v. United States</u>, 395 U.S. 6, 16 (1969) (requiring registration under "Marihuana Tax Act" during time when "possession of any quantity of marihuana was apparently a crime in every one of the 50 states"). Section 951, however, does not require someone to provide notice in a manner that compels an admission of illegal conduct. Therefore, in this setting, "the mere possibility of incrimination is insufficient to defeat the strong policies in favor of a disclosure called for by statutes like the one challenged here." <u>Byers</u>, 402 U.S. at 427-28.

Notwithstanding Section 951's plain language and case law both reflecting that it does not require any underlying illegal conduct, Grimes claims that its "overt purpose is 'to prosecute' individuals." Grime Mot. at 35. This is incorrect. The purpose of Section 951 is to prosecute individuals that act as foreign agents without providing notice, not for committing illegal conduct. Indeed, under Section 951, the underlying conduct does not have to be illegal. <u>See</u> <u>Duran</u>, 596 F.3d at 1295 (the statute broadly encompasses "<u>any</u> affirmative conduct undertaken as an agent of a foreign government"). Understandably, Section 951's requirement that an agent of a foreign government notify the U.S. government of their activities may deter certain conduct by that agent. But, as discussed previously, while that underlying conduct may help a foreign government and harm the United States, it may not be inherently illegal. <u>See</u>, <u>e.g.</u>, <u>Heine</u>, 151 F.2d at 817 (affirming conviction of defendant who provided German government with information about airline industries from "lawfully accessible" sources such as "ordinary magazines"); <u>Duran</u>, 596 F.3d at 1293 ("the activities that fall within § 951's purview have never been expressly or by judicial interpretation limited to those bearing upon national security or even those which by their nature are criminal or inherently wrongful"). Thus, a person can provide

notice as an agent of a foreign government without a credible fear that this fact alone could be used to self-incriminate.   It is a neutral statute, and therefore is valid.   See Hung, 629 F.2d at 919-20

## VI.      Section 951's Implementing Regulations are Not Invalid

Grimes argues that he cannot be prosecuted under Section 951 because the implementing regulations are invalid.   See Grimes Mot. at 24-26.   In understanding and applying a regulatory scheme, courts should interpret statutes to be coherent and internally consistent.   See FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133, (2000). Wherever possible, courts should read regulations to be consistent with the statutes that authorize them, and a construction that thwarts the statute which the regulation implements is impermissible.   Insurance Company of North America v. Gee, 702 F.2d 411, 414 (2d Cir. 1983).

Section 951 imposes a criminal penalty upon anyone "other than a diplomatic or consular officer or attaché, [who] acts in the United States as an agent of a foreign government without prior notification to the Attorney General if required in subsection (b)."   18 U.S.C. § 951(a).   The term "agent" is further defined by the statute as someone who "agrees to operate within the United States subject to the direction or control of a foreign government or official." 18 U.S.C. § 951(d).   Subsection (b) of the statute directs the Attorney General to promulgate regulations to establish notification requirements.   Thus, taken as a whole, Section 951 provides for criminal liability for (1) a person who agrees to act in the United States subject to the direction or control of a foreign government (or official); and (2) does so without providing the notice specified by the Attorney General's regulations.

These implementing regulations are contained in 28 C.F.R. § 73 et seq.   As mandated by 18 U.S.C. § 951(b), the regulations "establish[] requirements for notification," including defining persons required to notify the Attorney General as "individuals acting as

representatives of, or on behalf of, a **foreign government** or official, who are subject to the direction or control of that **foreign government** or official, and who are not specifically excluded by the terms of the Act or the regulations thereunder." 28 C.F.R. § 73.1(a).

Grimes claims that 28 C.F.R. § 73.1(a) impermissibly widens the definition of agent by omitting the term "agree," and thus criminalizes behavior in a manner in direct conflict with the language of Section 951. Id. This reading is misguided and should be rejected.

