IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:21-cr-00371(BMC)(TAM) |
| | ) | Hon. Brian M. Cogan |
| MATTHEW GRIMES | ) | |


**MR. GRIMES' REPLY IN FURTHER SUPPORT OF
HIS MOTION TO DISMISS THE INDICTMENT**

Abbe David Lowell
Christopher D. Man
Andrew E. Tauber
WINSTON & STRAWN LLP
1901 L Street, NW
Washington, DC 20036
ADLowell@winston.com
202-282-5000 (ph)
202-282-5100 (fax)

Sofia Arguello
Johanna Hudgens
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
SArguello@winston.com
212-294-6700 (ph)
212-294-4700 (fax)

*Counsel for Defendant Matthew Grimes*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

I.    THE INDICTMENT FAILS TO STATE A CLAIM AGAINST MR.
GRIMES ............................................................................................... 1

    A.    The Facts Alleged In The Indictment Show That Mr. Grimes Was
An Agent Of Colony Capital, *Not* The UAE .............................................. 1

    B.    "Agent" Under Section 951 Does Not Include Employees Of
Agents ....................................................................................... 5

    C.    Mr. Grimes Was Not An Agent Of A Foreign Government
Because He Was Engaged In A "Legal Commercial Transaction" ............ 6

II.    THE INDICTMENT FAILS TO CHARGE MR. GRIMES WITH
SPECIFIC INTENT, WHICH DUE PROCESS REQUIRES ............................... 9

    A.    Specific Intent Is Required.......................................................... 9

    B.    Due Process Requires Specific Intent ....................................... 13

III.    SECTION 951 IS UNCONSITUTTIONALLY VAGUE ................................... 15

    A.    Section 951 Is Void On Its Face ................................................ 15

    B.    Section 951 Is Void As Applied ................................................ 17

    C.    Mr. Grimes Was Not Provided Fair Notice That His Alleged
Conduct Was A Crime ............................................................... 19

IV.    SECTION 951 IS UNENFORCEABLE BECAUSE ITS
IMPLEMENTING REGULATIONS ARE VOID ............................................. 27

V.    SECTION 951 VIOLATES THE FIRST AMENDMENT ................................. 29

    A.    Section 951 Unduly Burdens Political Speech ......................... 29

    B.    Section 951 Is An Unconstitutional Prior Restraint................................ 32

    C.    Section 951 Constitutes Speaker-Based Discrimination.......................... 35

VI.    SECTION 951 VIOLATES THE SELF-INCRIMINATION CLAUSE ............. 36

CONCLUSION.................................................................................................. 40

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Beal v. Stern,*
184 F.3d 117 (2d Cir. 1999) ............................................................. 32

*Betancourt v. Bloomberg,*
448 F.3d 547 (2d Cir. 2006) ............................................................. 16

*Brown v. Ent. Merchants Ass'n,*
564 U.S. 786 (2011) ......................................................................... 34

*C.F.T.C. v. Vartuli,*
228 F.3d 94 (2d Cir. 2000) ............................................................... 32

*Carter v. United States,*
530 U.S. 255 (2000) ......................................................................... 11

*Cheek v. United States,*
498 U.S. 192 (1991) ......................................................................... 11

*Citizens United v. F.E.C.,*
558 U.S. 310 (2010) ......................................................................... 35

*Citizens United v. Schneiderman,*
882 F.3d 374 (2d Cir. 2018) ............................................................. 32

*City of Chicago v. Morales,*
527 U.S. 41 (1999) ........................................................................... 16

*Decker v. Nw. Env't Def. Ctr.,*
568 U.S. 597 (2013) ......................................................................... 28

*Elonis v. Unites States,*
575 U.S. 723 (2015) ........................................................................... 9

*First Nat'l Bank of Bos. v. Bellotti,*
435 U.S. 765 (1978) ......................................................................... 35

*Giboney v. Empire Storage & Ice Co.,*
336 U.S. 490 (1949) ......................................................................... 30

*Hobbs v. Cnty. of Westchester,*
397 F.3d 133 (2d Cir. 2005) ............................................................. 32

*Holder v. Humanitarian Law Project,*
561 U.S. 1 (2010) ............................................................................. 34

*Ianelli v. United States,*
420 U.S. 770 (1975)..................................................................39

*Johnson v. United States,*
576 U.S. 591 (2015)..................................................................15

*Kolender v. Lawson,*
461 U.S. 352 (1983)..................................................................16

*Lambert v. California,*
355 U.S. 225 (1957)..................................................................13

*Lia v. Saporito,*
909 F. Supp. 2d 149 (E.D.N.Y. 2012) .................................17

*Liparota v. United States,*
471 U.S. 419 (1985)..............................................................10, 12

*Lusk v. Vill. of Cold Spring,*
475 F.3d 480 (2d Cir. 2007)...................................................32

*Marchetti v. United States,*
390 U.S. 39 (1968)....................................................................37

*Morissette v. United States,*
342 U.S. 246 (1952)..................................................................10

*Rehaif v. United States,*
139 S. Ct. 2191 (2019)...............................................................9

*Republic of Ecuador v. Chevron Corp.,*
638 F.3d 384 (2d Cir. 2011)...................................................18

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
515 U.S. 819 (1995)..................................................................35

*Russell v. United States,*
369 U.S. 749 (1962)....................................................................4

*Shuttlesworth v. City of Birmingham,*
394 U.S. 147 (1969)..................................................................32

*Smith v. United States,*
568 U.S. 106 (2013)....................................................................7

*Sunderland v. United States,*
19 F.2d 202 (8th Cir. 1927) ......................................................5

*Tandon v. Newsom,*
    141 S. Ct. 1294 (2021) ................................................................. 35

*Thibodeau v. Portuondo,*
    486 F.3d 61 (2d Cir. 2007) ................................................... 16, 19

*Time Warner Cable Inc. v. F.C.C.,*
    729 F.3d 137 (2d Cir. 2013) ....................................................... 35

*Torres v. Lynch,*
    578 U.S. 452 (2016) ....................................................................... 9

*Travis v. United States,*
    364 U.S. 631 (1961) ..................................................................... 40

*Turner Broad. Sys., Inc. v. F.C.C.,*
    512 U.S. 622 (1994) ..................................................................... 35

*United States v. Briggs,*
    54 F. Supp. 731 (D.D.C. 1944) ..................................................... 5

*United States v. Butenko,*
    384 F.2d 554 (3d Cir. 1967) .......................................................... 3

*United States v. Byrne,*
    422 F. Supp. 147 (E.D. Pa. 1976) .............................................. 20

*United States v. Campa,*
    529 F.3d 980 (11th Cir. 2008) .................................................... 10

*United States v. Cantrell,*
    612 F.2d 509 (10th Cir. 1980) ...................................................... 5

*United States v. Cantril,*
    8 U.S. 167 (1807) .......................................................................... 5

*United States v. Chung,*
    659 F.3d 815 (9th Cir. 2011) ........................................................ 2

*United States v. Cisneros,*
    26 F. Supp. 2d 24 (D.D.C. 1998) ................................................. 4

*United States v. Conde,*
    309 F. Supp. 2d 510 (S.D.N.Y. 2003) ......................................... 5

*United States v. Craft,*
    105 F.3d 1123 (6th Cir. 1997) ...................................................... 8

*United States v. Dumeisi*,
424 F.3d 566 (7th Cir. 2005) ...................................................10, 31

*United States v. Duran*,
596 F.3d 1283 (11th Cir. 2010) ........................................................10

*United States v. Eason*,
434 F. Supp. 1217 (W.D. La. 1977).....................................................5

*United States v. Farhane*,
634 F.3d 127 (2d Cir. 2011).............................................................15

*United States v. Gagliardi*,
506 F.3d 140 (2d Cir. 2007).............................................................31

*United States v. Howell*,
78 U.S. 432 (1870)...........................................................................5

*United States v. Hung*,
629 F.2d 908 (4th Cir. 1980) ...........................................................36

*United States v. Larionoff*,
431 U.S. 864 (1977).........................................................................28

*United States v. Mancuso*,
420 F.2d 556 (2d Cir. 1970).............................................................14

*United States v. O'Brien*,
391 U.S. 367 (1968).........................................................................30

*United States v. Palo*,
2017 WL 6594196 (W.D. Pa. Dec. 26, 2017)......................................5

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000).........................................................................34

*United States v. Quattrone*,
402 F.3d 304 (2d Cir. 2005).............................................................32

*United States v. Rafiekian*,
2019 WL 3021769 (E.D. Va. 2019).....................................................7

*United States v. Rafiekian*,
991 F.3d 529 (4th Cir. 2021) .............................................................3

*United States v. Rajarantnam*,
2014 WL 1554078 (S.D.N.Y. Apr. 17, 2014)........................................5

*United States v. Ramirez,*
  324 F.3d 1225 (11th Cir. 2003) ...........................................................7

*United States v. Virginia,*
  518 U.S. 515 (1996).............................................................................34

*United States v. X-Citement Video, Inc.,*
  513 U.S. 64 (1994)...............................................................................9

*Urlaub v. Inc. Vill. of Bellport,*
  498 F. Supp. 2d 614 (E.D.N.Y. 2007) .................................................32

*Village of Hoffman Estates v. Flipside Hoffman Estates, Inc.,*
  455 U.S. 489 (1982).............................................................................15

*In re Washington Post Co.,*
  807 F.2d 383 (4th Cir. 1986) ..............................................................34

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton,*
  536 U.S. 150 (2002).............................................................................34

**Constitutional Provisions**

U.S. Const. amend. I ...............................................................................1

U.S. Const. amend. V.............................................................................38

**Statutes**

2 U.S.C. § 1603(a)(1)............................................................................33

18 U.S.C. § 951 .............................................................................. *passim*

22 U.S.C. § 611(c)(1)........................................................................5, 19

22 U.S.C. § 612(a) ................................................................................33

22 U.S.C. § 614(a) ................................................................................34

50 U.S.C. § 3811 ..................................................................................30

**Regulations**

28 C.F.R. § 73.1 ................................................................................6, 28

**Rules**

Fed. R. Crim. P. 12 ............................................................................7, 8

**Other Authorities**

*Audit of the National Security Division's Enforcement and Administration of the Foreign Agent's Registration Act* (Sept. 2016)........................................................22

*Communist Block Intelligence Gathering on Capitol Hill: Hearing. on S. 1959 and S. 1963 Before the Subcomm. on Sec. & Terrorism of the S. Comm. on the Judiciary*, 97th Cong., 2d Sess. (May 12, 1982) ......................................................6

*Oversight of the Foreign Agents Registration Act and Attempts to Influence U.S. Elections: Lessons Learned from Current and Prior Administrations*, U.S. Sen. Comm. on the Judiciary 2, 6 (2017) ..............................................................37

S. Rep. 98-225 (1983)............................................................................................21

*The Scope of Agency Under FARA* (May 2020) ..................................................23

## INTRODUCTION

To save its indictment against Mr. Grimes, the government argues that a 22-year-old assistant to an American CEO and company, under their "direction and control," paid by them to do completely legal activities (1) can become a foreign agent without ever personally agreeing to do so, (2) can be found guilty without any specific intent to do anything illegal, (3) would surely be on notice that his otherwise lawful conduct was illegal under an obscure statute, (4) would understand better than the Justice Department itself the difference between this statute and the Foreign Agents Registration Act (FARA), (5) would not have his First Amendment rights trampled when he worked on public policy issues, (6) would not be giving up his rights against self-incrimination by reporting to the Attorney General that he somehow had become a foreign agent, and (7) could be conspiring with or aiding and abetting people without knowing they were doing anything illegal. The twists and turns to have this Court make those findings are not supported by the law of Section 951, how it has been applied, and the protections given to people in the United States from novel and unprecedented criminal charges. The government's repeated fallback to the argument that "these are all issues to be decided at trial" writes pre-trial motions out of the rules and asks the Court to abdicate its role to insure only proper charges go forward. For all these reasons, the indictment again him must be dismissed.