First, there is nothing inconsistent about the statute and the regulation. There is no meaningful difference between the definition of "agent of a foreign government" provided in 18 U.S.C. 951(d) ("an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official") and that of an agent who must provide notice under 28 C.F.R. 73.1(a) ("all individuals acting as representatives, or on behalf of, a foreign government or official, who are subject to the direction or control of that foreign government or official"). The regulation does not omit the concept of an agreement referenced in the statute, as Grimes claims. Instead, it uses synonymous language—acting as a "representative of, or on behalf of," which necessarily incorporates the identical premise of a mutual agreement, since one cannot actually be a representative or acting on behalf of another without such an agreement. Thus, there is no daylight between the statute and regulations. See Rafiekian, 991 F.3d at 538 n.11 (discussing statutory definition of agent and explaining that the regulations "similarly define" the term).

Second, even under Grimes' strained interpretation of 28 C.F.R. § 73.1(a) as defining "agent" more broadly than "agent of a foreign government" under 18 U.S.C. § 951(d), no legal infirmity would arise because criminal liability would only attach to an individual if that person (a) met the regulatory definition of "agent" under 28 C.F.R. § 73.1(a); (b) failed to notify

the Attorney General; and (c) acted in the United States as an "agent of a foreign government," as that term is defined in 18 U.S.C. § 951(d). That is, the individual would have to constitute <u>both</u> an "agent" under 28 C.F.R. § 73.1(a) <u>and</u> an "agent of a foreign government" under 18 U.S.C. § 951(d) before they could be charged for failing to notify the Attorney General. Thus, the definition of the term "agent" under 28 C.F.R. § 73.1(a) does not broaden criminal exposure beyond the scope of the statutory language of Section 951.

VII.  <u>The Defendant's Motion to Dismiss the Indictment Based on Alleged Improper Pre-Trial Delay Should Be Denied</u>

Lastly, Barrack contends that the Court should dismiss the Indictment because the government's purported delay in bringing charges violates due process. <u>See</u> Barrack Mot. at 36. This argument is entirely meritless.

The Second Circuit standard for pre-indictment delay is clear, and it imposes a heavy burden on the defendant to show that: (i) "he suffered actual prejudice because of the alleged pre-indictment delay," and (ii) "that such delay was a course intentionally pursued by the government for an improper purpose." <u>Cornielle</u>, 171 F.3d at 752 (citations omitted). The burden for proving both prongs of the standard rests squarely on the defendant. <u>United States v. Scarpa</u>, 913 F.3d 993, 1014 (2d Cir. 1990); <u>United States v. Rubin</u>, 609 F.2d 51, 66 (2d Cir. 1979); <u>United States v. Ricco</u>, 549 F.2d 264, 272 (2d Cir. 1977). The burden is so heavy that it is rarely met by a defendant. <u>See DeMichele v. Greenburgh Centr. Sch. Dist. No. 7</u>, 167 F.3d 784, 790-91 (2d Cir. 1999) ("[W]hile the [Supreme] Court may not have shut the door firmly on a contention that at some point the Due Process Clause forecloses prosecution of a claim because it is too old, at most the door is barely ajar."). Barrack has not met his heavy burden in this case.

A.    The Defendant Has Failed to Demonstrate Actual and Substantial Prejudice

It is well-settled that the statute of limitations is "the primary guarantee against bringing overly stale criminal charges."  United States v. Marion, 404 U.S. 307, 322 (1971) (internal quotation marks and citations omitted).  Thus, when a case has been brought within the statute of limitations, it is "only rarely dismissed," and carries a "strong presumption of validity." United States v. Cornielle, 171 F.3d 748, 752 (2d Cir. 1999); see also United States v. Lawson, 683 F.2d 688, 694 (2d Cir. 1982).

Substantial prejudice is just that—substantial, actual, non-speculative prejudice. See United States v. Birney, 686 F.2d 102, 105-06 (2d Cir. 1982) (a defendant's "proof of prejudice must be definite and not speculative"); see also United States v. Henderson, 337 F.3d 914, 920 (7th Cir. 2003) (prejudice sufficient to warrant dismissal for pre-indictment delay must be "actual and substantial" and "specific, concrete, and supported by evidence").  Prejudice in this context refers to "actual prejudice to the defendant's right to a fair trial."  United States v. Elsbery, 602 F.2d 1054, 1059 (2d Cir. 1979).  Claims of loss of memory resulting from the passage of time have been held to be insufficient to warrant dismissal of an indictment on due process grounds.  See United States v. Wright, 343 F.3d 849, 860 (6th Cir. 2003); Henderson, 337 F.3d at 919-20.  Moreover, even when a claim of prejudice is based upon the complete loss of a witness's testimony or other evidence, a defendant nevertheless must show how that testimony or evidence would have affected the outcome or otherwise have assisted the case.  See United States v. Gilbert, 266 F.3d 1180, 1187 (9th Cir. 2001) (defendant's pre-indictment delay claim rejected due to failure to show "how the testimony from [three absent] witnesses would have benefitted his case"); United States v. Spears, 159 F.3d 1081, 1085 (7th Cir. 1999) ("[A] defendant must do more than show that a particular witness is unavailable and that the witness'