## ARGUMENT

## I. THE INDICTMENT FAILS TO STATE A CLAIM AGAINST MR. GRIMES

### A. The Facts Alleged In The Indictment Show That Mr. Grimes Was An Agent Of Colony Capital, *Not* The UAE

The government isolates some actions it alleges Mr. Grimes took—e.g., relaying suggested edits to articles and speeches to Mr. Barrack or sending an over-enthusiastic text to Mr. Alshahhi (who Mr. Grimes believed to be a consultant) stating "at your direction," when

agreeing to relay a message to Mr. Barrack—and contends that is all it needs to charge Section 951. Each time the government does that, it ignores what comes before, during and after each event—for example, Mr. Grimes "agreed to follow the directions and control" not of the United Arab Emirates (UAE) but of his employer, an American company and its American CEO. It should be clear from its words and a common sense reading of them that the indictment presents a factual predicate for only a single agency relationship for Mr. Grimes in which his principal was his "employe[r]," Colony Capital (Colony), and he was "reporting directly to" Mr. Barrack. (Dkt. 5 ¶ 3.) The indictment explains that Mr. Grimes helped Mr. Barrack prepare a "strategy proposal" for the UAE that was to help it "achieve outsized financial returns" as its "primary purpose," and "second[arily]" to encourage the Trump Administration to adopt "policies" that will favor its investments. (*Id*. ¶ 34.) And the indictment says that Mr. Barrack *would tell Colony employees* to "help Abu Dhabi with whatever they need" (*Id*. ¶ 77 (emphasis added).) Collectively these allegations show that Mr. Barrack saw the UAE as a lucrative client and business partner to his "global investment management firm" (Dkt. 5 ¶ 2), and he directed (and paid) Mr. Grimes and other employees to take actions to solidify Colony's business relationship with the UAE.

Unlike the facts that the indictment alleges to demonstrate Mr. Grimes' agency relationship with Colony, there are no similar facts alleged to establish that Mr. Grimes was an agent of the UAE. There is no allegation that he was employed by the UAE, paid or compensated in any way by the UAE, or even who Mr. Grimes would report to as his principal in the UAE. *See United States v. Chung*, 659 F.3d 815, 823 (9th Cir. 2011) (explaining that the government must prove that the defendant "acted *pursuant to an agreement* to operate subject to

the direction or control of" a foreign government) (emphasis added).[1]  Moreover, the law is clear

that "[t]o fall within § 951's ambit, a person must do more than act in parallel with a foreign

government's interests or pursue a mutual goal."  *United States v. Rafiekian*, 991 F.3d 529, 538

(4th Cir. 2021).  Thus, there is no reason to deduce from the facts alleged in the indictment that

Mr. Grimes' alleged actions were taken due to an agency relationship that he had with the UAE.

Not only is it a bit ludicrous to suggest that Mr. Grimes, as a young employee of Colony

in his twenties, would abandon his loyalty to his employer and instead go on a folly as the unpaid

of the UAE, it is utterly inconsistent with the indictment's factual allegations that Mr. Grimes

was the agent of Colony.  Perhaps recognizing that an accurate depiction of Mr. Grimes and his

---

[1] It is unclear why the government bristles at Mr. Barrack's characterization, consistent with traditional agency principals, that an agent owes a "duty" to the agent's principal.  (Govt Opp. at 21).  The government claims that Section 951 "speaks of an agreement, not a duty" (*id.*), but an agreement gives rise to a duty among the parties to uphold any commitment they made as part of the agreement.  Mr. Grimes had a duty to follow Mr. Barrack's directions as part of Mr. Grimes' employment agreement with Colony.  The UAE and others may very well have supported or even encouraged those actions, but that would not make Mr. Grimes their agent.  Mr. Grimes had no agreement or duty to do what they wanted, only what Colony and Mr. Barrack wanted and were paying Mr. Grimes to do.

It is more curious that the government would acknowledge elsewhere in its brief that Congress amended Section 951 in 1984 to provide a definition of "agent" that would "'exclud[e] . . . several classes of individuals' who were previously covered" (Govt Opp. at 58 n.21 (quoting legislative history but misstating the 1984 amendments as occurring in 1983)), but then cite *pre-amendment cases* to emphasize the statute's breadth.  (*Id.* at 22–23 (citing cases from 1945, 1967, and 1980).)  The government even quotes a pre-amendment case holding "a contractual relationship is unnecessary, since the act itself does not define the word 'agent.'" (*Id.* at 23 (quoting *United States v. Butenko*, 384 F.2d 554, 565 (3d Cir. 1967), *vacated Alderman v. United States*, 394 U.S. 165 (1969)).)  But Section 951(d) now defines "agent" to require an agreement, subject to a host of exceptions.  *See, e.g., Rafiekian*, 991 F.3d at 539, 541 (because "§ 951's definition of 'agent' envisions a mutual agreement to operate subject to foreign direction or control," the requisite agreement cannot be one-sided, and "a person does not become an 'agent' for purposes of Section 951 simply by acting in accordance with foreign interests or by privately pledging allegiance."); *Chung*, 659 F.3d at 823 ("The government therefore must prove that . . . Defendant acted pursuant to an agreement to operate subject to the direction or control of [a foreign government].  Thus, in addition to proving *Defendant's* intent, the government must also establish that a [foreign government] official directed or controlled Defendant's actions . . . .").  This sort of mutual agreement that is now required is contractual in nature.

actual role would defeat its case, the government adopts a strategy to blend Mr. Grimes' conduct with the others by repeatedly referring in its opposition to "the Defendants" as having committed certain acts. A careful comparison[2] of the indictment and opposition's allegations reveal this improper tactic.

The indictment first claims that Mr. Grimes was employed by Colony, reported to Mr. Barrack, and did all the acts alleged in the indictment pursuant to Mr. Barrack's direction as his employer. (Dkt. 5 ¶ 3.) Thus, Mr. Grimes was an agent of Colony acting as directed by his principal, Mr. Barrack. Nevertheless, the government then makes the naked claim that all those *very same* actions that Mr. Grimes allegedly took at Mr. Barrack's direction at the *same time* he was a paid agent of Colony were somehow taken at the direction of some unnamed UAE official pursuant to some unspecified agreement to become an agent of the UAE. While it is true that both Colony and the UAE seemed to see promise in working together, that would not make the agents of one entity the agents of the other. It is a truism as old as the Bible that "no man can serve two masters." *Matthew* 6:24.

The internal inconsistency between the indictment's logical and factually supported claim that Mr. Grimes was acting as the agent of Colony and its inconsistent and unsupported claim that he was acting as the agent of the UAE warrant dismissal of the indictment. The Fifth and Sixth Amendments require that an indictment provide notice of charges that "sufficiently apprises the defendant of what he must be prepared to meet" at trial. *Russell v. United States*, 369 U.S. 749, 763 (1962). Consequently, "[a] count of an indictment is 'repugnant' and must be dismissed if there is a 'contradiction between material allegations' in the count." *United States*

---

[2] Exhibit 1 is the comparison of what the indictment actually charges as to Mr. Grimes (and the other defendants) and the mischaracterization of those allegation in the government's opposition brief. (*See* Exhibit 1.)

*v. Cisneros*, 26 F. Supp. 2d 24, 52 (D.D.C. 1998) (quoting *United States v. Briggs*, 54 F. Supp. 731, 732 (D.D.C. 1944)).[3]  Dismissal of the charge is required because it otherwise allows the government to shift its theories at trial.  *See Cantrell*, 612 F.2d at 511; *Conde*, 309 F. Supp. 2d at 512; *United States v. Eason*, 434 F. Supp. 1217, 1221 (W.D. La. 1977).

### B. "Agent" Under Section 951 Does Not Include Employees Of Agents

The government misunderstands or misdirects the purpose of Mr. Grimes' arguments concerning the statutory differences in FARA and Section 951.  (*See* Grimes MTD at 5–8.)  Mr. Grimes explained that when Congress added a definition of "agent" to Section 951 in 1984, it did so against the backdrop of FARA's 1966 amendment that more broadly defined "agent" to reach those who are "directly or indirectly" directed by a foreign principal, 22 U.S.C. § 611(c)(1), but Congress declined to extend Section 951 as far as FARA in this respect.  Instead, under Section 951(d) an agent is the "individual who agrees" to be an agent, so there is no concept of a derivative agent under Section 951.  This difference is neither accidental nor insignificant to the charges against Mr. Grimes.  Even if Mr. Barrack was an agent of the UAE—a claim that Mr.