testimony would have helped the defense. He must also show that the witness would have testified, withstood cross-examination, and that the jury would have found the witness credible." (citations omitted)). "Courts have held that 'the defendant also has the burden of showing that the lost testimony or information was not available through other means.'" Pierre-Louis, 2018 WL 4043140, at *4 (quoting United States v. Sprouts, 282 F.3d 1037, 1041 (8th Cir. 2002)).

The vast majority of pre-indictment delay cases fail on the first prong. See, e.g., Marion, 404 U.S. at 324-25 (fading witness memories insufficient; "no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution"); United States v. Snyder, 668 F.2d 686, 689 (2d Cir. 1982) (death of a defense witness three years before indictment insufficient prejudice); United States v. Iannelli, 461 F.2d 483, 485 (2d Cir. 1972) (unavailability of witnesses insufficient prejudice); United States v. King, 560 F.2d 122, 130-31 (2d Cir. 1977) (death of witness and missing documents insufficient prejudice); Pierre-Louis, 2018 WL 4043140, at *4-5 (death of a defense witness and defendant's own memory issues insufficient prejudice).

Barrack claims that because of the purported delay, he is unable to obtain (1) "critical proof to establish what he was asked and how he answered" questions when he was interviewed in 2019; and (2) evidence of records from others of communications he may have had. Id. Neither has merit.

First, Barrack was represented by multiple attorneys who took notes during the 2019 interview, presumably with the intent of creating the "critical proof to establish what he was asked and how he answered" of which defendant claims he has been deprived. Barrack Mot. at 38. Barrack fails to articulate how these notes would have been more helpful to the defendant if the charges were brought earlier. And Barrack identifies no other proof that he

could have gathered regarding his statements at his interview, had he been indicted earlier. As a result, Barrack not only fails to establish a substantial, actual, non-speculative prejudice, but fails to establish any prejudice at all. See Birney, 686 F.2d at 105-06.

Second, Barrack does not provide a single concrete example of attempts that he has made to obtain documents or offer examples about how these attempts have been thwarted by the passage of time. See Barrack Mot. at 38. He does not specify what documents he could have obtained, from whom he would have obtained them, or make any claims that this evidence would have been admissible. He merely speculates that the evidence could have helped his defense. This is far from the definite proof of prejudice required to state a due process claim. See United States v. Greer, 956 F. Supp. 525, 528 (D. Vt. 1997) ("In the context of unavailable witnesses, the defendant must offer some grounds for his belief that the absent witness would have helped his case in a material way." (internal quotation marks and citation omitted)). Barrack's claim that he no longer has access to certain unspecified evidence is not a proper basis to dismiss the Indictment. See United States v. Dornau, 356 F. Supp. 1091, 1094 (S.D.N.Y. 1973) ("A bare allegation that records have been lost or destroyed, which might relate to the instant prosecution, is insufficient to show actual prejudice. The fact that evidence may be lost or destroyed during the pre-indictment stage is inherent in any delay, no matter what the duration. Furthermore, there has been no allegation in this case that the destruction of the records was deliberate on the part of either the government or trustee." (internal citations omitted)).