---

[3] This principle has long been established.  *United States v. Howell*, 78 U.S. 432, 438 (1870) (discussing repugnant indictments); *United States v. Cantril*, 8 U.S. 167, 168 (1807) (Marshall, C.J.) (dismissing indictment as repugnant).  Older cases, like *Howell* and *Cantril* refer to this problem of internal inconsistencies as "repugnant."  Whatever the terminology, internal inconsistency warrants dismissal of the indictment.  *See, e.g.*, *Sunderland v. United States*, 19 F.2d 202, 208 (8th Cir. 1927) ("Repugnancy in a count consists in a contradiction between material allegations therein.").  More recent case law agrees.  *See, e.g.*, *United States v. Cantrell*, 612 F.2d 509, 510–11 (10th Cir. 1980) (finding inconsistency in indictment alleging the defendant stole firearms in Missouri and transported them to Kansas in one count, but later charging the defendant with receiving the same firearms in Kansas, and overturning the receiving conviction); *United States v. Rajarantnam*, 2014 WL 1554078, at *7 (S.D.N.Y. Apr. 17, 2014) (finding substantive counts inconsistent with conspiracy count, and substantive counts "cannot be salvaged"); *United States v. Palo*, 2017 WL 6594196, at *6 (W.D. Pa. Dec. 26, 2017) (forbidding government to proceed to trial with inconsistent counts); *United States v. Conde*, 309 F. Supp. 2d 510, 511 (S.D.N.Y. 2003) ("An indictment is defective if it contains logically inconsistent counts.").

Barrack denies and that the indictment does not even claim that Mr. Grimes knew—Mr. Grimes would not become the agent of the UAE by becoming the agent of Mr. Barrack.

This legal distinction between Section 951 and FARA is dispositive as to Mr. Grimes and demonstrates that the indictment against him must be dismissed. The indictment alleges that Mr. Grimes was the agent of Mr. Barrack because he was "employed" at Mr. Barrack's company and "report[ed] directly" to him. (Dkt. 5 ¶ 3.) There is no allegation that Mr. Grimes personally made any agreement with anyone in the UAE government to be an agent of the UAE, no UAE government principal is identified, and no time, date, or place of such agreement is identified. Accordingly, the grand jury that indicted Mr. Grimes must have proceeded on the improper theory that if Mr. Grimes was the agent of Mr. Barrack and Mr. Barrack was the agent of the UAE, then Mr. Grimes would become an agent of the UAE as well (which also explains why the grand jury's legal instructions should be produced, *see* GJ Mot. at 5–6, GJ Reply at 1–3). Because that legal theory is not viable, there is no viable claim against Mr. Grimes.

### C. Mr. Grimes Was Not An Agent Of A Foreign Government Because He Was Engaged In A "Legal Commercial Transaction"

Mr. Grimes pointed out that Section 951(d) excludes from the definition of "agent of a foreign government" "any person engaged in a legal commercial transaction" and "legal commercial transaction" is defined to include "any . . . service . . . of any kind . . . not prohibited by federal or state legislation or implementing regulations," 28 C.F.R. § 73.1(f). This exception was added at the urging of the Department of Justice (DOJ) so that the definition of "agent of a foreign government" would be construed "narrowly."[4] Again, the indictment alleges that Mr.

---

[4] *Communist Block Intelligence Gathering on Capitol Hill: Hearing. on S. 1959 and S. 1963 Before the Subcomm. on Sec. & Terrorism of the S. Comm. on the Judiciary*, 97th Cong., 2d Sess. at 30 (May 12, 1982) (statement of Mark Richard, Deputy Attorney General for the Criminal Division) [hereinafter "Judiciary Hr'g"].

Grimes was "employed" by Colony, and he "report[ed] directly to" Mr. Barrack, who asked Mr. Grimes to do everything allegedly charged in the indictment—none of which was alleged to be illegal. Thus, on its face, the indictment charges that Mr. Grimes is within the legal commercial transaction exception.

The government's response falters out of the gate. The government's primary argument is that this is an affirmative defense and not an element. (Govt Opp. at 26.) This distinction does not matter here. The indictment itself is defective because it alleges facts that demonstrate that the "legal commercial transaction" exception is applicable; Mr. Grimes is not seeking dismissal on evidence that he is introducing.[5]

Rule 12(b)(3) requires that a defendant must raise "by pretrial motion" or risk waiver of a host of issues that may appear on the face of the indictment, even where the same defect in the prosecution may be an affirmative defense. For example, although the statute of limitations is an affirmative defense, where "a statute of limitations defense is clear on the face of the indictment and requires no further development of facts at trial, a defendant waives his right to raise that defense by failing to raise it in a pretrial motion." *United States v. Ramirez*, 324 F.3d 1225, 1228

---

[5] Because the government pleads the facts necessary to establish the applicability of the "legal commercial transaction" exception in the indictment itself, there is no factual issue to be tried as to whether the exception applies. Thus, it does not matter whether it is an element or an affirmative defense. But the district court in *United States v. Rafiekian*, 2019 WL 3021769, at *10 (E.D. Va. 2019), *rev'd in pertinent part*, 991 F.3d 529, 538 (4th Cir. 2021), had the better view that it is an element in any event. As noted above, the exception was added with the definition of "agent of a foreign government" at the same time, with the government emphasizing its necessity in construing the phrase "narrowly." Judiciary Hr'g at 30. "By defining 'agent' in this fashion, the statute does not excuse an established criminal act, as an affirmative defense would; instead, it has 'render[ed] the underlying conduct noncriminal.'" *Rafiekian*, 2019 WL 3021769, at *10 (quoting *Smith v. United States*, 568 U.S. 106, 111–12 (2013)). Moreover, the exception "exclude[s] an exceptionally broad category of potential defendants," such that it is integral to the definition itself. *Id*. Accordingly, it should be treated as an element and "there must be proof that the person engaged in some conduct other than an excluded legal commercial transaction" in the indictment itself, which is lacking here and provides an independent basis for dismissal. *Id*.

(11th Cir. 2003). Where the facts necessary to establish an affirmative defense "are stated in the indictment" the existence of the affirmative defense becomes "a legal issue, not a factual one." *United States v. Craft*, 105 F.3d 1123, 1127 (6th Cir. 1997). It would make no sense to require such issues to be raised in a "pretrial motion" at the penalty of waiver if such motions could never be granted because they always raised an issue for trial. Where notice of a trial defense is required to be raised before trial, such as an alibi or insanity defense, it is done by notice, not by motion. Fed. R. Crim. P. 12.1, 12.2, & 12.3. Nor would it serve any purpose to wait for trial, where the facts charged in the indictment demonstrate the applicability of the affirmative defense.

The government's next argument is that "the Indictment alleges several facts to demonstrate that the Defendants were engaged in 'non-commercial endeavors' that are not legal commercial transaction" (Govt Opp. at 29), but none of these so-called "several facts" are identified and the indictment's actual allegations (e.g., that the "primary purpose" of the strategy proposal was to help "achieve outsized financial returns" and "second[arily]" to encourage the Trump Administration to adopt "policies" that will favor its investments (Dkt. 5 ¶ 34)) support the commercial exception. Notably, the government does not contest that all the alleged conduct is "legal," only that it is "non-commercial," but that is plainly wrong as to Mr. Grimes. At all times charged in the indictment, he was "employed" by Colony and "reporting directly to" Mr. Barrack (*id.* ¶ 3), so in the language of the commercial legal transaction regulation, he was providing a "service" that he was paid by his employer to provide with respect to everything that Mr. Barrack asked him to do. Mr. Grimes did not take a leave of absence from Colony or perform any of the alleged acts charged in the indictment on his free time. He was paid for his services, and his employer covered his salary and expenses. Thus, on its face, the indictment

demonstrates that the exception is applicable. And as shown above, *supra* Section I.A. at 1–2, the allegation of internally inconsistent facts warrants dismissal as well.

## II. THE INDICTMENT FAILS TO CHARGE MR. GRIMES WITH SPECIFIC INTENT, WHICH DUE PROCESS REQUIRES

### A. Specific Intent Is Required

In arguing that Section 951 is merely a general intent crime, the government relies upon overruled cases, relies as a crutch and then misapplies the maxim that "ignorance of the law is no defense," and ignores the fact that Congress legislates against a background presumption requiring specific intent. The basic presumption is to require specific intent even when Congress is "silent" about any scienter in the statutory text. (Grimes MTD at 12–13 (citing numerous Supreme Court cases).) The government is flat wrong in claiming that the Court need only read general intent into a statute; rather, the whole purpose is to require consciousness of wrongdoing. As the Supreme Court recently explained: "Whether a criminal statute requires the Government to prove that the defendant acted knowingly is a question of congressional intent. . . . In determining Congress' intent, we start from a longstanding presumption, traceable to the common law, that Congress intends to require a defendant to possess a culpable mental state regarding 'each of the statutory elements that criminalize otherwise innocent conduct.'" *Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019) (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994)); *see Torres v. Lynch*, 578 U.S. 452, 467 (2016) ("In general, courts interpret criminal statutes to require that a defendant possess a *mens rea*, or guilty mind, as to every element of an offense. That is so even when the 'statute by its terms does not contain' any demand of that kind.") (quoting *X-Citement*, 513 U.S. at 70); *Elonis v. Unites States*, 575 U.S. 723, 734 (2015) ("We therefore generally 'interpret [ ] criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them.' In

such cases, courts read the statute against a 'background rule' that the defendant must know each fact making his conduct illegal.") (internal citations omitted). This "presumption in favor of 'scienter'" reflects the "basic principle that underlies the criminal law, namely, the importance of showing what Blackstone called 'a vicious will.'" *Rehaif*, 139 S. Ct. at 2195–96 (quoting 4 W. Blackstone, Commentaries on the Laws of England 21 (1769)). This "understanding that an injury is criminal only if inflicted knowingly 'is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.'" *Id.* at 2196 (quoting *Morissette v. United States*, 342 U.S. 246, 250 (1952)). "Scienter requirements advance this basic principle of criminal law by helping to 'separate those who understand the wrongful nature of their act from those who do not.'" *Id.* (quoting *X-Citement*, 513 U.S. at 72–73 n.3). Accordingly, the Supreme Court will reject a statutory interpretation that "would have criminalized 'a broad range of apparently innocent conduct' and swept in individuals who had no knowledge of the facts that made their conduct blameworthy." *Elonis*, 575 U.S. at 735 (quoting *Liparota v. United States*, 471 U.S. 419, 426 (1985)).

The government rightly notes that there is non-binding authority from the Eleventh Circuit holding that Section 951 is merely a general intent crime because the statute was silent on scienter, *United States v. Duran*, 596 F.3d 1283, 1291 (11th Cir. 2010); *United States v. Campa*, 529 F.3d 980, 999 (11th Cir. 2008),[6] but the analysis followed in those cases was overruled by the Supreme Court cases addressed above holding that it will "interpret[] statutes to include a

_____

[6] The government also cites *United States v. Dumeisi*, 424 F.3d 566, 581 (7th Cir. 2005) (Govt Opp. at 29), which did state in one conclusory sentence that "[k]nowledge of the requirement to register is not an element of § 951," but it offered no analysis to support this *dicta* because the defendant "did not make this argument at trial, and the instruction given by the district court [was given] without objection." *Id.* at 581. In any event, the Supreme Court's decision in *Rehaif* and other subsequent cases demonstrates that *Dumeisi*'s summary conclusion is wrong.

scienter requirement even where the statutory text is *silent* on the question." *Rehaif*, 139 S. Ct. at 2197 (quoting *X-Citement*, 513 U.S. at 70) (emphasis added).