Finally, Barrack makes a general claim about a loss of memories, without identifying a single witness who is now unavailable due to loss of memory. See Barrack Mot. at 39. "Faded memories or unavailable witnesses are inherent in any delay, even if justifiable. To merit dismissal, a defendant must demonstrate a substantial, actual prejudice to his ability to

defend himself." United States v. Long, 697 F. Supp. 651, 657 (S.D.N.Y. 1988) (finding that "perceived prejudice is speculative" where there was "no way of knowing what [the unavailable witness's] testimony would have been"). Even were Barrack to provide the names of witnesses with failing memories, this in and of itself would still be insufficient. See Spears, 159 F.3d at 1085 ("[A] defendant must do more than show that a particular witness is unavailable and that the witness' testimony would have helped the defense. He must also show that the witness would have testified, withstood cross-examination, and that the jury would have found the witness credible." (citations omitted)); see also United States v. Valona, 834 F.2d 1334, 1339 (7th Cir. 1987) (noting that prejudice analysis must consider whether the missing witness "would have withstood cross-examination," whether the jury would have found him a "credible witness," and whether the testimony, when compared to other trial evidence "would affect the trial outcome" (internal quotation marks and citations omitted)).

Here, Barrack has not alleged that anyone would have been available to testify in the first instance, much less that he or she would have voluntarily agreed to testify at his trial in a way that would help, rather than hurt, Barrack. Further, dimming or fading memories over the passage of time are not in themselves sufficient to "demonstrate that [defendants] cannot receive a fair trial" or "justify the dismissal of the indictment." Marion, 404 U.S. at 326; Elsbery, 602 F.2d at 1059. To the extent the passage of time affects the memories of witnesses who testify at trial, Barrack will have an opportunity to cross-examine such witnesses. See United States v. Harrison, 764 F. Supp. 29, 32 (S.D.N.Y. 1991) (noting that "the passage of time does affect witnesses' memories and it may be relevant to the credibility of their testimony" and that the government also faces potential harms from the passage of time). Accordingly, Barrack's bald assertions regarding diminished memories of potential witnesses are speculative and, thus, fall

short of the proof of actual prejudice required by the Supreme Court's standard in Marion.

B.     The Defendant Has Failed to Establish That the Government Delayed the Indictment for An Improper Purpose

If, and only if, a defendant has established significant, actual prejudice does the inquiry turn to the reason for the delay.  See, e.g., Pierre-Louis, 2018 WL 4043140, at *5 ("Because Defendant failed to show prejudice, the Court need not even address the second prong.").  The reason for delay violates due process only if it is so extreme that it departs from fundamental notions of "fair play.'"  United States v. Lovasco, 431 U.S. 783, 795 (1977).  The Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly," Dowling v. United States, 493 U.S. 342, 352 (1990), and the Supreme Court has "stressed the importance for constitutional purposes of good or bad faith on the part of the Government when the claim is based on loss of evidence attributable to the Government," Arizona v. Youngblood, 488 U.S. 51, 57 (1988).

The Second Circuit has made clear that a defendant seeking the dismissal of an indictment filed within the statute of limitations must establish that the government acted intentionally, deliberately, or with some strategy, and that the government used that delay to gain a tactical advantage over the defendant.  See, e.g., Cornielle, 171 F.3d at 752 (delay must be "intentional device to gain [a] tactical advantage over the accused"); see also United States v. Alameh, 341 F.3d 167, 176 (2d Cir. 2003) ("To show unjustifiable conduct, a defendant must demonstrate that the government has intentionally used delay to gain unfair tactical advantage."); see also United States v. Delacruz, 970 F. Supp. 2d 199, 203 (S.D.N.Y. 2013) ("Delacruz's motion to dismiss would nevertheless fail for the independent reason that he has not made any showing that the preindictment delay was an intentional device designed by the Government to gain a tactical advantage."); United States v. Martinez, No. 94 Cr. 219 (RPP), 1995 WL 10849, at *4

(S.D.N.Y. Jan. 12, 1995) ("In order to establish improper delay by the Government in filing an indictment, a defendant must show that the delay was the result of an intentional device of the Government to gain tactical advantage over the accused." (internal quotation marks and alterations omitted) (citing United States v. Hoo, 825 F.2d 667, 671 (2d Cir. 1987))).   Indeed, some version of the phrase "deliberate device" and "tactical advantage" is found in nearly every Second Circuit decision on the issue.   See, e.g., Alameh, 341 F.3d at 176 ("intentionally used delay to gain unfair tactical advantage"); Corielle, 171 F.3d at 752 (requiring "intentional device" to gain "tactical advantage"); Lawson, 683 F.2d at 694 (delay not "engineered by the government for an improper purpose, such as gaining a tactical advantage"); Snyder, 668 F.2d at 689; United States v. Watson, 599 F.2d 1149, 1157 n. 5 (2d Cir. 1979); United States v. Tanu, 589 F.2d 82, 89 (2d Cir. 1978); United States v. Laurenti, 581 F.2d 37, 40 n.11 (2d Cir. 1978); United States v. Hillegas, 578 F.2d 453, 460 (2d Cir. 1978).