The government also misapplies the maxim that "ignorance of the law is no excuse" to the crime. This common law maxim rests on "the common law presum[ption] that every person knew the law," but the subsequent "proliferation of statutes and regulations" has undercut that presumption and led Congress to often require proof of the guilty knowledge that the common law presumed people would know. *Cheek v. United States*, 498 U.S. 192, 199 (1991). The idea that a person (especially one in Mr. Grimes' position) would be convicted despite his "ignorance" of a law that purportedly says when he is employed and paid by an American company and follows the directions of his American boss to do perfectly legal things, he can become a foreign agent and then a felon for failing to register, is clearly not the same as a *malum in se* prohibition, such as murder or stealing. As noted above, the Supreme Court accordingly presumes that Congress intends for there to be an intent requirement that is sufficient to separate those who act innocently from those who act with a wrongful intent.

Although the government is right that this will not always require that the Court infer knowledge that a defendant's conduct violates a particular statute, it is wrong to suggest that general intent is sufficient. Rather, the Supreme Court explains: "[w]hen interpreting federal criminal statutes that are silent on the required mental state, we read into the statute 'only that *mens rea* which is necessary to separate wrongful conduct from 'otherwise innocent conduct.''" *Elonis*, 575 U.S. at 736 (quoting *Carter v. United States*, 530 U.S. 255, 269 (2000)).

The Supreme Court has identified "confusion surrounding the ignorance-of-the-law maxim" and clarified that "the maxim does not normally apply where a defendant 'has a mistaken impression concerning the legal effect of some collateral matter and that mistake

results in his misunderstanding the full significance of his conduct,' thereby negating an element of the offense." *Rehaif*, 139 S. Ct. at 2198. *Rehaif* illustrated this principle by looking to the Court's decision in *Liparota v. United States*, 471 U.S. 419 (1985).

*Rehaif* distinguished the ignorance of the law maxim in *Liparota* because the statute there imposed criminal liability on "whoever knowingly uses, transfers, acquires, alters, or possesses" food stamps "in any manner not authorized by the statute or the regulations." *Rehaif*, 139 S. Ct. at 2198 (quoting *Liparota*, 471 U.S. at 420). *Rehaif* explained that in *Liparota*, "[w]e held that the statute required scienter not only in respect to the defendant's use of food stamps, but also in respect to whether the food stamps were used in a 'manner not authorized by the statute or regulations.'" *Id.* (quoting *Liparota*, 471 U.S. at 425 n.9). Thus, "the Government [had] to prove that the defendant knew that his use of food stamps was unlawful—even though that was a question of law." *Id.*

Just as the statute in *Liparota* required that the use of food stamps not be "authorized by the statute or regulations," Section 951(a) requires registration only "if required in subsection (b)," which in turn requires the Attorney General to "promulgate rules and regulations establishing requirements for notification." Thus, both statutes explicitly embrace a legal determination that must be made in determining whether the statutes are applicable. Just as *Liparota* required the government to prove the defendant knew his use of food stamps was not authorized, this Court should hold that a defendant charged under Section 951 must know that he was required to register in accordance with Section 951(b).

The government's effort to distinguish *Rehaif* fails. The government is right that *Rehaif* required a defendant to know that they are in the United States illegally, but the defendant did not have to know that it was unlawful for them to have a firearm. (Govt Opp. at 33.) Such a

defendant is still aware that they are engaged in unlawful conduct by being in the United States. Under Section 951, a defendant should be required to know that they were obligated to register under Section 951(b), but the government does not have to prove that the defendant was aware that is a felony under Section 951(a). Here, the indictment does not charge that Mr. Grimes was aware that he or any of the defendants were required to register at all.

### B.    Due Process Requires Specific Intent

The government acknowledges that the Supreme Court invalidated on due process grounds a registration requirement as "applied to a person who has no actual knowledge of his duty to register" in *Lambert v. California*, 355 U.S. 225, 227 (1957). (Govt Opp. at 31; *see also Lambert*, 355 U.S. at 228 (rejecting the claim that ignorance of the law is no defense where the defendant is unaware of any wrongdoing and not engaged in conduct that should put him on notice of wrongdoing).) Its various attempts to distinguish the case from Section 951 all fail.

The government notes that the regulated conduct in *Lambert* was "wholly passive[,] mere failure to register" (*id.* at 228), but Section 951 is no different. *Lambert* required persons of a certain status—convicted felons—to register, and Section 951 requires persons of a certain status—agents of a foreign government—to register. For persons of either status, not registering is a wholly passive act.

The government also makes too much of *Lambert*'s observation that a convicted felon's "mere presence" in the city triggered registration, as though that is purely passive. *Id.* at 229. But a convicted felon does not vanish from prison and magically find himself present in Los Angeles; the convicted felon must take some action to get to Los Angeles. The statute at issue also applied to someone "having a place of abode outside the city to register if he comes into the city on five occasions or more during a 30-day period." *Id* at 226. Thus, the Second Circuit found that "flying to Los Angeles" is something "*Lambert* would cover," and said it would be

"sheer sophistry" to try to recharacterize that as passive nonfeasance. *United States v. Mancuso*, 420 F.2d 556, 558 (2d Cir. 1970). Getting in and out Los Angeles more than five times in a 30-day period certainly requires more activity than Mr. Grimes installing a messaging application on a phone for his boss, which the government claims is sufficient to trigger a duty to register under Section 951. (Govt Opp. at 59.)

The government engages in a *non sequitur* by arguing that to achieve the *status* of being an agent of a foreign government a person must engage in "conduct" as an agent (Govt Opp. at 32 n.9), but that is just as true of *Lambert* where a defendant must have engaged in some conduct to become a convicted felon. In contrast to Section 951, where the government claims someone can become an agent based on "conduct [that] can include entirely legal activity," in *Lambert* the defendant must have engaged in conduct itself that constituted a felony. (*Id*. at 75.)

The Second Circuit faced a situation similar to *Lambert* in *Mancuso*, where the Second Circuit reversed a conviction and dismissed the indictment. *Mancuso* involved a statute that required those convicted of drug offenses to register with customs when leaving or entering the United States, but the statute was silent as to a *mens rea* requirement. The Second Circuit avoided holding the statute unconstitutional as in *Lambert* by construing the law to require knowledge of the registration requirement (something the Supreme Court in *Lambert* could not do as it involved a state municipal law, not a federal statute). *Mancuso*, 420 F.2d at 559. In doing so, the Second Circuit added that none of the criminal ends of deterrence, retribution, rehabilitation or disablement are served by enforcing a registration requirement against a defendant who is unaware the law exists, and that the "ignorance of the law excuses no one" maxim is "severely undercut" when it involves "a malum prohibitum and little known statutory command that can be found only by going to the statute books." *Id*. at 559 & n.5. That is

certainly the case with a statute as obscure as Section 951, which even DOJ's own Inspector General found that DOJ does not understand (Grimes MTD at 23) and which the government notes has confused the courts as well (Govt Opp. at 11 n.1 and 41 n.13 (court error); *see also id.* at 17 n.5 (noting FARA and Section 951 are "often conflated").)

## III.    SECTION 951 IS UNCONSITUTTIONALLY VAGUE

In his opening memorandum (Grimes MTD at 13–18), Mr. Grimes explained that Section 951 is unconstitutionally vague on its face and as-applied to him in this case.  Nothing that the government says in response refutes that conclusion.

### A.    Section 951 Is Void On Its Face

To the extent the government addresses Mr. Grimes' facial challenge at all, its argument rests on two false premises.  First, the government argues that Mr. Grimes may not "maintain a facial vagueness challenge" because, according to the government, Section 951 "does not implicate, let alone infringe upon, free speech."  (Govt Opp. at 73.)  As explained below, there is no merit to that contention.  *See infra* Section V at 29.

Second, the government argues that "[e]ven if the First Amendment were implicated," Mr. Grimes' facial challenge fails because he "cannot prove that [Section 951] is vague in 'all of its applications.'"  (Govt Opp. at 73 (quoting *United States v. Farhane*, 634 F.3d 127, 139 (2d Cir. 2011), in turn quoting *Village of Hoffman Estates v. Flipside Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982).)  That is not the law.  As the Supreme Court recently stated in *Johnson v. United States*: "although statements in some of our opinions could be read to suggest otherwise, our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp."  576 U.S. 591, 602 (2015).  Accordingly, *Johnson* rejected the assertion "that 'a statute is void for vagueness only if it is vague in all its applications.'"  *Id.* at 603.

Having simply assumed the argument away, the government does not confront—let alone refute—Mr. Grimes' demonstration that Section 951 is vague on its face because it does not define the phrase "subject to the direction or control" of a foreign government or official. 18 U.S.C. § 951(d). Mr. Grimes identified a wide array of commonplace scenarios in which an individual would, contrary to intuition and prosecutorial history, be required to register with the Attorney General under the government's interpretation of Section 951. (*See* Grimes MTD at 15–16.) The government does not deny that such individuals would be required to register under its construction of the statute yet does not explain how such individuals would know that they were required to register. Nor does the government identify any standards, much less "explicit standards" (*Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007)), that govern its application of the phrase "subject to the direction or control" of a foreign government or official.

The fact that the government has never prosecuted anyone under the scenarios identified but has chosen to prosecute Mr. Grimes under analogous circumstances demonstrates that Congress's failure to define the phrase "subject to direction or control" grants the government unbridled—and thus impermissible—prosecutorial discretion. As the Supreme Court has held repeatedly, "the void-for-vagueness doctrine requires that a penal statute define the criminal offense" not only "with sufficient definiteness that ordinary people can understand what conduct is prohibited" but also "in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *accord, e.g.*, *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). Indeed, "'[a]lthough the doctrine focuses both on actual notice to citizens and arbitrary enforcement, ... the more important aspect of the vagueness doctrine is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Betancourt v. Bloomberg*,

448 F.3d 547, 552 (2d Cir. 2006) (quoting *Kolender*, 461 U.S. at 357–58 (1983)). That is because "[w]here the legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Id.* (quotation marks omitted). Exactly so here, where Congress has failed to define the phrase "subject to the direction and control" of a foreign government or official. Section 951 is therefore void on its face.