Even if Barrack could establish any actual prejudice—which he cannot—such prejudice would be "necessary but not sufficient" to establish a due process claim.   Lovasco, 431 U.S. at 790.   Barrack's motion fails because he has not demonstrated the other necessary element to prevail: that the claimed delay by the government was intentional and deliberate to gain a strategic advantage.   Here, as in Lovasco, any pre-indictment delay was the result of the government's continuing investigation and evaluation of the case.   The Lovasco Court held that the investigative delay did not deprive the defendant of due process and noted that imposing a duty upon prosecutors to file charges as soon as probable cause exists "'would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself.'"   Id. at 791 (quoting United States v. Ewell, 383 U.S. 116, 120 (1966)).

The same is true in the present case.   Barrack has not shown—and cannot show—

that the government caused any pre-indictment delay in this case to gain a tactical advantage. Barrack merely conjectures that the "Department of Justice delayed indictment until a new presidential administration came into power," which raises, in Barrack's mind, "the very real potential that politics was the motivating force for the belated charges." Barrack Mot. at 39. But rhetoric aside, Barrack offers nothing beyond baseless speculation in support of his claims.

As discussed above, any delay in bringing the indictment was the result of continued investigation and evaluation of the evidence. Even if the Court were to determine that there was some sort of delay in seeking the Indictment, Barrack's motion should be dismissed because he failed to show that the government acted improperly to obtain a tactical advantage. See, e.g., Pierre-Louis, 2018 WL 4043140 (denying motion to dismiss for pre-indictment delay as to conduct charged in 2016 involving sexual abuse of minors from 1998 to 2007 as defendant failed to satisfy both prongs of pre-indictment delay standard); United States v. Burke, No. 09 Cr. 135 (SJ), 2011 WL 2609837, at *7 (E.D.N.Y. July 1, 2011) (denying motion to dismiss indictment based on thirty-year pre- indictment delay because even if unavailability of alibi witnesses were prejudicial, defendant failed to show that government delayed for its own benefit); United States v. Carbonaro, No. 02 Cr. 743 (RCC), 2004 WL 2222145 (S.D.N.Y. Sept. 30, 2004) (in a racketeering conspiracy case in which a 14-year-old murder was alleged as a predicate act, finding that, even assuming defendant had shown actual prejudice, defendant's motion to dismiss based on pre-indictment delay failed because defendant supplied no evidence that government's conduct was for an improper purpose). Notably, Barrack does not explain what tactical advantage, if any, the government sought to receive through this supposed delay or claim that the government actually received it.

In sum, not only does Barrack fail to demonstrate actual, non-speculative

prejudice owing to pre-indictment delay, but he also fails to establish that the government intentionally manufactured any alleged delay to gain a tactical advantage over him. He has "offered no credible evidence to suggest that the Government tarried in bringing charges against him solely to gain some prosecutorial advantage." Pierre-Louis, 2018 WL 4043140, at *5. As such, because Barrack cannot meet his "heavy burden" of showing both actual prejudice and unjustifiable government conduct, his motion to dismiss the Indictment for pre-indictment delay should be denied.

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully requests that the Court deny the Defendants' motions to dismiss the Indictment.

Dated:     Brooklyn, New York
           February 28, 2022


                                    BREON PEACE
                                    United States Attorney
                                    Eastern District of New York

                          By:      __/s/_____
                                    Ryan C. Harris
                                    Samuel P. Nitze
                                    Hiral D. Mehta
                                    Craig R. Heeren
                                    Assistant U.S. Attorneys
                                    (718) 254-7000

                                    MATTHEW G. OLSEN
                                    Assistant Attorney General
                                    Department of Justice
                                    National Security Division

                          By:      _/s/ Matthew J. McKenzie_
                                    Matthew J. McKenzie
                                    Trial Attorney