### B.    Section 951 Is Void As Applied

In his opening memorandum, Mr. Grimes observed that a person of ordinary intelligence is not likely to understand that Section 951 requires someone in Mr. Grimes' position—*i.e.*, "a junior employee of an American firm who 'reports directly to' an American supervisor" (Grimes MTD at 17 (quoting Dkt. 5 ¶ 3))—to register with the Attorney General.

In response, the government says that "the Indictment does not allege that Grimes was a junior employee." (Govt Opp. at 61.) True, the indictment does not use the word "junior," but that is immaterial. The government repeatedly described Mr. Grimes as merely "an assistant" to Mr. Barrack when successfully seeking search and arrest warrants in connection with this case. Compl. & Aff. ISO Arrest Warrant ¶ 9, *United States v. Rashid Al-Malik*, 19-MJ-556 (E.D.N.Y. June 25, 2019) (Dkt. 1, *United States v. Rashid Al-Malik*, No. 1:21-cr-00371 (E.D.N.Y.)); Application for a Search Warrant ¶ 16, *In the Matter of the Search of Information Associated with Rashid_almalik@yahoo.com*, 19-M-396 (E.D.N.Y. Apr. 16, 2019); Aff. ISO an Application for a Search Warrant ¶ 5, *In the Matter of the Search of Information Associated with Apple DSID 1965957580*, 18-MJ-1224 (E.D.N.Y. Dec. 14, 2018). Having obtained the relief it sought based on those representations to judges of this Court, the government is judicially estopped from now claiming that Mr. Grimes was anything other than "an assistant." *See Lia v. Saporito*, 909 F. Supp. 2d 149, 174 (E.D.N.Y. 2012) (the judicial-estoppel "doctrine 'prevents a party from

asserting a factual position clearly inconsistent with a position previously advanced by that party and adopted by the court in some manner'") (quoting *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 397 (2d Cir. 2011), *aff'd*, 541 F. App'x 71 (2d Cir. 2013).[7]

Advancing its precluded argument that Mr. Grimes was more than an assistant and that a person of ordinary intelligence would understand that someone in his position would know that his alleged conduct was prohibited, the government asserts that:

> [t]he Indictment … alleges that Grimes had significant responsibilities in the charged scheme, including inter alia, (1) drafting a strategy proposal for the UAE to promotes its foreign policy interests and increase its political influence in the United States; (2) editing and revising a national energy speech with UAE-favored language for then-Candidate Trump; and (3) editing and revising a nationally published Op-Ed for Barrack that had UAE-favored language.

(Govt Opp. at 61.)   There are at least two problems with the government's argument.   First, contrary to the government's representation, *the indictment* does not allege that Mr. Grimes had any role in editing or revising a national energy speech for then-candidate Trump.[8]   Second, and more fundamentally, the indictment does not allege that any of Mr. Grimes' alleged acts were taken outside the scope of his employment as an assistant to Mr. Barrack.   Thus, although the government baldly asserts that "[i]n fact, most, if not all, of Grimes' alleged actions were entirely

---

[7] Nor may the government rely on the purported facts set forth in Govt Opp. at 61 n.25.   The government admits that they are "not alleged in the Indictment."   (*Id.* at 61 n.25.)   The purported facts are, moreover, wrong.   Records in the government's possession show Mr. Grimes did not make the amounts asserted by government, and Mr. Grimes was never Vice President of Colony. (He was promoted to Vice President of a related company in 2018, but that was well after any of the overt acts alleged in the indictment.)   The government's reliance on supposed facts not alleged in the indictment is ironic given its (false as to Mr. Grimes) complaint that "the Defendants' arguments … move well beyond the language of the charging instrument to advance factual disputes not properly entertained in a motion to dismiss." (*Id.* at 1.)

[8] The government's false assertion that "[t]he Indictment … alleges that Grimes … edit[ed] and revis[ed] a national energy speech … for then-Candidate Trump" (Govt Opp. at 61) is just one of many instances in which the government's opposition misrepresents the indictment's allegations. (*See* Exhibit 1.)

outside the scope of his employment" (Govt Opp. at 69), the government does not—and cannot—cite any allegation in the indictment to substantiate that false assertion.

As discussed *supra* at 18, there is no reason to think that a person of ordinary intelligence would understand that an assistant taking direction from an American supervisor within the scope of his employment at an American company is required to register as an agent of a foreign government. As Mr. Grimes noted (Grimes MTD at 17) and the government ignores, if a person of average intelligence consulted the US Code, that person would likely conclude that someone in Mr. Grimes' position was *not* required to register under Section 951. Given that FARA, unlike Section 951, defines the term "agent of a foreign principal" to include not only individuals who act "under the direction or control[] of a foreign principal" but those who act "under the direction or control[] … of a person … whose activities are directly or *indirectly* supervised, directed, controlled, financed, or subsidized … by a foreign principal" (22 U.S.C. § 611(c)(1) (emphasis added)), a person of ordinary intelligence who compared Section 951 with FARA would reasonably infer that Section 951, unlike FARA, does not reach employees of alleged foreign agents. In short, Section 951 is unconstitutionally vague as applied to Mr. Grimes because it does not afford a "person of ordinary intelligence a reasonable opportunity to know" that Mr. Grimes' alleged conduct "is prohibited." *Thibodeau*, 486 F.3d at 65.

## C. Mr. Grimes Was Not Provided Fair Notice That His Alleged Conduct Was A Crime

### 1. Statutory Notice

The government does not quarrel with the proposition that it would violate due process to apply a statute to a person like Mr. Grimes if he had not been given fair notice that the statute is applicable to him (Govt Opp. at 56–57), but then the government feigns confusion about why Mr. Grimes would not have had fair notice. Quite simply, Section 951 (at least since it was

narrowed by the 1984 amendments) has never been applied to someone like him—an employee of an American company whose job it was to be an assistant to an American businessman who was directing him to engage in entirely lawful activities.

The government bounces between two poles. At times, the government argues that Section 951 is "narrowly tailored" and applicable "to a relatively discrete group," which is "even further narrowed by the statutory exceptions to the term 'agent.'" (Govt Opp. at 54–55.) At other times, the government says that Section 951 is "a broad, catch-all." (*Id.* at 67; *see also id.* at 14, 20, 27 ("catch-all").)

The government was right the first time and gets lost in the history of the statute. The government highlights the breadth of Section 951 by pointing to the reasons that Congress enacted its *predecessor* WWI Era statute and then looks to the limited case law under that *predecessor* statute. (Govt Opp. at 14.) But that *predecessor* statute proved unworkable, it interfered with the United States' foreign relations, largely went unenforced, and when it had been enforced, it was found unconstitutionally vague. *See, e.g.*, S. Rep. 98-225 at 415 (Aug. 4, 1983); Judiciary Hr'g at 31 (addressing *United States v. Byrne*, 422 F. Supp. 147, 152 n.2 (E.D. Pa. 1976)). Consequently, "despite its vintage" there is a "dearth of authority" applying the revised Section 951. *Rafiekian*, 991 F.3d at 538 & n.10.

The 1984 amendments defined "agent of a foreign government" and transferred rulemaking authority from the State Department to DOJ. Even with rulemaking authority being transferred to it, DOJ opposed early drafts of a bill that left that phrase undefined because it was "overly broad in terms of persons covered." Judiciary Hr'g at 21. Alluding to the *Byrne* case, Mark Richard advised Congress that "the Department does believe that the Congress should define the term 'agent of a foreign government' in S. 1963 *narrowly* to avoid the problems

presented in the recent IRA gun smuggling case in Philadelphia, in which the judge indicated that in the absence of clarifying regulations Section 951 was too vague to adequately warn defendants that their conduct was proscribed." *Id.* at 37 (emphasis added). DOJ subsequently submitted a letter proposing a definition of that phrase, which Congress adopted. *Id*. at 66–67.

With respect to Mr. Grimes, the 1984 amendments did at least two things to clarify that Section 951 would not reach him. First, as explained above, Congress avoided construing "agent" as broadly as FARA to reach people who assist others who are agents (indirect agents) by requiring an agreement between each individual required to register and a foreign government. Second, Congress effectively limited Section 951 to illegal conduct by adding an extremely broad "legal commercial transaction" exception. (Grimes MTD at 36 (quoting congressional purpose that Section 951's "usefulness" was in "espionage prosecutions" and the purpose of the proposed legislation was explicitly "to impede espionage").) In fact, Congress was encouraged by the State Department and DOJ to narrow the focus of the statute by excluding "legitimate activities." Judiciary Hr'g at 28, *see also id*. at 31. That narrowness was accomplished through the "legal commercial transaction" exception, which allowed Section 951 to focus upon espionage. S. Rep. 98-225 at 415 (1983) ("The proposed act is not intended to cover those individuals engaged in routine commercial matters. . . . By excluding from the notification requirement several classes of individuals who are presently covered, the proposal also limits the coverage of the statute by focusing only on those in whom the United States government has a necessary interest."). As the Fourth Circuit observed, this exception "excludes a large category of potential defendants—those engaged in legal commerce." *Rafiekian*, 991 F.3d at 543. The government does not address the 1984 amendments or explain how Mr. Grimes would be covered by the statute *after* those amendments.

### 2. DOJ Guidance

Not only does the statute itself show that Mr. Grimes is *not* violating Section 951, Mr. Grimes was not provided due process notice to believe otherwise. The Advisory Opinions issued under FARA (Grimes MTD at 19–22) confirm that none of his activities for Mr. Barrack would transform Mr. Grimes into an agent of the UAE. The UAE did not need anything from the 20-something-year-old Mr. Grimes who was fresh out of college. He was essentially a "gofer," who ran errands, passed messages, and assisted in drafting speeches, articles, and presentations for Mr. Barrack—all submitted under Mr. Barrack's name, subject to his final editorial control.

The government faults Mr. Grimes' reliance on FARA Advisory Opinions (AOs) for arising under a different statute and not being binding, but this is essentially all the guidance that DOJ provides. There is *no* comparable guidance with respect to Section 951 specifically. Mr. Grimes pointed to those AOs to show that if his conduct would not be included in a statute the government argues is broader in its reach that Section 951 (*see* Govt Opp. at 14–15), he could not be on notice that his acts would violate a statute the government (when convenient) argues is narrower (*see* Govt Opp. at 17–18). Although the concept of agency is broader under FARA given that it reaches even those who may indirectly aid a foreign principal by working for one of the principal's agents, the FARA AOs provide helpful guidance as to what does *not* create an agency relationship. In addition, even the DOJ acknowledged that Section 951 "lacks a formal administrative registration regime," that its lack of guidance was "problematic" because "the regulations do not describe the types of activities that would trigger a requirement to notify the Department," and that the agency itself confused the two laws. (Grimes MTD at 19 (citations omitted); *see also* DOJ, *Audit of the National Security Division's Enforcement and Administration of the Foreign Agent's Registration Act* at App. 3 (Sept. 2016) [hereinafter "OIG Audit"].)

While the government takes issue with Mr. Grimes' reliance upon AOs, much of the point he seeks to make are reiterated in a more formal DOJ guidance document:

> In assessing whether a person is acting on behalf of a foreign principal, the Department may consider whether the person appears to be advancing his own interests or those of a U.S. person, on the one hand, or the interests of a foreign principal, on the other. For example, a businessperson may be expected to have his own reasons for advocating for a particular policy change that will benefit him financially (*e.g.*, lobbying against tariffs that make it more expensive for him to import goods from China).… Likewise, the fact that a person is persuaded on a matter by a foreign principal and then advances that position is not, standing alone, sufficient to make him an agent. A foreign government's explanation of its point of view, for example, may persuade a policymaker to adopt that position as his own; his subsequent actions in support of that position may be taken of his own accord, not as a function of any agency relationship.[9]

That analysis applies here. Mr. Grimes saw that Mr. Barrack and Colony were courting the UAE to pursue investment opportunities. Where Colony can help its clients and business partners make money or foster a climate in which they can be more profitable, that is good for Colony. It both helps build goodwill and generates more money for clients and partners to invest. That was the motive behind everything that Colony—and by extension Mr. Grimes—did.

Mr. Grimes relied upon AO 12/6/17[10] because it involved US firms not having to register under FARA where their engagement with a foreign government were "limited to scheduling, coordinating, and facilitating communications." The government notes that those US companies were not engaged in "substantive work" on behalf of the foreign government (Govt Opp. at 68), but that is the point. The sorts of efforts that Mr. Grimes did in scheduling meetings and coordinating or facilitating communications between Mr. Barrack and the UAE is not "substantive work" that would make him the agent of the UAE. Nor did Mr. Grimes ever do

---

[9] DOJ, *The Scope of Agency Under FARA* at 4 (May 2020), https://www.justice.gov/nsd-fara/page/file/1279836/download.

[10] As in the Motion to Dismiss, we cite Advisory Opinions as AO, followed by the date they are issued. These opinions can be found on the DOJ website: https://www.justice.gov/nsd-fara/advisory-opinions.

substantive work for the UAE—he was an agent of Colony. And while it typically is true that all parties who are working toward an investment agreement hope that agreement will be profitable for all involved, each party's agents remain their own agents; they do not become agents for one another by working toward a common goal.

Mr. Grimes relied upon AO 4/6/18 to demonstrate that he would not become an agent of the UAE by becoming an agent of Colony, even if Colony had to register under FARA, because he has no direct contractual relationship with the UAE (even though FARA sometimes reaches indirect agents). (Grimes MTD at 20–21.) The government now disclaims that it contends that Mr. Grimes became an agent of the UAE *through* his employment at Colony, but it does not explain how that is possible or that he then entered an agreement to become an agent of the UAE.

Recognizing the problem it has with charging someone like Mr. Grimes, the government advances a number of odd claims, including that Mr. Grimes was acting "outside the scope of his employment" by editing a speech for then-candidate Trump and later gathering non-public information from the White House (Govt Opp. at 69), but as noted *supra* at 18, n.8, that is a misstatement of what the indictment itself charges. The indictment alleges that Mr. Grimes was "reporting directly to" Mr. Barrack (Dkt. 5 ¶ 3), so these actions were within the scope of his employment if Mr. Barrack asked him to do them. Why else would he do this? Nobody else was paying him to do these things. He did them because Mr. Barrack was paying for his services and Mr. Barrack directed him to do so.

The government also claims that Mr. Grimes was in constant contact with Mr. Alshahhi who was not a Colony employee and who, the government now claims, made clear that he "was acting on behalf of senior UAE officials." (Govt Opp. at 69.) But that is not charged in the

indictment, nor does it matter.  Mr. Grimes would have seen and believed that Mr. Alshahhi was acting in his own interest as a consultant who hoped to get paid for helping to bring the parties together.  In any event, Mr. Grimes worked for Mr. Barrack and Colony—he was never the agent of Mr. Alshahhi.  Mr. Grimes would pass messages between Mr. Barrack and others, including Mr. Alshahhi.  Even where Mr. Alshahhi would make a suggestion for something that Mr. Barrack should do, Mr. Grimes would merely note that recommendation for Mr. Barrack and Mr. Barrack would then decide for himself what he wanted to do.  Mr. Barrack would tell Mr. Grimes what he wanted drafted, Mr. Grimes would take the first draft, and Mr. Barrack would ask Mr. Grimes to get the input from Mr. Alshahhi, but Mr. Barrack decided for himself what went out under his name.  Neither Mr. Grimes nor Mr. Alshahhi told Mr. Barrack what to do.[11]

Mr. Grimes also pointed to AO 11/8/12 which found that receiving a grant from a foreign entity did not trigger agency to argue that Mr. Grimes' hope of a profitable relationship with the UAE would not make him an agent of the UAE, as in neither situation would the receipt of money give the foreign source control over the recipient.  (Grimes MTD at 22–23.)  The government claims that Mr. Grimes "grossly mischaracterizes" this AO because the entity seeking the advisory opinion specifically stated that the foreign entity had no affiliation with a foreign government and would not exercise direction or control over the recipient.  (Govt Opp. at 69.)  But that does not make the government's conclusion that receipt of money from a foreign

---

[11] The government descends to absurdity when it notes that Mr. Alshahhi asked Mr. Grimes to convey to Mr. Barrack that a UAE official would like for the Muslim Brotherhood to be designated by the US President as a foreign terrorist organization.  The government underlines for emphasis that Mr. Grimes responded "[a]t your direction" (Govt Opp. at 42), as though that is an admission that he is an agent of Mr. Alshahhi.  But the context makes clear that Mr. Grimes was doing what he always did, just acknowledging that he would pass that request on to Mr. Barrack.  Mr. Grimes passed messages to Mr. Barrack because that is what Mr. Barrack hired him to do.  And he certainly was not promising that Mr. Barrack could deliver on the request or that he as the 23-year-old assistant at the time could make the President of the United States do anything.

entity does not demonstrate a foreign entity's control any less applicable to the facts of this case. The point is that even if Colony hoped for a profitable relationship from facilitating investment by the UAE, that would not put the UAE in control of Colony or its agents, including Mr. Grimes.

Mr. Grimes also relied upon AO 10/22/20 and AO 7/13/18 which concluded that a journalist or publisher does not become an agent of a foreign person by allowing the foreign person to comment on drafts, so long as they maintain editorial control. The government seeks to distinguish that situation by noting that the conduct alleged here "occurred over many months" and involved more than a single publication (Govt Opp. at 70), but that makes no difference. Mere suggestions do not become directives no matter how many or how frequently they are made. The important point is that Mr. Barrack had final editorial control on whether any changes would be implemented (at least as far as Mr. Grimes was concerned).

The government finds Mr. Grimes' reliance upon AO 9/16/20 "most egregious" (Govt Opp. at 70), but the government and Mr. Grimes are pointing to *two different aspects* of that AO. There, a US journal that compiled information on US decisionmakers and policy topics of its choosing was advised by DOJ that it was not required to register even though the foreign embassies could suggest topics that they wanted covered, so long as the journal would maintain editorial control. That is analogous to the situation here where Mr. Barrack maintained editorial control at all times, irrespective of any input received or whether the UAE found his position helpful.

The AO did contrast that with a different service, explaining that it would create an agency relationship if a foreign subscriber had the "ability to request coverage of a specific topic,

coupled with the [company] agreeing to act upon such a request."[12]   That would essentially involve a foreign entity hiring the Journal to do a research project of its choosing, such that an agency relationship would be established.   But that is not the situation here.   The UAE did not hire Colony (or Mr. Barrack or Mr. Grimes) to do anything.   The UAE may have passed requests to Mr. Barrack through Mr. Grimes, but Mr. Barrack decided what he would do, and Mr. Grimes passed those messages along because his principal (Colony) paid him to do so.   Neither Mr. Grimes nor Mr. Barrack owed any allegiance to the UAE, even though the outcomes sought by the UAE often overlapped with Colony's interests.

Again, these AOs buttress Mr. Grimes' statutory analysis.   He knew that he was the agent of Colony and that it was his job to do what Mr. Barrack asked of him.   If he had read them or been assumed to have access to them, Mr. Grimes would know from the AOs that he would not somehow switch allegiances from Mr. Barrack to the UAE by scheduling calls or delivering messages between them, or by incorporating edits from the UAE into speeches or articles for Mr. Barrack to review and decide whether to include.   Mr. Grimes also would know that he would not become the agent of the UAE if Colony advocated for the same things as the UAE, even if the UAE persuaded Colony that such advocacy was a good idea, or even if Mr. Grimes thought that he or Colony could profit from the relationship with the UAE.   In short, Mr. Grimes was the agent of Colony, he was not the agent of the UAE, and he certainly had no adequate due process notice to believe otherwise.

## IV.   SECTION 951 IS UNENFORCEABLE BECAUSE ITS IMPLEMENTING REGULATIONS ARE VOID

Mr. Grimes explained (Grimes MTD at 24–26) that Section 951 is unenforceable because (i) Section 951(a) only criminalizes conduct that violates the regulations issued under Section

---

[12] DOJ, AO 9/16/20 at 2, https://www.justice.gov/nsd-fara/page/file/1366646/download.

951(b), and (ii) those regulations are invalid because they impermissibly expand the statutory definition of a foreign agent by omitting the "agree[ment]" element set forth in Section 951(d). The government does not deny the "basic tenet that 'regulations, in order to be valid, must be consistent with the statute under which they are promulgated.'" *Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 609 (2013) (quoting *United States v. Larionoff*, 431 U.S. 864, 873 (1977)). The government maintains, however, that "there is nothing inconsistent about the statute and the regulation" because there is supposedly

> no meaningful difference between the definition of "agent of a foreign government" provided in 18 U.S.C. 951(d) ("an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official") and that of an agent who must provide notice under 28 C.F.R. 73.1(a) ("all individuals acting as representatives, or on behalf of, a foreign government or official, who are subject to the direction or control of that foreign government or official").

(Govt Opp. at 78.) According to the government, "[t]he regulation does not omit the concept of an agreement referenced in the statute" because "it uses synonymous language—acting as a 'representative of, or on behalf of,' which necessarily incorporates the identical premise of a mutual agreement, since one cannot actually be a representative or acting on behalf of another without such an agreement." (*Id.*)

The language is not synonymous. As Mr. Grimes explained (Grimes MTD at 25–26), 28 C.F.R. § 73.1(a)'s omission of the "agree[ment]" element means that its definition of a foreign agent is far broader than the statutory definition found in Section 951(d). An individual might unwittingly act "on behalf of" a foreign government without ever having agreed to do so. Someone might, for example, do another person's bidding without realizing that person is a foreign official or is a person acting subject to the direction or control of a foreign official. (*Cf.* Govt Opp. at 20 (arguing that "a person can be convicted of [being] an agent even where they act 'indirectly'"). The government can try to linguistically fill the gap, but the gap exists.

As a fallback position, the government says that, even if the regulation defines a foreign agent more broadly than the statute, there is no problem because someone would have to be a foreign agent under both the regulation *and* the statute "before they could be charged for failing to notify the Attorney General." (Govt Opp. at 79.) If the government is prepared to stipulate that it must prove that Mr. Grimes was an agent as defined in Section 951(d) before he may be convicted under Section 951(a), then, Mr. Grimes will withdraw his objection to enforcement of Section 951(a) based on the discrepancy between the statute and the regulation.

## V.    SECTION 951 VIOLATES THE FIRST AMENDMENT

Mr. Grimes explained (Grimes MTD at 26–32) that Section 951 as applied to him violates the First Amendment because it burdens political speech, acts as a prior restraint, and discriminates between speakers. None of the government's retorts are persuasive.

### A.    Section 951 Unduly Burdens Political Speech

Arguing that "Section 951 does not regulate speech" but instead "regulates conduct" (Govt Opp. at 52), the government suggests that Section 951 does not implicate the First Amendment. But, as applied to Mr. Grimes, Section 951 implicates—and violates—the First Amendment.

Trying to downplay the First Amendment activity at issue here, the government says that "the Indictment charges [Mr. Grimes] not for any particular speech but because he was tasked by UAE officials to conduct the alleged activities." (Govt Opp. at 52 (quotation marks omitted).) That is sophistry. Nearly all of Mr. Grimes' "alleged activities" involved assisting in influencing public opinion and government policy—a core concern of the First Amendment. (*See* Grimes MTD at 27–28.)

Contrary to what the government suggests (Govt Opp. at 52), speech is not deprived of First Amendment protection merely because it is the means by which a crime is committed. This

is illustrated by *United States v. O'Brien*, 391 U.S. 367 (1968), which involved an individual charged with burning his draft card in protest of the Vietnam War. The defendant was indicted under 50 U.S.C. § 3811, an indisputably valid statute penalizing anyone "who forges, alters, knowingly destroys, knowingly mutilates, or in any manner changes" a draft card. The question in *O'Brien* was whether the statute was unconstitutional as applied to the defendant "because his act of burning his [draft card] was protected 'symbolic speech' within the First Amendment." *O'Brien*, 391 U.S. at 376. Rather than hold speech integral to a crime to be categorically excluded from First Amendment protection, the Supreme Court considered whether application of the statute to the defendant "further[ed] an important or substantial governmental interest" that was "unrelated to the suppression of free expression" and whether "the incidental restriction on alleged First Amendment freedoms [wa]s no greater than is essential to the furtherance of that interest." *Id.* at 377. Although the Court ultimately concluded that application of the statute to the defendant was permissible because it "specifically protect[ed]" the "substantial governmental interest" in efficient administration of the draft and there was "no alternative means that would more precisely and narrowly" achieve that interest (*id.* at 381), the salient point here is that the Court subjected application of the statute to First Amendment scrutiny even though the speech at issue was the means by which a crime was committed. If, as the government maintains, speech integral to a crime were outside the First Amendment's protection altogether, there would have been no need for the Court's detailed analysis of why, in its view, application of the statute to the defendant was the most "precise[] and narrow[]" means available to achieve the government's substantial interest in efficient administration of the draft. *Id.*

Notwithstanding its sometimes-broad language, none of the cases cited by the government (*cf.* Govt Opp. at 52–53) are to the contrary. In *Giboney v. Empire Storage & Ice*

*Co.*, 336 U.S. 490 (1949), the speech at issue was designed to incite illegal conduct by a third party. Similarly, in *United States v. Gagliardi*, 506 F.3d 140 (2d Cir. 2007), the defendant's speech was meant to entice a supposed minor to engage in criminal sexual conduct. Here, by contrast, there is no allegation that the political advocacy in which Mr. Grimes was purportedly involved was either intended or likely to induce illegal activity by a third party.

Nor is the government helped by *Dumeisi*, 424 F.3d at 566, an espionage case. To start, *Dumeisi* did not consider a First Amendment challenge to application of Section 951. The passage quoted by the government—that "[e]ven where a person's speech might constitute some evidence of the crime, the content of the speech is entirely irrelevant to the charge" (*id.* at 581 (quoted at Govt Opp. at 50))—was said in response to a sufficiency-of-the-evidence challenge. To the extent the Seventh Circuit addressed the First Amendment at all, it did so in connection with a jury instruction that informed the jury that it could consider articles published by the defendant only as evidence of "motive and intent." *Id.* at 579. Here, there is no indication that government intends to limit its use of Mr. Grimes' alleged political advocacy in the same way. Moreover, the evidence in *Dumeisi* established that the pro-regime articles published by the defendant were published not for purposes of persuasion but as "a means of learning the identity and whereabouts of Opposition members." *Id.* at 571. Furthermore, their publication was merely one aspect of the defendant's wide-ranging covert activity on behalf of Iraq's intelligence agency. *Cf. id.* at 581. Here, by contrast, the charges against Mr. Grimes rest almost entirely on his assisting in alleged political advocacy, which is not alleged to have been anything other than an overt attempt "to influence United States foreign policy." (Dkt. 5 ¶ 79.)

In sum, Mr. Grimes' alleged conduct is nothing like the conduct alleged in *Giboney*, *Gagliardi*, or *Dumeisi*, and there is no merit to the government's contention that his political advocacy falls outside the First Amendment's protections.

## B.     Section 951 Is An Unconstitutional Prior Restraint

The government does not deny that "registration requirements insofar as they are a prerequisite for constitutionally protected speech are a quintessential form of prior restraint." *C.F.T.C. v. Vartuli*, 228 F.3d 94, 109 (2d Cir. 2000) (citing *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969)) (quoted in Grimes MTD at 30). Nor does the government deny that a prior restraint is "presumptively unconstitutional." *Lusk v. Vill. of Cold Spring*, 475 F.3d 480, 486 (2d Cir. 2007) (quotation marks omitted).

Instead, the government argues that Section 951 "cannot be construed as a prior restraint" because the registration requirement that it imposes does not depend on "the content of speech." (Govt Opp. at 55 (citing *Citizens United v. Schneiderman*, 882 F.3d 374, 387 (2d Cir. 2018)).) Not so. "A regulation may constitute a prior restraint even if it is not content-based." *Beal v. Stern*, 184 F.3d 117, 124 (2d Cir. 1999); *accord Urlaub v. Inc. Vill. of Bellport*, 498 F. Supp. 2d 614, 618 (E.D.N.Y. 2007); *see also Hobbs v. Cnty. of Westchester*, 397 F.3d 133, 148 (2d Cir. 2005) (a "prior restraint" is "*any* regulation that 'gives public officials the power to deny use of a forum in advance of actual expression'") (cleaned up; emphasis added).[13]

---

[13] Second Circuit precedent on the issue goes both ways (*see Citizens United*, 882 F.3d at 387 n.5; *United States v. Quattrone*, 402 F.3d 304, 310 n.5 (2d Cir. 2005)), but the better view is that even content-neutral restrictions can constitute prior restraints. Imagine a statute that required all podcasts to be registered before being streamed, or a statute that prohibited the distribution of any written, audio, or visual content until a copy of the work was provided to the Librarian of Congress. Neither statute would be content-based but each would surely run afoul of the First Amendment.

Next, the government asserts that "even if Section 951 were construed to be a prior restraint on speech, and thus subject to strict scrutiny, the statute would" survive such scrutiny. (Govt Opp. at 55.)  Again, not so.  According to the government, Section 951 is "narrowly tailored" to the government's "compelling" interest in "national security" because it is limited "to a relatively discrete group: (1) individuals acting in the United States (2) subject to the direction or control (3) of a foreign government."  (*Id*. at 54–55.)  There are at least two problems with that assertion, aside from the government's back-and-forth on whether Section 951 is narrow or broad, depending on what argument it is rebutting.

First, the fact that Section 951 applies to only "a relatively discrete group" of individuals is beside the point.  The question is not whether Section 951's notification requirement applies to more people than necessary, but whether its application to First Amendment activity is necessary to achieve a compelling government interest.  As Mr. Grimes explained (Grimes MTD at 30–31), requiring Mr. Grimes to notify the Attorney General before engaging in the First Amendment activity he allegedly engaged in is not necessary to achieving any compelling government interest, even one grounded in national security.  The government provides no reason why any concern about speech by foreign agents requires *prior* notification to the Attorney General when FARA, like the Lobbyist Disclosure Act, requires only after-the-fact registration.  *Cf.* 22 U.S.C. § 612(a) (requiring that someone who becomes an agent of a foreign principal must register with the Attorney General "within ten days *thereafter*") (emphasis added); 2 U.S.C. § 1603(a)(1) (requiring paid lobbyists to register "45 days *after* . . . first mak[ing] a lobbying contact" or being employed to do so) (emphasis added).  Nor does the government explain why concern about speech by foreign agents requires prior notification when FARA allows agents of foreign principals to transmit "informational materials" so long as they provide the Attorney General

copies thereof "not later than forty-eight hours *after*" transmittal has begun. 22 U.S.C. § 614(a) (emphasis added).

Second, because "[h]istory teaches us how easily the spectre of a threat to 'national security' may be used to justify a wide variety of repressive government actions" (*In re Washington Post Co.*, 807 F.2d 383, 391 (4th Cir. 1986)), the government cannot rely on generalized "national security" interests to justify Section 951's prior restraint of speech. Rather, the government "must specifically identify an 'actual problem' in need of solving." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011) (quoting *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 822–23 (2000)); *cf. Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 165, 169 (2002) (generalized interest in "the prevention of crime" did not justify registration ordinance when there was no "evidence of a special crime problem" associated with door-to-door canvassing). Moreover, to save a statute from strict scrutiny, "a tenable justification must describe actual state purposes, not rationalizations for actions in fact differently grounded." *United States v. Virginia*, 518 U.S. 515, 535–36 (1996); *cf. Watchtower*, 536 U.S. at 169 (Breyer, J., concurring) (municipality's interest in crime prevention did not save registration requirement from strict scrutiny where "there is no indication that the legislative body that passed the ordinance considered this justification"). Here, the government neither identifies an "actual problem" caused by foreign agents' speech nor cites any legislative history suggesting that Congress enacted Section 951 to address such a problem.[14]

In short, nothing that the government says undermines the conclusion that Section 951 as applied to Mr. Grimes is an unconstitutional prior restraint.

---

[14] *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) (cited in Govt Opp. at 55 n.19) is readily distinguishable on this ground. There, the Court's conclusion that the statute at issue survived strict scrutiny relied heavily on the fact that "Congress made *specific* findings" to justify the challenged speech restrictions. 561 U.S. at 29 (emphasis added).

### C.    Section 951 Constitutes Speaker-Based Discrimination

The government does not deny that Section 951 distinguishes between speakers. (*Cf.* Grimes MTD at 31–32.)  Indeed, it admits that only "a relatively discrete group" is subject to Section 951. (Govt Opp. at 54.)  Despite this, the government insists that Section 951 "does not constitute 'speaker-based discrimination.'" (*Id.* at 53.)  The government is wrong.

According to the government, speaker-based discrimination occurs only when a statute "'reflect[s] the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say).'" (*Id.* at 53 (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 658 (1994)).)  That is not the law.  The First Amendment "stands" not only "against attempts to disfavor certain subjects or viewpoints." *Citizens United v. F.E.C.*, 558 U.S. 310, 340 (2010).  Rather, "[p]rohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others." *Id.*; *accord, e.g.*, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995); *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 784–85 (1978).

A "speaker-based restriction," such as Section 951, "is subject to strict scrutiny and will be tolerated only upon a showing that it is narrowly tailored to a compelling government interest." *Time Warner Cable Inc. v. F.C.C.*, 729 F.3d 137, 155 (2d Cir. 2013). "[T]he government has the burden to establish that the challenged law satisfies strict scrutiny." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021).  For the reasons explained above (*see supra* at Section V.B. at 33) and in Mr. Grimes' opening memorandum (Grimes MTD at 30–32), the government has not established—and cannot establish—that Section 951 is narrowly tailored to a compelling government interest.  The charges therefore violate the First Amendment and must be dismissed.

## VI.    SECTION 951 VIOLATES THE SELF-INCRIMINATION CLAUSE

The government makes short shrift of this argument by relying on an out-of-circuit case that predates the 1984 amendments to Section 951.  (Govt Opp. at 74 (relying upon *United States v. Hung*, 629 F.2d 908 (4th Cir. 1980)).)   Prior to 1984, there was no "legal commercial transaction" exception, and the statute was administered by the State Department and not DOJ, so the statute could be viewed as a "neutral" registration requirement because the bulk of what it captured would be agents engaged in lawful transactions.  But even the same Fourth Circuit later recognized that this new "exception excludes a large category of potential defendants." *Rafiekian*, 991 F.3d at 543.   And by excluding these "legal" activities, the statute no longer remains neutral.  The statute now *exists in Title 18*, it targets those who are engaged in *illegal activity*, and *requires self-disclosure* to the Attorney General, the nation's *top law enforcement officer*.

As noted above, the 1984 amendments specifically narrowed Section 951 to focus on targeting illegal activity, *see supra* Section III.C.1. at 19–21, and that is how DOJ's National Security Division views the statute, at least when it is not addressing this Court.  Before this case, DOJ stated that "a key difference between FARA and 18 U.S.C. §951 is that FARA covers agents of foreign principals who engage in political activity on behalf of that principle, while 18 U.S.C. §951 covers agents of foreign governments who engage in non-political activity, such as 'espionage-lite' or clandestine behavior" and that "[t]he typical conduct to which Section 951 applies consists of espionage-like behavior, information gathering, and procurement of technology, on behalf of foreign governments or officials."  OIG Audit at App. 3.  DOJ later reiterated this conclusion:

> FARA is designed to encourage transparency by foreign principals attempting to influence the U.S. government or public through public speech, political activities, and lobbying through agents in the United States, not to discourage that

conduct itself, [while] Section 951 ... is used to prosecute clandestine, espionage-like behavior, information gathering, and procurement of technology on behalf of foreign governments or officials. Although Section 951 requires notification to the Attorney General, the statute is designed to deter and punish wrongful conduct (namely, engaging in clandestine conduct on behalf of a foreign power). . . .

Section 951 is designed to punish and deter criminal, espionage-like behavior, and the Department uses Section 951 to reach serious criminal conduct such as espionage-like activities (e.g., the Russian "Illegals" prosecution) or acting as a procurement agent for foreign governments in order to evade U.S. export controls or sanctions.

*Oversight of the Foreign Agents Registration Act and Attempts to Influence U.S. Elections: Lessons Learned from Current and Prior Administrations*, U.S. Sen. Comm. on the Judiciary 2, 6 (2017) (statement of Adam S. Hickey, Deputy Assistant Att'y Gen., Nat'l Sec. Div., DOJ). Thus, Section 951 now targets those who are agents of foreign government who are doing things that would not fall withing the "legal commercial transaction" exception, in other words, things that are likely illegal.

The government also overstates the cases that invalidated similar registration schemes as involving "inherently illegal underlying conduct." (Govt Opp. at 75.) Mr. Grimes explained that with respect to each case that he cited, the Supreme Court invalidated the registration requirement even though registration would not necessarily be an admission of criminal liability. (Grimes MTD at 32–35.) Those registration schemes target people likely engaged in criminal behavior, but registration was not always (inherently) indicative of a crime. The very purpose of Section 951 is to require notification to the Attorney General (after the 1984 amendments) of the pool of people most likely to engage in unlawful espionage activities on behalf of a foreign government (and excluding those in "legal commercial transactions"). The government itself seems to acknowledge that admitting a person's status as an agent is what courts call a "significant 'link in a chain' of evidence" because that is often difficult for the government to prove. *Marchetti v. United States*, 390 U.S. 39, 48 (1968). As the government explains foreign

agents "try to obscure their relationship with the foreign government, and typically avoid memorializing that relationship in an agreement like a contract, because neither the agent nor the foreign government want their agreement to come to light." (Govt Opp. at 24.) While that is no doubt true and may complicate evidence gathering, the Self-Incrimination Clause of the Fifth Amendment precludes the government from compelling such self-disclosures as part of a registration system.

## VII.  CHARGING DEFECTS REQUIRE DISMISSAL

### A.  Count 1 Should Be Dismissed As Duplicitous

The government's response here is not responsive. It argues that aiding and abetting is embedded in every substantive count (Govt Opp. at 34), but that is not why Mr. Grimes challenged Count 1 as duplicitous. Rather, he challenged it because it alleges multiple crimes. "Mr. Grimes could be found guilty on Count 1 if (a) he acted as an agent without registering, or (b) if he aided and abetted Mr. Barrack in doing so, or (c) if he aided and abetted Mr. Alshahhi in doing so." (Grimes MTD at 37–38.) The government does not and cannot deny that is three separate charges in a single count. Hence, it is duplicitous and should be dismissed.

### B.  Count 1's Aiding-And-Abetting Theory And The Conspiracy Charged In Count 2 Fail To Allege Required Specific Intent And Should Be Dismissed

Mr. Grimes established that the conspiracy and aiding and abetting charges require the government to prove criminal intent and, therefore, that he knew Mr. Barrack and Mr. Alshahhi were required to register under Section 951. That knowledge, however, is not alleged anywhere in the indictment. The government nonetheless dismisses the argument as "a challenge to the sufficiency of the government's evidence, rather than the sufficiency of the language in the Indictment." (Govt Opp. at 36.) Not so. Mr. Grimes is challenging the fact that his knowledge of Mr. Barrack and Mr. Alshahhi having a duty to register under Section 951 is not charged in

the indictment, so there is no basis for finding that he had the requisite criminal intent to conspire or aid and abet them in not registering.  Absent this finding in the indictment by the *grand jury*, the government cannot make this an evidentiary issue at trial for a *petit jury.*

### C.  Conspiracy Prosecutions Under Section 951 Are Not Authorized

Section 951 itself requires an agreement among two or more people, which would be a conspiracy, so Wharton's Rule dictates a "judicial presumption" that Congress would not have intended that the general conspiracy statute apply to this same crime.  *Ianelli v. United States*, 420 U.S. 770, 782 (1975).  It is true that this presumption is sometimes overcome (or a showing of an additional third-party is required), but the government talks out of both sides of its mouth in seeking to overcome that presumption here.  Now the government tells us that violations of Section 951 "implicate national security concerns" with "significant consequences on society" (Govt Opp. at 39), but it is hard to see how that is consistent with the government's earlier claim that it is a "neutral" registration scheme that says nothing about criminal behavior and may involve "entirely legal activity."  (Govt Opp. at 75.)  Whichever view of Section 951 the Court chooses to accept, Mr. Grimes has provided the Court with a reason to dismiss the indictment.

### D.  The Indictment Indicates No Basis For Venue In This District

The government's response simply does not address that there are two different counts, each requiring its own basis for venue, and that its view that some act in the alleged conspiracy in Count 2 occurred within "the Eastern District" does not bootstrap the need for a footing in Count 1.  Failure to register is usually charged where the omitted filing should have been made or, at the very least, where the defendant engaged in some overt act in connection with that failure to register.  (*See* Grimes MTD at 42.)  To hold otherwise would essentially give

government free choice of tribunal, which as the Supreme Court noted in *Travis v. United States*, 364 U.S. 631, 634 (1961), is not appropriate.

## CONCLUSION

The indictment against Mr. Grimes should be dismissed.


Dated: March 14, 2022                    Respectfully submitted,

/s/ *Abbe David Lowell*
Abbe David Lowell                        Sofia Arguello
Christopher D. Man                       Johanna Hudgens
Andrew E. Tauber                         WINSTON & STRAWN LLP
WINSTON & STRAWN LLP                     200 Park Avenue
1901 L Street, NW                        New York, NY 10166
Washington, DC 20036                     SArguello@winston.com
ADLowell@winston.com                     212-294-6700 (ph)
202-282-5000 (ph)                        212-294-4700 (fax)
202-282-5100 (fax)


*Counsel for Defendant Matthew Grimes*

**CERTIFICATE OF SERVICE**

I certify that on March 14, 2022, a copy of the foregoing was filed with the Court's electronic case filing system, thereby effecting service on counsel for all parties.

/s/ Abbe David Lowell
Abbe David Lowell